## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BLITZ U.S.A., Inc., *et al.*,[1] | ) | Case No. 11-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROCKY FLICK, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF BLITZ U.S.A., INC., IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Rocky Flick, hereby declare under penalty of perjury:

1.     I am the President and Chief Executive Officer of Blitz U.S.A., Inc. ("***Blitz***"), a corporation organized under the laws of the State of Oklahoma and one of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***" or "***Blitz***"). I have been employed by the debtors for over 20 years and have held the position of Chief Executive Officer since 2007.

2.     I graduated with a bachelor's degree in business and Spanish, and received a Masters in Business Administration (MBA) from Kansas State University. I joined Blitz as a salesman in 1988 from Rubbermaid Specialty Products. While at Rubbermaid, I held various positions including Marketing Research Specialist, Customer Service Manager, Marketing Manager and Vice President of Marketing. In my tenure at Blitz I have held various positions on the management team, including Vice President of Sales and Marketing and Vice President/General Manager. I was named President of Blitz in 1998 and, in 2007, I was named

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: LAM 2011 Holdings, LLC (8742); Blitz Acquisition Holdings, Inc. (8825); Blitz Acquisition, LLC (8979); Blitz RE Holdings, LLC (9071); Blitz U.S.A., Inc. (8104); and F3 Brands LLC (2604). The location of the Debtors' corporate headquarters and the Debtors' service address is: 404 26th Ave. NW Miami, OK 74354.

the Chief Executive Officer.  In my capacity as Chief Executive Officer, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

3.     On the date hereof (the "***Petition Date***"), Blitz and five of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

4.     I submit this declaration (the "***First Day Declaration***") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "***First Day Motion***," and collectively, the "***First Day Motions***").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

5.     Since its early beginning in 1966, Blitz and its predecessors have been successfully producing portable fuel containers for consumer use.  Today, with more than 150

---

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

million units currently in circulation, Blitz accounts for approximately 70% of the market share in the United States in the portable fuel containment and storage industry.

6.     For the past 45 years, Blitz has operated profitably with minimal interruption from litigation.  Approximately three years ago, Blitz began to experience an uptick in litigation with approximately four to seven new cases filed against Blitz each year.  Although Blitz has been able to successfully manage its litigation exposure and associated defense costs during the past several years, following a 2010 Utah State jury verdict and several plaintiff-friendly settlements involving Blitz's insurance carriers, Blitz has become the subject of an increased influx of lawsuits.  Indeed, as many as 22 new cases have been filed against Blitz since March, 2011, for a total of 36 pending lawsuits.  This litigation has undermined Blitz's public image as a producer of essential consumer products that are safe when used correctly and publically called into question Blitz's commitment to safety.  With a self-insured retention ("*SIR*") of $1 million per occurrence, Blitz is now forced to divert all net operating cash flows after debt service to fund SIR payments.  Thus, Blitz was forced to commence these cases to obtain a much needed breathing spell from its pending litigation and provide Blitz with a unified forum in which to defend these claims.

7.     Blitz intends to utilize the chapter 11 process to fully and finally litigate the many lawsuits pending in various jurisdictions across the country and reorganize as a healthy company without the burdensome weight of litigation.  Notably, in affirmation of its sound business model and profitable operations, Blitz's largest creditor and prepetition secured lender, the Bank of Oklahoma, has consented to Blitz's use of cash collateral and has agreed to provide Blitz with the necessary liquidity to utilize chapter 11 to effectively defend and discharge its litigation exposure.  In addition, Blitz has discussed its position with Wal-Mart Stores – Blitz's largest

customer and a co-defendant in 11 lawsuits currently pending as of the date hereof – and Wal-Mart supports Blitz's reorganization efforts in these chapter 11 cases.[3]

8.       With the help of the chapter 11 process and its major stakeholders, Blitz will seek to effectively manage its litigation exposure, negotiate with its creditors and re-assure the general public that, despite what they may hear, Blitz is committed to safety and will continue to provide a much needed product in a safe manner for many years to come.  Indeed, without a continuous supply of government-regulated safety-tested fuel storage containers, the general public may resort to extremely unsafe fuel storage practices, such as storing gasoline in milk cartons and other unsafe containers.  The harm to the general public of such a result would be immense.  Thus, it is critical that Blitz emerge from these chapter 11 cases as a strong company that will continue to produce quality gas cans for many years to come.

## I.       General Background.

### A.       Blitz's Business Operations and Corporate Structure

9.       As noted above, Blitz and its predecessors have been leading producers of fuel storage and fuel transportation products for more than 20 years.  Blitz is the ultimate successor to U.S. Metal Container, a company that manufactured the traditional olive-drab jerry can for sale to the U.S. military throughout World War II.  In the late 1960s, U.S. Metal Container painted its traditional five-gallon gas can bright red and started selling the product to retailers across the country, including Wal-Mart and Sears.  By the mid-1980s, the gas container market had shifted away from metal and towards plastic.  In 1987, U.S. Metal Container developed its first line of

---

[3]    Blitz is also seeking to extend the automatic stay, pursuant to section 105 of the Bankruptcy Code, to protect Wal-Mart and avoid distraction to Blitz during its chapter 11 cases.  Indeed, as outlined in the Debtors' motion to extend the automatic stay that was filed concurrently herewith, Blitz is obligated to indemnify Wal-Mart for any liability associated with the pending lawsuits against Wal-Mart and a continuation of those lawsuits would necessarily involve and distract Blitz's management team from its reorganization efforts.

