## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BLITZ U.S.A., Inc., *et al.*,[1] | ) Case No. 11-[_____] (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED AND SUPERPRIORITY BASIS, (B) AUTHORIZING THE USE OF CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (D) GRANTING RELATED RELIEF, AND (E) SCHEDULING FINAL HEARING THEREON

Blitz U.S.A., Inc. ("***Blitz***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), file this motion (this "***Motion***") for entry of an interim order (the "***Interim DIP Order***"), substantially in the form attached hereto as **Exhibit A**, and after a final hearing on the Motion (the "***Final Hearing***"), a final order (the "***Final DIP Order***," and together with the Interim DIP Order, collectively, the "***DIP Orders***") (a) authorizing the Debtors to obtain postpetition financing on a senior secured and superpriority basis in accordance with the terms of a postpetition DIP financing agreement (the "***DIP Financing Credit Agreement***") consistent with the terms of that certain DIP Commitment Letter (as defined herein), (b) authorizing the Debtors to use Cash Collateral (as defined herein), (c) granting adequate protection to the Prepetition Lenders (as defined herein) with respect to, *inter alia*, such use of Cash Collateral and any diminution in the value of the Prepetition Lenders' interests in their prepetition collateral (the "***Prepetition Collateral***"), including Cash Collateral,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: LAM 2011 Holdings, LLC (8742); Blitz Acquisition Holdings, Inc. (8825); Blitz Acquisition, LLC (8979); Blitz RE Holdings, LLC (9071); Blitz U.S.A., Inc. (8104); and F3 Brands LLC (2604). The location of the Debtors' corporate headquarters and the Debtors' service address is: 404 26th Ave. NW Miami, OK 74354.

(d) prescribing the form and manner of notice and setting the time for the Final Hearing, and (e) granting certain related relief. In support of the Motion, concurrently herewith, the Debtors submit the *Declaration of Rocky Flick, President and Chief Executive Officer of Blitz U.S.A., Inc. in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***") and respectfully state as follows:

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363 and 364 of chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## Introduction

4.      As described in the First Day Declaration, the Debtors are the industry leader in portable fuel containment. Since its inception as the supplier of the traditional, olive-drab jerry can to the U.S. military throughout World War II, Blitz and its predecessor companies have evolved into the producer of the best fuel containment products in the world. Today, the red plastic jerry can is an American icon. With their global headquarters in Miami, Oklahoma, the Debtors employ approximately 250 employees and achieve annual sales of approximately $80

million.  Through end of fiscal year 2011, the Debtors generated $80 million in revenue and $6 million in adjusted EBITDA.

5.      Notwithstanding their industry-leading position and time-tested product line, the Debtors have recently become the subject of over 35 pending lawsuits alleging, among other things, certain product deficiencies.  Despite the Debtors' firm belief that their products are safe and free of deficiencies, on the date hereof (the *"Petition Date"*), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code to address the challenges posed by the overwhelming pending litigation.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.

**Specific Background**

**A.      The Prepetition Senior Secured Credit Facility**

6.      As discussed in the First Day Declaration, as of the Petition Date, the Debtors had outstanding debt obligations in the aggregate principal amount of approximately $66.5 million, including approximately $41 million in senior debt arising under that certain First Amended and Restated Credit Agreement, dated February 4, 2011, among Blitz Acquisition, LLC, Blitz U.S.A., Inc. and Blitz RE Holdings, LLC as borrowers (collectively, the *"Prepetition Borrowers"*), Blitz Acquisition Holdings, Inc. as guarantor (the *"Prepetition Guarantor"*), F3 Brands LLC as guarantor (the *"Additional Guarantor"* and together with the Guarantor, the *"Prepetition Guarantors"*), LAM 2011 Holdings, LLC (f/k/a Blitz Holdings, LLC) as parent, the Lenders party thereto (the *"Prepetition Lenders"*) and BOKF, NA d/b/a Bank of Oklahoma as

3

administrative agent ("**BOK**") (as amended, supplemented, restated or otherwise modified from time to time, collectively "**Prepetition Credit Facility**"). The Prepetition Credit Facility consists of approximately $22 million outstanding under a prepetition term loan facility (including outstanding letters of credit) (the "**Prepetition Term Loan**") and approximately $19 million outstanding under a prepetition revolver facility (the "**Prepetition Revolver**"). All obligations under the Prepetition Credit Facility are secured by a first priority security interest in substantially all of the Prepetition Borrowers' and Prepetition Guarantors' assets. Absent acceleration, amounts due under the Prepetition Term Loan and Prepetition Revolver are due by February 4, 2016, while portions of the Prepetition Term Loan are due in 2013 and the remainder in 2014. Amounts owing under the Prepetition Term Loan and Prepetition Revolver bear interest equal to the Adjusted LIBOR Rate plus 2.25-3.75% (per adjusted EBITDA) per anum.