4

plastic gas cans for sale to the general public. For the next few years the company sold fewer and fewer metal gas cans until the company's name, U.S. Metal Container, no longer fit its predominant product line. Consequently, in 1992, U.S. Metal Container changed its name to Blitz U.S.A., Inc. Throughout the 1990s, Blitz successfully grew its market share in plastic gas containers. Today, with its headquarters in Miami, Oklahoma, the original home town of U.S. Metal Container, Blitz employs over 250 employees, achieves annual sales of approximately $80 million and has an annual adjusted EBITDA of approximately $6 million.



**Classic "Blitz" Can:** Tradition meets innovation with the modern 5 Gallon bright red jerry can.

10.    Prior to 2007, Blitz was a family-owned company and was owned by Crestwood Holdings, Inc. ("***Crestwood***"). On September 12, 2007, Blitz Acquisition, LLC, , a Delaware limited liability company ("***Blitz Acquisition***"), purchased Blitz (the "***2007 Tranasction***")[4]. Blitz's current corporate structure is depicted in the below chart:

---

[4]    Blitz Acquisition's parent is Blitz Holdings, LLC, which was renamed LAM Holdings, LLC ("***LAM***") on April 12, 2011. LAM's majority shareholder is Kinderhook Capital Fund II, L.P. (see Paragraph 25).



11.     Pursuant to the 2007 Transaction, Blitz Acquisition purchased all of the outstanding stock of Blitz from the shareholders of Crestwood.  Contemporaneously therewith, Blitz RE Holdings, LLC ("***Blitz RE***"), a Delaware limited liability company and wholly-owned subsidiary of Blitz Acquisition, purchased certain parcels of real property and improvements, which house Blitz's manufacturing facilities and corporate offices, from RELCO, Inc., a company owned by the shareholders of Crestwood.  Pursuant to a lease agreement dated as of October 1, 2011, Blitz leases certain real property and the buildings located on such property from Blitz RE.

12.     In 2009, in an effort to expand and diversify its product line Blitz acquired the rights to a line of organization and lawn and garden products under the brand name "2x4 Basics."  In early 2011, Blitz began contemplating a spinoff of its non-gas can product lines, which included the 2x4 Basics products as well as certain other automotive maintenance products produced by Blitz.  In October, 2011, Blitz formally spun off these additional product

RLF1 5563729v. 5

lines into F3 Brands LLC ("*F3*") which is now a wholly-owned Blitz subsidiary and debtor in these cases.

13.    Blitz's decision to separate the F3 brands from its core gas can business stemmed from a desire to consolidate its operations and return to its roots, allowing F3 room to grow and flourish as an independent entity.  Additionally, as its own entity, F3 can establish its own brand identity, making it easier for Blitz to utilize the chapter 11 process to market and sell F3. Because the formal separation of F3 and Blitz occurred very recently, the two companies share many of the same attributes, including a similar customer base and corporate structure.  F3 is also headquartered in Miami, Oklahoma, and Blitz RE also owns the real property that houses F3's facilities.  As is the case with Blitz, F3 leases these facilities from Blitz RE.

14.    In early 2011, to further increase its market reach and diversify its revenue streams, Blitz purchased Reliance Products, Inc. and its affiliates (collectively "***Reliance***"). Today, the Reliance entities are affiliates of Blitz that are wholly owned by Blitz Acquisition Holdings, Inc. and are not debtors in these cases.  Reliance manufactures two core product lines, a line of consumer camping hydration and sanitation products (representing approximately 1/3 of Reliance's business) and a line of specialized bottles used for the storage of concentrated agricultural chemicals (representing approximately 2/3 of Reliance's business).  Blitz initially acquired Reliance with plans to integrate the manufacturing of certain Reliance products into its product line -- specifically the chemical storage bottles which are manufactured through a similar process as Blitz gas cans and are subject to similar government regulations and standards. Today, Reliance's management team and manufacturing facilities are primarily located in Winnipeg, Canada and Blitz has halted any plans for integration.

7

**B.** **Safety Initiatives.**

15.     Blitz is sensitive to the fact that storing and transporting fuel is an inherently dangerous activity.  Although safe when used correctly, misuse of a Blitz gas container could potentially result in property damage, serious injury and even death.  Because of the dangers inherent in the misuse of Blitz's product, Blitz is committed to promoting awareness of safety and proper use of gasoline storage containers.  To this end, Blitz has spent over $1 million on safety initiatives to date.

16.     Blitz's safety initiatives include embossing safety warnings and placing stickers regarding safety on its products, partnering with Shiners Hospitals for Children burn awareness and prevention efforts and supporting several interactive websites aimed at preventing gas fires and burns.  These websites include www.stopgasfires.org, www.realmenrealfires.com and www.burnawarenessweek.org.  Recently, The National Gasoline Safety Project, an outreach of the Portable Fuel Can Manufacturers Association (of which Blitz is a member) has also placed hangtags on new portable gasoline fuel containers sold in the United States, including Blitz's products, to "remind parents that gas and fire never mix."  The tags prominently feature firefighters and invite the purchaser to visit the www.stopgasfires.org website.