## B.     Debtors' Need for Postpetition Financing and Use of Cash Collateral

7.     In the normal course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, capital expenditures, litigation-related expenses incurred defending the product liability lawsuits against the Debtors, and for other general corporate purposes. An inability to use these funds during these chapter 11 cases could cripple the Debtors' business operations. Indeed, the Debtors' must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operation needs, all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful reorganization.

4

## C.    The DIP Commitment Letter

8.    Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases.  Based on such analysis, the Debtors determined that they could likely survive solely on the use of "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the *"Cash Collateral"*), through December 2011.  Thereafter, however, the Debtors believe that they will need approximately $5 million in postpetition DIP financing to support their operational and restructuring activities in connection with these chapter 11 cases.  Accordingly, the Debtors, with the assistance of their advisors, canvassed the market place to find interested parties to participate in a debtor-in-possession financing.  Based on such efforts, and the advice of counsel and other professionals, the Debtors determined that the Prepetition Lenders were willing to provide postpetition financing (and consent to the use of Cash Collateral) on more favorable terms than any other reasonably available alternative.

9.    Accordingly, the Debtors began negotiating with the Prepetition Lenders regarding the terms of a postpetition DIP facility.  After a series of good faith, arm's-length negotiations, the Debtors entered into a Debtor in Possession Financing Facility Commitment Letter (the *"DIP Commitment Letter"*), a copy of which is attached hereto as **Exhibit B**, with BOKF, NA d/b/a Bank of Oklahoma (the *"DIP Agent"*), as agent, and BOKF NA d/b/a Bank of Oklahoma, The F&M Bank & Trust Company, and Citizens Security Bank and Trust Company (collectively, the *"DIP Lenders"*) (each of which are also Prepetition Lenders under the Prepetition Credit Facility), whereby the DIP Lenders have agreed to, *inter alia*, provide the Debtors with a $5 million postpetition senior secured credit facility (the *"DIP Financing Facility"*) and to permit the Debtors' use of Cash Collateral during the pendency of these chapter

11 cases, in accordance with the terms of an approved budget (a copy of which is attached to the DIP Commitment Letter) (the *"Approved Budget"*).

10.     As the parties have yet to enter into a formal DIP financing agreement, the Debtors, the DIP Agent and the DIP Lenders intend to spend the early days of these chapter 11 cases negotiating the terms of a DIP Financing Credit Agreement consistent with the terms of the DIP Commitment Letter. By the Interim DIP Order, the Debtors request that the Court, among other things, (i) approve the terms of the DIP Commitment Letter (including the consensual use of Cash Collateral in accordance with the terms of the Approved Budget) and (ii) authorize the Debtors to execute and deliver the DIP Financing Credit Agreement, all agreements, documents, and instruments contemplated by each (collectively, the *"DIP Documents"*), which shall be subject to the Court's approval at the Final Hearing. Accordingly, the Court's interim approval of the DIP Financing Facility shall be limited to the terms of the DIP Commitment Letter and the Interim DIP Order. The Debtors are not seeking approval of the DIP Documents until the Final Hearing, so that the Court will have had an opportunity to review the terms of the DIP Financing Credit Agreement and the proposed Final DIP Order. The Debtors propose to file an executed version of the DIP Financing Credit Agreement and proposed Final DIP Order, along with a notice identifying any provisions that need to be disclosed pursuant to Local Rule 4001-2(a)(ii), no later than fourteen days in advance of the Final Hearing.