17.     In addition, Blitz has funded research through Salter Mitchell, a leading consumer research firm, on consumer gasoline behaviors and ending unsafe gasoline practices.  Finally, consumers who visit Blitz's main company website www.blitzusa.com, find "Safety Awareness" as one of websites main pages.  While Blitz stands behind the safety of its product when used correctly, Blitz is dedicated to eradicating unsafe misuse of gasoline storage containers and preventing harm caused through such misuse.

18.     In addition to Blitz's internal commitment to safety and gasoline fire awareness, Blitz is subject to and maintains compliance with various state and federal regulations and safety

standards. Specifically, Blitz's gas containers are manufactured in accordance with standards promulgated by the American Society for Testing and Materials ("**ASTM**"), including ASTM F852 (Standard Specification for Portable Gasoline Containers for Consumer Use) and ASTM F839 (Standard Specification for Cautionary Labeling of Portable Gasoline Containers for Consumer Use). In addition, Blitz's facilities are subject to regular inspections by independent contractors employed by ASTM to ensure compliance with portable gasoline container standards. These inspections are random and unannounced. Finally, Blitz complies with ASTM standards for cautionary labeling and spill resistance, as well as EPA regulations regarding emissions, self-venting spouts and closure requirements.

### C. Insurance Coverage.

19. Blitz's insurance coverage is an essential aspect of Blitz's business and the ability to maintain such insurance coverage throughout Blitz's chapter 11 cases is crucial to Blitz's ability to reorganize. Blitz currently maintains insurance with Federal Insurance Company under a policy (the "**Federal Policy**") that provides coverage with respect to directors and officers liability, employment practices liability, fiduciary liability, crime non-liability, and kidnap, ransom and extortion non-liability. The Federal Policy provides claims-made coverage for the period from October 1, 2011 through October 1, 2012. Under the Federal Policy, (a) the directors and officers liability coverage has an aggregate limit of liability of $7 million with a per-claim retention amount of $25,000, (b) the employment practices liability coverage has an aggregate limit of liability of $4 million with a per-claim retention amount of $20,000, (c) the fiduciary liability coverage has an aggregate limit of liability of $3 million with no applicable retention, (d) the crime coverage has an aggregate limit of liability of $2 million with a per-claim retention amount of $5,000 and (e) the kidnap and ransom coverage has an aggregate limit of liability of $2 million with no applicable retention. No retention amount applies to any

non-indemnifiable loss of the company's executives or employees under any liability coverage.

20.	In addition to the Federal Policy, Blitz has also historically maintained, and continues to maintain, commercial liability coverage.  For the current policy year of July 31, 2011 through July 31, 2012, Blitz maintains a total of $63 million in commercial liability coverage under five insurance policies.  Blitz's current commercial liability insurance coverage is subject to a retention amount of $1 million per claim.  Over the past five years, Blitz's commercial liability insurance limits have ranged from $37 million (for policy years 2006-2009) to $63 million (for policy years 2010-2012).  During that same time period, Blitz's primary commercial liability policies have contained deductibles or self-insured retention amounts ranging from $25,000 to $1 million.  The increase in liability insurance limits and retention amounts is demonstrative of Blitz's increasing exposure to tort litigation.  As described more fully below, Blitz must maintain its insurance policies in order to successfully reorganize and exit chapter 11 as a viable entity.

## II.	The Debtors' Prepetition Capital Structure.

21.	As of the Petition Date, the Debtors have outstanding debt obligations in the aggregate principal amount of approximately $66.5 million, consisting primarily of approximately (a) $41 million in senior debt under the senior secured credit facility, (b) $22 million in unsecured subordinated promissory notes and (c) $3.5 million of other debt.

### A.	Senior Secured Credit Facility.

22.	The Debtors' first lien prepetition funded secured debt obligations arise under that certain First Amended and Restated Credit Agreement, dated February 4, 2011, among Blitz Acquisition, LLC, Blitz U.S.A., Inc. and Blitz RE Holdings, LLC as borrowers (collectively, the "***Petition Borrowers***"), Blitz Acquisition Holdings, Inc. as guarantor (the "***Prepetition Guarantor***"), F3 Brands LLC as guarantor (the "***Additional Guarantor***" and together with the

Prepetition Guarantor, the "***Prepetition Guarantors***"), LAM 2011 Holdings, LLC (f/k/a Blitz Holdings, LLC) as parent, the Lenders party thereto (the "***Prepetition Lenders***") and BOKF, NA d/b/a Bank of Oklahoma as administrative agent ("***BOK***") (as amended, supplemented, restated or otherwise modified from time to time, collectively "***Prepetition Credit Facility***"). The Prepetition Credit Facility consists of approximately $22 million outstanding under a prepetition term loan facility (including outstanding letters of credit) (the "***Prepetition Term Loan***") and approximately $19 million outstanding under a prepetition revolver facility (the "***Prepetition Revolver***"). All obligations under the Prepetition Credit Facility were secured by a first priority security interest in substantially all of the Prepetition Borrowers' and Prepetition Guarantors' assets. Absent acceleration, amounts due under the Prepetition Term Loan and Prepetition Revolver are due by February 4, 2016, while portions of the Prepetition Term Loan are due in 2013 and the remainder in 2014. Amounts owing under the Prepetition Term Loan and Prepetition Revolver bear interest equal to the Adjusted LIBOR Rate plus 2.25-3.75% (per adjusted EBITDA) per anum.