**D.     Summary of DIP Commitment Letter**

11.     In accordance with the disclosure requirements of Bankruptcy Rule 4001(b), (c) and (d) and Local Rule 4001-2(a)(i) and (ii), the material terms of the DIP Commitment Letter are as follows:[2]

---

[2]     This summary is qualified in its entirety by the provisions of the DIP Commitment Letter. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Commitment Letter. To the

| Material Terms | Summary of DIP Commitment Letter |
|---|---|
| Borrowing Limits | The DIP Lenders shall provide a revolving credit facility in an aggregate principal amount not to exceed $5 million (the *"Maximum Loan Amount"*). The DIP Financing Facility will be used to provide working capital to the Debtors in accordance with the aggregate net cash deficit as projected by the Approved Budget plus such additional amount needed to enable the Debtors to maintain a cash balance of approximately $1,500,000, not to exceed the Maximum Loan Amount. For the avoidance of doubt, absent written consent of the DIP Lenders, no Approved Budget shall provide for professional fees associated with the Chapter 11 Cases to exceed $500,000 on a roll-forward monthly basis (the *"Professional Fee Cap"*). The Debtors shall at all times employ an independent financial advisor acceptable to the DIP Agent and the DIP Lenders. The Professional Fee Cap shall not include fees and expenses incurred for employment of a broker, investment banker or auctioneer in connection with the efforts to sell F3 Brands LLC, Reliance Products Holdings, Inc. and the Excess Equipment, all of which shall be paid from the proceeds of the sale of such entities or equipment. |
| Interest Rate | Interest will accrue on all extensions of credit at LIBOR plus 8.00% per annum. Upon the occurrence and during the continuance of an event of default under the DIP Financing Facility, interest shall accrue at the non-default rate plus 2.00% per annum. |
| Fees | The fee for origination of the DIP Financing Facility (the *"Origination Fee"*) shall be $75,000. The Unused Line Fee shall be LIBOR plus 1.00% per annum times the Maximum Loan Amount less the sum of the outstanding daily balance. |
| Use of Proceeds | The proceeds of the DIP Financing Facility and Cash Collateral shall be used solely to pay the post-petition operating expenses of the Debtors and other costs and expenses of administration of the Debtors' chapter 11 cases solely in accordance with the Approved Budget and the DIP Financing Credit Agreement, including the payment of any prepetition amounts authorized by the Court.<br><br>For the avoidance of doubt, no proceeds of the DIP Financing Facility and no Cash Collateral (including the Carve-Out Expenses), may be used (a) to seek the modification, stay, or amendment of the DIP Orders without the consent of the DIP Agent, (b) to oppose any action, including a motion seeking relief from the stay, by the holders of the DIP Financing Facility or the DIP Agent, (c) to fund any action which constitutes an Event of Default under the DIP Financing Credit Agreement or the DIP Orders.<br><br>Not more than $10,000 may be used to pay the expenses of a Creditors' Committee to investigate the extent, validity and priority of the claims and liens under the Pre-Petition Credit Facility. In no event may any Cash Collateral or DIP Proceeds be used to challenge any liens or claims (or the priority thereof) under the Pre-Petition Credit Facility. |
| Maturity | All obligations under the DIP Financing Facility will become due and payable on the date that is the earliest to occur of the following dates (the *"Maturity Date"*):<br><br>(a)      30 days after the entry of the Interim DIP Order if a Final DIP Order, in form and substance acceptable to the DIP Lenders, has not been entered on or prior to such date;<br><br>(b)      if the Final DIP Order has been entered on or prior to 30 days following the |

extent there are any conflicts between this summary and the DIP Commitment Letter, the terms of the DIP Commitment Letter shall govern. Additionally, capitalized terms not otherwise defined in this summary shall have the meanings given to them in the DIP Commitment Letter.