###     B.     Unsecured Debt.

23.     In connection with the 2007 Transaction, Blitz Acquisition Holdings, Inc., a Delaware corporation and the direct parent of Blitz Acquisition, issued two unsecured subordinated promissory notes (the "***Subordinated Promissory Notes***") to Crestwood, which were amended and restated in connection with the negotiation of the Senior Secured Credit Facility, each for an initial principal amount of $11,103,340.49 (for a total of $22,206,680.98) -- all of which was outstanding as of the Petition Date. In addition to the Subordinated Promissory Notes, Blitz estimates that it owes approximately $3.5 million to legal counsel across the country for defense costs associated with the prepetition litigation.

RLF1 5563729v. 5

C. **Equity Ownership.**

24.     The following chart depicts the holders of equity interest in LAM 2011 Holdings, LLC, Blitz's ultimate parent company:

| Members | Class A Common Units | Class B Common Units | Class C-1 Common Units | Class C-2 Common Units | Total Common Units |
|---|---|---|---|---|---|
| **LAM 2011 Holdings, LLC Members Schedule (as of October 24, 2011)** | | | | | |
| Kinderhook Capital Fund II, L.P. | 24,000,000 | | | | 24,000,000 |
| Other Holders | 2,656,000 | 1,880,660 | 2,212,541 | 1,153,017 | 7,902,218 |
| **Total** | **26,656,000** | **1,880,660** | **2,212,541** | **1,153,017** | **31,902,218** |

III.    **Events Leading to these Chapter 11 Cases.**

A.     **Prepetition Litigation.**

25.     As noted above, Blitz has recently become the subject of over thirty-six lawsuits alleging, among other things, certain product deficiencies. The allegations in these cases are generally that a Blitz brand plastic gas container exploded when the claimant poured gas on a fire or on embers to start a fire. Claimants allege that when gas is poured from the container on or near a flame, gasoline vapors outside the portable gasoline container ignite and the flame follows the vapor trail back inside the container causing it to explode. Claimants allege that these explosions would be eliminated through the use of a metal flame arrestor,[5] and they also allege that the plastic resins used in Blitz's containers are substandard, and that quality control testing is inadequate, thereby weakening the can and making an explosion more likely. In addition, other

---

[5]     No other manufacturer of similar fuel containment products in the United States use metal flame arrestors in their products. Metal flame arrestors pose various risks of their own.

cases concern individuals who were injured when a Blitz fuel container was opened around flames or other combustion sources.

26. The consequences of these lawsuits have been disastrous for Blitz's business. To date, Blitz has tried two cases to verdict, one of which resulted in a verdict for the defense, and one of which resulted in a multi-million dollar verdict against Blitz. Additionally, in recent years, Blitz's insurance carriers settled several lawsuits in excess of $1 million each. These settlements forced Blitz to shop for new insurance, ultimately requiring it to pay higher deductibles. Today, Blitz carries a $1 million deductible, or self insured retention, on each of the approximately 36 lawsuits pending against the company. Blitz expects that the cost of defending against the currently pending lawsuits to exceed $30 million, a debilitating expense for a company with $6 million in annual EBITDA. In addition, Blitz anticipates that it will be subject to more lawsuits in the future, adding to its already overwhelming financial burdens.

27. Of the 36 pending lawsuits, 11 also name Wal-Mart, Blitz's largest customer, as a defendant. Blitz has an obligation to indemnify Wal-Mart for certain claims pursuant to a Supplier Agreement, dated March 11, 2010. In addition, Wal-Mart is an insured under Blitz's commercial liability insurance policies. Blitz is seeking to extend the automatic stay set forth in section 362 of the Bankruptcy Code to stay the litigation against Wal-Mart during the pendency of its chapter 11 cases and, on the date hereof, filed a motion requesting such relief in this Court. This relief is essential to Blitz's reorganization efforts because, if litigation is allowed to proceed only against Wal-Mart, coverage otherwise available to Blitz could be depleted in defending or settling matters for Wal-Mart which could be defended or settled on behalf of both Blitz and Wal-Mart.

RLF1 5563729v. 5

28.    Although the Debtors' business model is sound and, under normal circumstances, profitable, the Debtors cannot continue to support the enormous costs associated with defending against 36 separate lawsuits.  Indeed, the Debtors monthly spend on defense costs is over $1 million.  In addition, the Debtors' insurance carries a $1 million deductible, or self-insured retention, on a per-case basis, and insurance coverage is limited.  Because of the cost of defending against the pending litigation, the Debtors are in violation of certain covenants under the Senior Secured Credit Facility.

**B.    The Debtors' Prepetition Restructuring Negotiations.**

29.    The overwhelming financial burdens stemming from the Debtors' prepetition litigation and associated defense costs made it increasingly difficult for the debtors to service their debt obligations.  Specifically, the Debtors were at risk of violating certain EBITDA and other covenants on their Senior Secured Credit Facility.  On October 4, 2011, the Debtors entered into a forbearance agreement with the BOK, under which the BOK agreed to forbear from exercising their contractual and legal rights and remedies with respect to the Debtors' defaults.  This forbearance agreement expired on October 31, 2011 and was extended by the BOK though the date hereof.