RLF1 5563728v. 2

| Material Terms | Summary of DIP Commitment Letter |
|---|---|
| | date of entry of the Interim DIP Order, then June 30, 2012; |
| | (c) the effective date of a plan of reorganization in the chapter 11 cases that has been confirmed by an order of the Court; and |
| | (d) such earlier date on which all of the obligations under the DIP Financing Facility shall become due and payable in accordance with the terms of the DIP Financing Credit Agreement. |
| Benchmarks | The Debtors shall have accomplished each of the following tasks by the dates set forth below (the **"Benchmark Requirements"**):<br><br>(a) The Debtors shall have identified a stalking horse bidder, and have entered into a stalking horse asset purchase agreement for the sale of F3 Brands LLC on terms acceptable to the DIP Agent and the DIP Lenders (including that all sale proceeds will be paid to the DIP Agent for the benefit of DIP Lenders and/or Prepetition Agent for the benefit of Prepetition Lenders) on or before January 16, 2012, to the extent of the then outstanding and unpaid allowed claims of DIP Lenders and/or the Prepetition Lenders.<br><br>(b) The Debtors shall have filed a motion to approve the sale of F3 Brands LLC on terms acceptable to the DIP Agent and DIP Lenders on or before January 18, 2012.<br><br>(c) A sale of F3 Brands LLC on terms acceptable to DIP Agent and the DIP Lenders shall have occurred on or before March 16, 2012.<br><br>(d) A sales broker acceptable to the DIP Agent and the DIP Lenders shall have been engaged on terms acceptable to the DIP Agent and the DIP Lenders to sell Reliance Products Holdings, Inc. on or before December 16, 2011.<br><br>(e) A prospectus shall have been prepared and circulated broadly (as determined by the sales broker) to potential buyers of Reliance Products Holdings, Inc. on or before January 16, 2012.<br><br>(f) A sale of Reliance Products Holdings, Inc. on terms acceptable to the DIP Agent and the DIP Lenders (including that all sale proceeds will be paid to DIP Agent for the benefit of DIP Lenders and/or Prepetition Agent for the benefit of Prepetition Lenders) on or before May 31, 2012.<br><br>(g) On or before December 15, 2011, the Debtors shall have formulated and presented to the DIP Agent and the DIP Lenders, for review by the DIP Agent and the DIP Lenders, a business plan for the period January 1, 2012 through June 30, 2012 (the **"Business Plan"**) which will address, among other things, (i) a plan to reverse negative cash flow and net income, (ii) milestones for resolution of the chapter 11 cases (including filing Chapter 11 Plan and outline thereof); and (iii) addressing product liability concerns post-reorganization (including any insurance needs). The Business Plan will address employee incentive compensation for accomplishing all Benchmark Requirements.<br><br>(h) On or before November 30, 2011, the Debtors will identify any excess equipment and other assets (**"Excess Equipment"**) to be sold and present a plan for such sale, such plan to be acceptable to the DIP Agent and the DIP Lenders (including that all sale proceeds will be paid to the DIP Agent for the benefit of the DIP Lenders and/or the Prepetition Agent for the benefit of the Prepetition Lenders). |

RLF1 5563728v. 2

| Material Terms | Summary of DIP Commitment Letter |
|---|---|
| | (i)  All Excess Equipment shall have been liquidated on or before February 28, 2012. |
| Events of Default | Customary and appropriate for financings of this type and for this transaction in particular (subject to customary and appropriate grace periods), and customary bankruptcy defaults, including, without limitation any of the foregoing (herein, an *"Event of Default"*): |
| | (a)  the Interim DIP Order or the Final DIP Order shall have been stayed, amended, modified, reversed or vacated without the consent of the DIP Lenders; |
| | (b)  the Final DIP Order shall not have been entered within 30 days from the entry of the Interim DIP Order; |
| | (c)  appointment of a trustee, or appointment of an examiner with expanded powers; |
| | (d)  subject to the payments permitted by the Approved Budget and amounts paid on account of pre-petition claims pursuant to any order of the Court, the payment by a Debtor of, or application by any Debtor for authority to pay, any pre-petition claim without the DIP Lenders' consent; |
| | (e)  the allowance of any claim under Section 506(c) of the Bankruptcy Code against the Agent or the Lenders, or against any agent or lender in connection with the Prepetition Credit Facility; |
| | (f)  without the DIP Lenders' consent, the board of directors of any Debtor authorizes (or the Debtors shall file a motion seeking approval of, or bidding procedures in respect of) the sale of all or substantially all of the assets of such Debtor, either pursuant to Section 363 of the Bankruptcy Code or otherwise; |
| | (g)  the dismissal of any of the chapter 11 cases, or the conversion of any chapter 11 case to a chapter 7 case, or any Debtor shall file a motion or other pleading seeking the dismissal of its chapter 11 case under section 1112 of the Bankruptcy Code or otherwise; |
| | (h)  the entry of an order by the Court granting relief from the automatic stay to allow any creditor to execute upon or enforce a lien on any Collateral unless the Agent consents to the entry of such order; |
| | (i)  the failure to meet any Benchmark Requirement as of the date set forth above (whereupon there will be no further advances under the DIP Financing Facility, and the DIP Financing Facility shall be repaid in full within 30 days); |
| | (j)  the failure to meet the Budget Compliance requirements; |
| | (k)  the Debtors shall propose any plan of reorganization, other than a plan which either (i) provides for the payment in full in cash on the effective date of all obligations under the DIP Financing Facility or (ii) is acceptable to the DIP Lenders in their sole and absolute discretion; |
| | (l)  failure to achieve certain milestones to be agreed with respect to the timing of a plan of reorganization process; |