30.    Although Blitz is currently working with Congress to obtain favorable legislation that would limit its exposure to similar litigation in the future, and make it easer to defend such litigation, the benefit of these efforts will take time.  Given the immense costs associated with Blitz's prepetition litigation, legislative change cannot occur quickly enough to salvage Blitz's current operations.  To that end, after careful review, the Debtors, in consultation with their advisors, determined that a chapter 11 filing, combined with removal of the pending litigation against the Debtors to Delaware, was the best and most efficient way to maximize a return for

RLF1 5563729v. 5

the Debtors, their estates, and all parties-in-interest.  Through a chapter 11 filing, the Debtors can efficiently and effectively defend against the outstanding litigation.

**IV.     Evidentiary Support for First Day Motions.**[6]

31.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

**A.     Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "*Joint Administration Motion*").**

32.     The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of Blitz U.S.A., Inc. and also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than Blitz U.S.A., Inc., to reflect the joint administration of these chapter 11 cases.

33.     Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will

---

[6]     Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

arise in these chapter 11 cases will jointly affect Blitz U.S.A., Inc. and each of its affiliates that also have filed chapter 11 cases. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

34.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Debtors' Motion for Entry of an Order (1) Authorizing the Debtors to (A) Continue Using the Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms, and (C) Continue Intercompany Arrangements and (2) Granting Intercompany Claims Administrative Priority (the "*Cash Management Motion*").**

35.     The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor in possession accounts, if needed; (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; and (e) continue performing Intercompany Transactions in the ordinary course of business.

36.     In addition, the Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts; and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank

Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

37.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions. If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

38.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

39.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

17

the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

      **C.**    **Debtors' Motion for Entry of an Order Authorizing the Payment of Prepetition (A) Wages, Salaries, and Other Compensation; and (B) Pay And Honor Obligations Relating To Employee Medical, Insurance And Other Benefits Programs (the "*Wages and Benefits Motion*").**

    40.    The Debtors request entry of interim and final orders authorizing the Debtors to, among other things, (a) pay prepetition wages, salaries and other compensation, taxes, withholdings and related costs and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance and other benefits programs; and (c) continue their employee medical, insurance and similar benefits programs on a postpetition basis.

    41.    As of the Petition Date, the Debtors employ approximately 250 employees, all of whom are paid on a salaried basis based upon a 40-hour week. The Debtors also supplement their workforce by utilizing approximately 20 temporary employees, all of whom are paid on an hourly basis and approximately 20 independent contractors. Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for employees may nevertheless be due and owing.

    42.    As described in the Wages Motion, the Debtors also provide employee medical, insurance and other benefits programs for the benefit of full-time employees, including medical, dental and vision care coverage, a flexible spending account, vacation time and 401(k) matching. Although the Debtors are current with respect to any payments or premiums on account of

employee benefit programs, as of the date hereof, certain prepetition obligations related to employee benefits may nevertheless be due and owing.

43.     Additionally, I believe the majority of the Debtors' employees, temporary employees and independent contractors rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these individuals will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is needed most.  In the absence of such payments, I believe the Debtors' employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, hindering the Debtors' ability to meet their customer obligations and likely diminishing creditors' confidence in the Debtors.  Moreover, the loss of valuable employees and the recruiting efforts that would be required to replace such employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.  Finally, I believe it is essential that the Debtors pay their independent contractors. The independent contractors are vital to the Debtors' operations and success as these individuals are traveling salespersons promoting sales of, and providing exposure to, the Debtors' products.

44.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

RLF1 5563729v. 5

**D.** **Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Prepetition Insurance Coverage (the "*Insurance Motion*").**

45.     The Debtors request authority to continue insurance coverage currently in effect and pay any prepetition amounts related thereto, including prepetition deductibles and self-insured retentions and payments on account of the Financed Policies.

46.     The Debtors' insurance policies are essential to the preservation of the value of the Debtors' business, properties, and assets.  In many cases, insurance coverage such as that provided by the Insurance Policies is required by the diverse regulations, laws, and contracts that govern the Debtors' commercial activities.  Failure to make the payments required by the Debtors' Insurance Policies, including the Financed Policies, could have disastrous effects on the Debtors' attempts to restructure in chapter 11.  Indeed, termination of the Insurance Policies due to any such non-payment likely would deprive the Debtors of the ability to operate their business under the laws of the states in which the Debtors conduct business.

47.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**E.** **Debtors' Motion for Entry an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "*Taxes and Fees Motion*").**

48.     The Debtors request authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date.  In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various authorities.  The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases.  Specifically, the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business

20

operations because the authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to the Debtors' restructuring.

49.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**F.      Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "*Utilities Motion*").**

50.     The Debtors request the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; and (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order.

51.     In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by four utility providers. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even

for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

52.     I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance are necessary in these chapter 11 cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

53.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**G.     Debtors' Motion For Entry of Interim and Final Orders Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Prepetition Obligations Related Thereto (the "*Customer Programs Motion*").**

54.     The Debtors request the authority to maintain and administer customer programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice.

55.     To maintain the loyalty and goodwill of their customer base (each a "***Customer***"

and collectively, the "***Customers***"), in the ordinary course of business the Debtors implemented Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure that the Debtors remain competitive. The Customer Programs, which are implemented and modified from time to time in the ordinary course of business, range in scope from volume rebates to trade promotions. I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of our business, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.

56.     In addition, the Debtors would not be the only party to suffer if the chapter 11 process impaired their long-standing relationships with Customers. The Customers and consumers of the Debtors' gas containers would also be negatively impacted. The Debtors' next largest competitor only accounts for 20% of the market for gas containers. Even if Customers were to look to the Debtors' competitors to manufacture gas cans to meet demand unfilled by the Debtors, it is unlikely that any competitor would have the capacity to fill such demand and definitely would be unable to offer the cost advantages provided by the Debtors' Customer Programs.