RLF1 5563728v. 2

| Material Terms | Summary of DIP Commitment Letter |
|---|---|
| | (m)     An order is entered confirming a plan of reorganization which does not provide for payment in full in cash of all obligations under the DIP Financing Facility on or before the effective date of such plan and for the continuation of the liens and priorities granted to the DIP Lenders until such plan effective date; and<br><br>(n)     except for the Carve Out Expenses and except as otherwise provided by the DIP Orders, the entry of an order in granting any super priority administrative claim or lien equal or superior to that granted on behalf of the DIP Agent and the DIP Lenders. |
| Collateral | Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Debtors under the DIP Financing Facility will be secured by first priority priming liens and security interests (subject to any prior Permitted Liens as defined in the Prepetition Credit Agreement) in and to all of the Debtors' assets, [upon entry of the Final DIP Order] including avoidance actions under Chapter 5 of the Bankruptcy Code (the "Collateral"). Such liens on the Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or post-petition liens and security interests, subject only to the Carve-Out Expenses. The DIP Agent and the DIP Lenders shall also have a superpriority administrative expense claim under section 364(c)(1) against the Debtors for the amount of all obligations under the DIP Financing Facility. Notwithstanding the foregoing, Debtors may seek the sale or factoring of their accounts receivable, such sale or factoring to be on terms acceptable to DIP Agent and DIP Lenders and Prepetition Agent and Prepetition Lenders. |
| Unpaid Interest/Fees | Upon the closing of the DIP Financing Facility, the DIP Borrowers shall pay all accrued and unpaid prepetition nondefault rate interest owing to the Prepetition Lenders under the Prepetition Revolver Facility and all invoiced and unpaid fees and expenses incurred in connection with the Prepetition Credit Facility and the DIP Financing Facility.<br><br>All reasonable costs and expenses of the DIP Agent and the DIP Lenders in connection with the chapter 11 cases or the DIP Financing Facility shall be reimbursed by the Debtors on a current basis. |
| Adequate Protection | As adequate protection for their prepetition secured claims against the Debtors, the DIP Orders shall (i) provide the agents and lenders under the Pre-Petition Credit Facility with allowed superpriority administrative expense claims against the Debtors under section 507(b) of the Bankruptcy Code (which shall be junior in right of payment to all obligations under the DIP Financing Facility), (ii) provide the lenders under the Prepetition Credit Facility with additional and replacement liens on all property of the Debtors (including Unencumbered Collateral) to the extent of any diminution in value of the collateral securing the Prepetition Credit Facility, and (iii) during the period up until the entry of the Final DIP Order, provide that the lenders under the Prepetition Credit Facility shall receive payments equal to interest at the non-default rate (and the parties shall preserve all rights with respect to post-petition interest at the default rate). |
| Indemnification | Whether or not this transaction is consummated, each Debtor shall indemnify and hold harmless the DIP Agent, each DIP Lender, their respective subsidiaries and affiliates, and their respective officers, directors, employees, agents and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted against such entity or individual in connection with this transaction, except to the extent any of the foregoing results from the willful misconduct of such entity or individual as determined by a final judgment of a court of competent jurisdiction. |

RLF1 5563728v. 2

| Material Terms | Summary of DIP Commitment Letter |
|---|---|
| Carveout | The DIP Agent's and DIP Lenders' liens and administrative claims shall be subject to the prior payment of the Carve Out Expenses. "Carve Out Expenses" shall mean (i) allowed, accrued, but unpaid professional fees of the Debtors and one official committee of creditors consistent with the Approved Budget which have been incurred prior to the occurrence of an Event of Default (regardless of when deemed allowed, and authorized to be paid), (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and such official committee of creditors which are actually and reasonably incurred after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $500,000, and (iii) fees payable to the U.S. trustee pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court; provided, however, that the Carve-Out Expenses shall not include (a) any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (b) any fees or expenses of a chapter 7 trustee, (c) any fees or disbursements arising after the conversion of any of the chapter 11 cases to a chapter 7 Case (d) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of investigation of prepetition secured claims except as specifically permitted by the DIP Orders or (e) any fees or disbursements related to any challenge or objection to the debt or collateral position of the DIP Agent or the DIP Lenders or hindering or delaying the DIP Agent's or any the DIP Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing<br><br>The DIP Agent shall have the right to establish reserves against borrowing availability under the DIP Financing Facility with respect to the Carve Out Expenses. |
| Budget Compliance | The DIP Financing Credit Agreement shall provide that the Debtors shall be required, absent consent of the DIP Lenders, to comply with the Approved Budget as follows, and any failure to do so shall constitute an Event of Default:<br><br>(i)    the Debtors' aggregate cumulative (over any consecutive 4 week period) revenue for any period, as compared to such amounts as set forth in the Approved Budget for such period, shall have not have a negative variance exceeding 10%;<br><br>(ii)    the Debtors' operating expenses (over any consecutive 4 week period), for any period, for both any individual line item or on an aggregate cumulative basis over all line items, as compared to such amounts as set forth in the Approved Budget for such period, shall not have a positive variance exceeding 10%. |
| Lien Challenges | The Debtors shall stipulate to the amount, priority and validity of the claim and liens of the lenders and agent under the Prepetition Credit Facility, and shall release any and all claims against the lenders and the agent under the Prepetition Credit Facility. Until the later of sixty days following the appointment of a Creditors' Committee, or such other date as the DIP Lenders may agree, the Creditors Committee (but no other person or entity) may challenge the liens on the prepetition collateral securing obligations under the Prepetition Credit Facilities or the amount and allowance of the prepetition indebtedness thereunder. |