57.     In addition, it is my belief that failure by the Debtors to honor certain of the Customer Programs may violate terms agreed upon between the Debtors and their Customers. The Debtors have supplier agreements in place with many of their Customers that set forth the standards and terms to which the Debtors must adhere when supplying gas containers to their Customers. These supplier agreements form the basis of the Debtors' customer programs and, if violated, could severely impede the Debtors' ability to sell their containers. As such, the Debtors intend to continue the following Customer Programs during these chapter 11 cases.

58.     In the ordinary course of business, and as agreed upon in individual supplier agreements, the Debtors offer certain volume rebates to their Customers (the "**Volume Rebates**").  Such Volume Rebates are granted to customers whose shipment activity or revenue levels reach a certain threshold.  The amount of the Volume Rebates accrued at any given time varies based on the number and size of the shipments and the previously agreed upon Volume Rebates.  The determination and payment of the Volume Rebates are calculated on a monthly basis while taking into account past business levels.  The Debtors' obligations with respect to Volume Rebates vary from month-to-month and are calculated in arrears.  The Debtors believe that Customers consider the Volume Rebates when calculating the net cost of the Debtors' gas containers.  As a result, the Debtors' failure to pay the Volume Rebates would result in higher net prices, thereby dissuading customers from using the Debtors' services in the future, and potentially causing them to utilize the Debtors' competitors, virtually all of which have similar programs.

59.     In addition, as set forth in detail in each of the individual supplier agreements, the Debtors agree to participate in certain Customers' promotions and advertising, including store circulars, media advertisements, and sponsorship of certain Customer events (collectively, the "**Trade Promotions**").  Trade promotions have a long history in the consumer goods industry. The Debtors and their Customers typically agree in advance as to how to use the funds. Although the terms of the Trade Promotions vary by Customer, the overall principle of these programs is the same.  Customers deduct the cost of the Trade Promotions from the cost of an applicable shipment of the Debtors' containers.

60.     During the fiscal year 2011, the Debtors estimate that the aggregate cost of the

Volume Rebates and Trade Promotions was $4.3 million. As of the Petition Date, the Debtors believe that they owe $1.8 million on account of the Volume Rebates and Trade Promotions.

(ii)     Manufacturing Warranties.

61.     As manufacturer of the red plastic jerry cans and other products for sale by over 175 Customers, the Debtors provide a product liability warranty to the consumers of the containers (the "***Manufacturing Warranties***"). The Debtors provide a one-year limited warranty as required by law. Consumers reach out directly to the Debtors to request replacement parts or whole containers through the Manufacturing Warranties. If the Debtors failed to honor the Manufacturing Warranties, penalties for breaching the Manufacturing Warranties could include customer product liability claims and product recalls initiated by the Debtors, retailers or government regulators. Per year, the Debtors receive only a few requests for replacement parts or products on account of the Manufacturing Warranties. As such, the aggregate costs of maintaining and honoring the Manufacturing Warranties is *de minimis*. Accordingly, the Debtors seek authority to continue to honor the Manufacturing Warranties in the ordinary course of business, whether arising prepetition or postpetition, consistent with past practices.

(iii)     Return Obligations.

62.     The Debtors' Customer Programs include ordinary course return obligations with their various Customers (the "***Return Obligations***"). Consistent with standard industry practice, the Debtors accept returns of their product related to quality issues, such as mislabeling or damaged product. In certain circumstances, the Debtors also accept the return of unsold containers. Often times, however, the Debtors will attempt to mitigate their costs of unsold products by engaging in markdown promotions. Before new models of gas cans are released, the Debtors will provide cash to enable the Customer to lower the price of older models and

25

induce Consumers to buy the older products. In addition, the Debtors, as part of their supplier agreements have built in a fixed return allowance (the "**Return Allowance**") with certain of their Customers. A Return Allowance is a flat annual percentage of sales that is returned to that certain customer without the Customer going through the trouble of sending back damaged or unused goods. Based on historical returns, the Debtors estimate the cost of their Customer Programs as they relate to Return Obligations is approximately $1.5 million annually. The Debtors estimate that approximately $450,000 was outstanding as of the Petition Date.

(iv)   Indemnification Obligations.

63.     In connection with the Debtors' sale of products to retail customers, the Debtors may agree in the supplier agreements to indemnify those retail customers for losses, including attorneys fees and court costs, that result from the sale of the Debtors' containers (the "**Indemnification Obligations**"). In addition, as set forth under the applicable supplier agreements, the Debtors are contractually obligated to use their own lawyers to defend the Customers and any cases against the Customers that represent a direct assault on Blitz's containers.

64.     The Debtors and some of their retail customers currently are subject to 36 product liability lawsuits that were commenced prepetition. Contemporaneously with this Motion, the Debtors have filed *Blitz U.S.A., Inc.'s Motion for Order Enjoining and Staying the PFC Litigation and Future Actions Against Third-Party Defendants* to stay the pending litigation. As such, the Debtors do not believe that any Indemnification Obligations to Customers will arise during these chapter 11 cases, but in an abundance of caution are asking the court for the authority to honor these Indemnification Obligations. I believe that failure to honor our Indemnification Obligations to our retail Customers would have a detrimental effect on their

26

ongoing business relationship with such Customers.