RLF1 5563728v. 2

## E.     Additional Provisions to Be Highlighted Under Local Rule 4001-2(a)(i)

12.     In addition to the material terms discussed above, the Debtors have identified the below provisions of the Interim DIP Order that are required to be highlighted pursuant to Local Rule 4001-2(a)(ii):

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – *Validity, Perfection, and Amount of Prepetition Obligations*, Interim DIP Order at ¶ 11.** Pursuant to the Interim DIP Order, the Debtors stipulate to the amount outstanding under the Prepetition Credit Facility and the nature and extent of the Prepetition Lenders' liens and security interests with respect thereto.

- **Local Bankruptcy Rule 4001-2(a)(i)(B) – *Committee Challenge Period*, Interim DIP Order at ¶ 20.** Pursuant to the Interim DIP Order, any committee shall have sixty (60) days from the appointment of such committee to challenge the Prepetition Lenders' security interests under the Prepetition Credit Facility.

- **Local Bankruptcy Rule 4001-2(a)(i)(D) – *Waiver of Section 506(c) Claims*, Interim DIP Order at ¶ 18.** The Interim DIP Order provides for a waiver of claims under section 506(c) upon the entry of the Final DIP Order.

- **Local Bankruptcy Rule 4001-2(a)(i)(D) – *Liens on Avoidance Actions*, Interim DIP Order at ¶ 10(a).** The definition of "Collateral" under the Interim DIP Order includes all causes of action (including, upon entry of the Final DIP Order, avoidance actions).

- **Local Bankruptcy Rule 4001-2(a)(i)(F) – *Treatment of Committee Professionals*, Interim DIP Order at ¶ 15.** The term "Carve Out Expenses" is defined under the Interim DIP Order to include "allowed, accrued, but unpaid professional fees of the Debtors and each Committee consistent with the Accrued Budget which have been incurred prior to the incurrence of an Event of Default." The Approved Budget includes a $500,000 per month "Professional Fee Cap" (on a roll-forward monthly basis), which is allocated as follows: (i) $400,000 per month for the Debtors' professionals (which includes the Debtors' counsel, financial advisor and any claims and noticing agent retained in the chapter 11 cases) and (ii) $50,000 for any committee professionals.

- **Local Bankruptcy Rule 4001-2(a)(i)(G) – *Priming of Prepetition Secured Debt*, Interim DIP Order at ¶ 10(b).** Pursuant to the Interim DIP Order, the DIP Lenders are granted valid, enforceable and perfected first priority security interests under section 364(d) of the Bankruptcy Code, subject only to the Carve-Out Expenses and Permitted Liens (as

12

defined in the Prepetition Credit Facility). The priming liens, however, are consensual, as the DIP Lenders only seek to prime themselves under the Prepetition Credit Facility.