65.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.**    **Debtors' Motion for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC as Notice and Claims Agent for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (the "*KCC Retention Motion*").**

66.    The Debtors request entry of an order pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Rule 2002-1(f) and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware authorizing the employment and retention of Kurtzman Carson Consultants LLC ("*KCC*") as notice, claims and balloting agent in connection with these chapter 11 cases, in accordance with the terms and conditions set forth in the Services Agreement.

67.    I believe that the relief requested in the KCC Retention Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the KCC Retention Motion should be approved.

**I.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to Pay Certain Prepetition Claims (A) of Critical Vendors, and (B) Lien Claimants, and (II) Granting Certain Related Relief ("*Critical Vendor Motion*")**

68.    The Debtors request the authority to pay certain prepetition claims of (a) Critical Vendors, (b) Lien Claimants and (c) claims arising under section 503(b)(9) of the Bankruptcy

27

Code. The fuel containers that the Debtors manufacture are the culmination of a highly-choreographed product development, purchasing, manufacturing and delivery system. The Debtors rely on a variety of third parties throughout their supply chain to ensure that their business runs smoothly and efficiently, including: (a) vendors that supply raw materials and other components used in the Debtors' manufacturing process (the "***Critical Vendors***"); (b) independent contractors and maintenance companies that maintain and repair the Debtors' manufacturing equipment and facilities (the "***Materialmen***"); and (c) commercial freight carriers that deliver the finished products to the Debtors' customers (the "***Shippers***," and together with the Materialmen, the "***Lien Claimants***").

        (i)    <u>Critical Vendors</u>.

69. The Critical Vendors are generally vendors of raw materials used in the Debtors manufacturing process and producers of certain finished components used in the Debtors' products. By way of example, the Debtors purchase a variety of primary raw materials from suppliers who, due to the scale and highly-regulated nature of the Debtors' operations, are uniquely able to meet the Debtors' needs. For example, resin (a form of high-density plastic) is the principal raw material used in the Debtors' manufacturing process. The Debtors purchase the vast majority of their raw resin from several critical resin suppliers (the "***Resin Suppliers***"). The Resin Suppliers are each certified by the American Society for Testing and Materials ("***ASTM***") to provide resin suitable for use in gasoline containers and other automotive products. The process for qualifying resin suppliers is both costly and lengthy. In addition, several of the Resin Suppliers supply such a great percentage of the Debtors' raw resin, that the other certified resin suppliers do not have the capacity to meet the Debtors' needs. For instance, just one supplier of base resin currently supplies 80% of the Debtors' total base resin requirements. Although the

Debtors purchase base resin from two other certified suppliers, these other suppliers do not have the capacity to supply the Debtors with the volume of resin that they require. Moreover, the Resin Suppliers provide product to the Debtors at a large savings compared to other suppliers. Resourcing this resin would be unduly costly to the Debtors' estates. Because resin is the most critical component of the Debtors' manufacturing process and resourcing the Resin Suppliers would be costly and cause lengthy production delays, absent the relief requested herein, I believe that the Debtors would be forced to resource most of their supply of resin to the significant detriment to their estates. Without access to a sufficient quantity of resin, the Debtors' entire manufacturing enterprise would shut down, irreparably harming the Debtors' relationships with their key customers and therefore the value of their bankruptcy estates.

70. By way of further example, another principal product needed to finish the Debtors' gas cans is a pouring spout which the Debtors attach to the body of the fuel container at the end of the production process. The Debtors purchase these spouts from just one supplier (the "**Spout Supplier**"). To manufacture the spouts, the Spout Supplier uses proprietary molds which the Debtors created specifically for their gas cans. Without similar molds, no other supplier could produce pouring spouts to the Debtors' specifications. Because the Spout Supplier has possession of the Debtors' molds, the Debtors fear that, absent payment, the Spout Supplier may refuse to relinquish control of the molds. In such a scenario, I believe it would be very difficult, time consuming and costly to recreate the needed molds. Even if replacement molds could be created, the process of resourcing the pouring spouts with another supplier would cause an undue delay in the Debtors' operations.

71. Finally, in addition to suppliers of "primary" product components, the Debtors also purchase certain ingredients to enhance the texture, functionality and appearance of their

products. For instance, the Debtors purchase coloring agents from a particular sole-source supplier. The chemicals that comprise these coloring agents not only give the Blitz cans their famous red color, but also contain certain chemicals that help each gas can withstand exposure and cracking. These ingredients are subject to specific government regulations that must be approved in the same lengthy approval process used to evaluate the Debtors' resin. I believe that resourcing new suppliers of these materials would be costly and would cause considerable delay in the Debtors' manufacturing process, rendering the Debtors unable to produce, and consequently sell, its products to its customers at this critical time.

72. By the Critical Vendor Motion, the Debtors authority to pay, in their sole discretion based on their business judgment, up to $1.3 million to Critical Vendors on account of their prepetition claims on an interim basis and up to a maximum aggregate amount of $2.0 million to Critical Vendors on account of their prepetition claims on a final basis.

(ii)     Lien Claimants.

73. In addition to the Critical Vendors, the Debtors also rely heavily on their Lien Claimants - service providers who make sure the Debtors' operations run efficiently and with minimal interruption. The Lien Claimants generally (though not exclusively) consist of independent contractors and maintenance companies that maintain and repair the Debtors' processing equipment, manufacturing facilities and commercial freight carriers that deliver the finished products to the Debtors' customers.