## **Relief Requested**

13.    By this Motion, the Debtors seek the entry of the DIP Orders granting the following relief:

    (a)    Authorizing the Debtors to enter into the DIP Financing Facility in a principal amount not to exceed $5 million and other financial accommodations, pursuant to the terms and conditions of the DIP Commitment Letter;

    (b)    Authorizing the Debtors to execute and deliver the DIP Financing Credit Agreement and all additional DIP Documents and to take all actions necessary, appropriate or required to comply with the Debtors' obligations thereunder and under the DIP Orders;

    (c)    Authorizing the Debtors to grant the DIP Agent, for its own benefit and the benefit of the DIP Lenders, senior, first priority, priming DIP liens on the Collateral securing, and the superpriority claims in respect of, the DIP Financing Facility;

    (d)    Authorizing the Debtors to use their cash on hand, cash proceeds of Prepetition Collateral and other cash that constitutes the Prepetition Lenders' Cash Collateral;

    (e)    Approving the form of the adequate protection to be provided to the Prepetition Lenders to protect the Prepetition Lenders' interests in the Prepetition Collateral, pursuant to sections 361, 362 and 363 of the Bankruptcy Code;

    (f)    Approving the procedure proposed herein for filing and noticing the executed DIP Financing Credit Agreement and proposed Final DIP Order;

    (g)    Scheduling the Final Hearing on the Motion to consider entry of the Final DIP Order; and

    (h)    Granting related relief.

RLF1 5563728v. 2

**Basis for Relief**

**A.    The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

       **(i.)    *Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.***

14.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[c]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment."); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),*

14

789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

15.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

16.    Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

17.    The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases. Based on such analysis, the Debtors determined that they

15

could survive solely on Cash Collateral through December 2011. Beginning in January 2012, however, the Debtors submit that they will need approximately $5 million in postpetition DIP financing to support their operational and restructuring activities. Accordingly, the Debtors began negotiating with the Prepetition Lenders regarding the terms of a postpetition DIP facility. After a series of good faith, arm's-length negotiations, the Debtors, the DIP Agent and DIP Lenders entered into the DIP Commitment Letter, whereby the parties reached agreement on the material terms of the $5 million DIP Financing Facility.[3] Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Commitment Letter provides a greater amount of financing on more favorable terms than any other reasonably available alternative. The Debtors' advisors have canvassed the market to find interested parties to participate in the debtor-in-possession financing and have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Financing Facility was fully subscribed.

18. Specifically, pursuant to the terms of the DIP Commitment Letter, the DIP Financing Facility will provide the Debtors with access to up to $5 million, which the Debtors and their advisors have independently determined should be sufficient to solidify their credit-worthiness to their vendors and support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases.

### (ii.) *The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.*

19. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically,

---

[3] Following the filing of this Motion, the Debtors, the DIP Agent and the DIP Lenders intend to continue their good faith, arm's-length discussions in furtherance of a fully negotiated DIP Financing Credit Agreement and will present evidence of such efforts at the Final Hearing on the Motion.

16

section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

20. To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

17

21.     The Debtors' discussions, through their counsel and financial advisors, with various potential sources of debtor-in-possession financing revealed that such financing on a junior or unsecured basis was not available.    The Debtors' secured debt and lack of unencumbered assets precludes them from obtaining postpetition financing in the amount they require on terms other than on a secured and superpriority basis.    The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, senior liens on the Debtors' unencumbered property as provided in section 364(c)(2) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than prior permitted encumbrances under the Prepetition Credit Facility) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, as provided in section 364(c)(2) of the Bankruptcy Code; as well as to grant the Debtors' repayment obligations under the DIP Documents superpriority administrative expense status as provided for in section 364(c)(1) of the Bankruptcy Code.

> ### (iii.)     *The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.*

22.     Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.    11 U.S.C. § 364(d).    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code,

courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

    (a)    whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

    (b)    whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

    (c)    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

    (d)    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 364.04[1] (16th ed.).

    23.    In this instance, there is substantial overlap between the proposed DIP Lenders and the Prepetition Lenders (all but one of the Prepetition Lenders are participating in the DIP Financing Facility). As a condition to lending pursuant to the DIP Financing Facility, the DIP Lenders have required the priming of their liens under the Prepetition Credit Facility, and have consented to such priming with regards to their respective liens under the Prepetition Credit Facility. Moreover, even in the absence of consent, the proposed priming liens under the DIP Financing Facility are warranted under section 364(d) of the Bankruptcy Code.

    24.    As discussed above, substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors and their advisors, the Debtors have been unable to procure the required funding absent the priming liens. Indeed, the Debtors conducted arm's-

length negotiations with the DIP Lenders regarding the terms of the DIP Financing Facility, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. Further, the Debtors need the funds to be provided under the DIP Financing Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Financing Facility, the Debtors will be unable to operate their business or prosecute these chapter 11 cases. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is in the best interest of all stakeholders. Additionally, upon entry of the Final DIP Order, the DIP Financing Facility will provide the Debtors with access to $5 million in postpetition financing, which the Debtors and their advisors have independently determined is sufficient and, necessary to allow the Debtors to maintain their operations and their relationships with key constituents in connection with these chapter 11 cases.