74. Although the Debtors generally make timely payments to all of the Lien Claimants, some may not have been paid for certain services rendered prior to the Petition Date. Notwithstanding the automatic stay under section 362 of the Bankruptcy Code, if not paid, (a) the Materialmen may have the right under applicable non-bankruptcy laws to perfect

materialmans', mechanics', artisans' or other liens against the Debtors' property, and (b) the Shippers may have the right to assert certain possessory liens on goods in their possession to secure payment of the charges and/or expenses incurred by them in connection with the transportation of such goods. Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay. As a result, the Debtors anticipate that certain Lien Claimants may assert and/or perfect liens or refuse to perform their ongoing obligations with the Debtors —including installation, servicing and warranty obligations. Even absent a valid Lien, to the extent certain Lien Claimants have possession of the Debtors' equipment, parts or inventory, I believe that mere possession (and retention) of the Debtors' goods by the Lien Claimants has the potential to severely disrupt the Debtors' operations.

75. As of the Petition Date, the Debtors estimate that the Lien Claimants have aggregate prepetition claims of approximately $520,000. The Debtors propose to pay and discharge, on a case-by-case basis and in their discretion and judgment, those prepetition claims of Lien Claimants that have given or could give rise to liens against the Debtors' property, regardless of whether the Lien Claimants have already perfected the liens. Specifically, the Debtors seek authority to pay up to a maximum aggregate amount of $520,000 to Lien Claimants on account of their prepetition claims on a final basis

**J.** **Debtors' Motion For Entry of Interim and Final Order (a) Authorizing the Debtors to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis, (b) Authorizing Use of Cash Collateral, (c) Granting Adequate Protection to Certain Prepetition Secured Parties, (d) Granting Related Relief, and (e) Scheduling Final Hearing Thereon (the "*DIP Motion*").**

76. In the normal course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, litigation-related expenses

RLF1 5563729v. 5

incurred defending the product liability lawsuits against the Debtors, and for other general corporate purposes. An inability to use these funds during these chapter 11 cases could cripple the Debtors' business operations. Indeed, the Debtors must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operation needs, all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

77.     Prior to the Petition Date, we undertook, with the assistance of our advisors, an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases. Based on such analysis, we determined that the Debtors could likely survive solely on the use of "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"), through December 2011. Thereafter, however, we believe that the Debtors will need approximately $5 million in postpetition DIP financing to support their operational and restructuring activities in connection with the chapter 11 cases. Accordingly, with the assistance of our advisors, we canvassed the market place to find interested parties to participate in a debtor-in-possession financing. Based on such efforts, and the advice of counsel and other professions, we determined that the Prepetition Lenders were willing to provide postpetition financing (and consent to the use of Cash Collateral) on more favorable terms than any other reasonably available alternative.

78.     Accordingly, we began negotiating with the Prepetition Lenders regarding the terms of a postpetition DIP facility. After a series of good faith, arm's-length negotiations, the Debtors entered into a commitment letter (the ***"DIP Commitment Letter"***) with BOKF, NA d/b/a Bank of Oklahoma (the "***DIP Agent***"), as agent, and BOKF NA d/b/a Bank of Oklahoma, The

F&M Bank & Trust Company, and Citizens Security Bank and Trust Company (collectively, the **"DIP Lenders"**) (each of which are also Prepetition Lenders under the Prepetition Credit Facility), whereby the DIP Lenders have agreed to, among other things, provide the Debtors with a $5 million postpetition senior secured credit facility (the **"DIP Financing Facility"**) and to permit the Debtors' use of Cash Collateral during the pendency of these chapter 11 cases, in accordance with the terms of an approved budget.

79.     As the parties have yet to enter into a formal DIP financing agreement, the Debtors, the DIP Agent and the DIP Lenders intend to spend the early days of these chapter 11 cases negotiating the terms of a DIP credit agreement (the **"DIP Financing Credit Agreement"**) consistent with the terms of the DIP Commitment Letter.  By the proposed interim order (the **"Interim DIP Order"**), the Debtors request that the Court, among other things, (i) approve the terms of the DIP Commitment Letter (including the consensual use of Cash Collateral in accordance with the terms of the budget) and (ii) authorize the Debtors to execute and deliver the DIP Financing Credit Agreement and all agreements, documents, and instruments contemplated therein (collectively, the "**DIP Documents**"), which shall be subject to the Court's approval at a final hearing on the DIP Motion (the **"Final Hearing"**).  I understand that the Court's interim approval of the DIP Financing Facility shall be limited to the terms of the DIP Commitment Letter and the Interim DIP Order and that we are not seeking approval of the DIP Documents until the Final Hearing, so that the Court will have had an opportunity to review the terms of the DIP Financing Credit Agreement and the proposed Final DIP Order.

80.     The Debtors' ability to finance its operations through the use of Cash Collateral is vital to the confidence of the Debtors' employees, major suppliers, and to the preservation and maintenance of going concern values and other values of the Debtors' estates.  I believe that the

Debtors' working capital and liquidity needs will be met through the use of Cash Collateral to be authorized pursuant to the Interim DIP Order. Accordingly, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, its creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: November 9, 2011
          Wilmington, Delaware

                                   Rocky Flick
                                   President and Chief Executive Officer
                                   Blitz U.S.A., Inc.