25. Further, as detailed above the Debtors have offered a fair and reasonable adequate protection package to the Prepetition Lenders. Accordingly, the Debtors submit that the proposed adequate protection is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B. The Debtors' Request To Use the Prepetition Senior Secured Lenders' Cash Collateral, Pursuant to the Terms of the DIP Orders, Should Be Approved.**

26. The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

27.     Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Section 363(e) of the Bankruptcy Code requires that the debtor adequately protect the secured creditors' interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during these chapter 11 cases.

28.     What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw.Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992). By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, and granting of replacement liens and administrative claims.

29.     As discussed above and as set forth in detail in the Interim DIP Order, the Debtors propose to provide the Prepetition Lenders, with, among other things, three primary forms of adequate protection to the extent of any diminution in value of the Prepetition Lenders' interests in the Prepetition Collateral (including the Cash Collateral) resulting from the Debtors' use, sale, or lease of the Prepetition Collateral (including the Cash Collateral), and the imposition of the automatic stay.

RLF1 5563728v. 2

30.     First, subject to the Carveout, the Debtors propose to provide the Prepetition Lenders with adequate protection liens on the Collateral, which includes, without limitation, any and all property of the Debtors to the extent of and diminution in the value of the Prepetition Collateral.  Second, subject to the Carveout, as further protection against any diminution in the value of the Prepetition Lenders' interest in the Prepetition Collateral, the Prepetition Lenders shall be granted the superpriority claims against each of the Debtors to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.  Finally, during the period up until the entry of the Final DIP Order, the Debtors will provide the Prepetition Lenders with payments equal to the nondefault rate under the Prepetition Credit Facility.

31.     In light of the foregoing, the Debtors submit, and the Prepetition Lenders agree, that the proposed adequate protection for the benefit of the Prepetition Lenders are necessary and appropriate under the circumstances of these chapter 11 cases to ensure that the Debtors are able to continue using Cash Collateral.  Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.  Moreover, courts in this district have granted similar relief in other recent chapter 11 cases.  *See, e.g., In re Neb. Book Co.*, No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011) (interim order); *In re Barnes Bay Development, Ltd.*, No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011) (interim order. *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (interim order); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010) (interim order); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009) (interim order); *In re Monaco Coach Corp.*, No. 09-10750 (KJC) (Bankr. D. Del. Mar. 10, 2009) (interim order); *In re Spansion Inc.*, No. 09-10690 (KJC) (Bankr. D. Del. Mar. 4, 2009) (interim order);

RLF1 5563728v. 2

*In re Muzak Holdings LLC*, No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009) (interim order);

*In re Hawaiian Telcom Commun's, Inc.*, No. 08-13086 (PJW) (Bankr. D. Del. Dec. 3, 2008).

### Debtors' Request for Entry of Interim DIP Order

32.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use Cash Collateral or obtain credit may not be commenced earlier than 14 days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the obtaining of credit or use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to the debtor's estate.

33.     The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees, suppliers, and customers and to the preservation and maintenance of the going-concern value and other values of the Debtors' estate. As discussed above, the Debtors require immediate access to Cash Collateral in order to meet their liquidity needs in connection with these chapter 11 cases. While the Interim DIP Order also approves the DIP Financing Facility to the extent set forth therein and in the DIP Commitment Letter (and the Debtors do not intend to draw on the DIP Financing Facility until January 2012), the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral. The Prepetition Lenders were unwilling to consent to the Debtors' use of Cash Collateral absent the Debtors agreement to the DIP Commitment Letter in its entirety. Accordingly, the Debtors seek immediate entry of the Interim DIP Order, in its entirety, to prevent immediate and irreparable harm to the Debtors' estate pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

RLF1 5563728v. 2

## Request for Final Hearing

34.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the entry of the Interim DIP Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

35.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

36.    The Debtors have provided notice of the Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the DIP Agent; (d) counsel to the agent for the Prepetition Lenders; and (e) any party that may have a particular interest in this motion. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Bankruptcy Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

37.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders granting the relief requested herein and such other and further relief as the Court deems appropriate.

Dated: November 9, 2011
Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

_____
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
Julie A. Finocchiaro (No. 5303)
Amanda R. Steele (No. 5530)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         defranceschi@rlf.com
               merchant@rlf.com
               finocchiaro@rlf.com
               steele@rlf.com

*Proposed Counsel to the Debtors
and Debtors in Possession*