# EXHIBIT A

## Proposed Interim DIP Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BLITZ U.S.A., Inc., *et al.*,[1] | ) Case No. 11-[_____] (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**INTERIM ORDER UNDER 11 U.S.C. §§ 105(A), 361, 363, AND 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, (III) APPROVING USE OF CASH COLLATERAL, AND (IV) SCHEDULING FINAL HEARING**

Blitz U.S.A., Inc., F3 Brands LLC, LAM Holdings, LLC, Blitz Acquisition Holdings, Inc., Blitz Acquisition, LLC and Blitz RE Holdings, LLC, as debtors and debtors-in-possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), moved on November 9, 2011 (the "Motion") for, *inter alia*, an interim order seeking:

(a)      authorization for the Debtors to obtain up to $5,000,000 in principal amount of postpetition financing under a revolving credit facility (the "DIP Financing Facility"), on the terms and conditions set forth in this Order, the term sheet setting forth the terms of the DIP Financing Facility (as amended, supplemented or otherwise modified, the "DIP Commitment Letter")[2] among the Debtors, BOKF, NA d/b/a Bank of Oklahoma, as agent (the "DIP Agent"), and the lenders identified therein (the "DIP Lenders");

(b)      authorization for the Debtors to execute and deliver a postpetition DIP financing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: LAM 2011 Holdings, LLC (8742); Blitz Acquisition Holdings, Inc. (8825); Blitz Acquisition, LLC (8979); Blitz RE Holdings, LLC (9071); Blitz U.S.A., Inc. (8104); and F3 Brands LLC (2604). The location of the Debtors' corporate headquarters and the Debtors' service address is: 404 26th Ave. NW Miami, OK 74354.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Commitment Letter. A copy of the DIP Commitment Letter is attached hereto as Exhibit "A".

agreement (the DIP Credit Agreement") consistent with the terms of the DIP Commitment Letter, and all other agreements, documents, and instruments to be delivered in connection with the DIP Financing Facility (when finalized in a form acceptable to the DIP Agent and the DIP Lenders in their sole discretion) (collectively, the "DIP Loan Documents"), which shall be subject to the Court's approval at the Final Hearing (as defined herein);[3]

(c)    authorization for the Debtors to grant the DIP Agent and DIP Lenders liens on and security interests in all of the Debtors' assets as provided herein and in the DIP Commitment Letter and to grant the DIP Lenders superpriority administrative expense claims;

(d)    authorization for the Debtors to (1) use Cash Collateral (within the meaning of section 363(a) of the Bankruptcy Code) and (2) provide adequate protection to the Pre-petition Lenders (as defined below);

(e)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the proposed interim order (this "Order"); and

(f)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing, on a final basis, the DIP Financing Facility, approving the DIP Documents and granting all relief requested in the Motion.

Upon the record presented at the Interim Hearing and after due deliberation, for good and sufficient cause,

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED**

---

[3] The Courts approval of the DIP Financing Facility pursuant to this Order shall be limited to the terms of the DIP Commitment Letter and this Order. The Debtors are not seeking approval of the DIP Documents until the Final Hearing and seek to file and notice such DIP Documents in advance of the Final Hearing in accordance with the terms set forth in this Order.

**THAT:**[4]

1.    <u>Disposition</u>. The Motion is granted on an interim basis on the terms set forth in this Order. Any objections to the interim relief sought in the Motion that have not previously been resolved or withdrawn, including any reservations of rights therein, are hereby overruled on their merits. This Order shall be valid, binding on all parties-in-interest, and fully effective immediately upon entry. The term of this Order and the DIP Commitment Letter approved hereunder shall expire, and any loans made pursuant to this Order[5] and the DIP Commitment Letter will mature and, together with all interest thereon and any other obligations accruing, hereunder or under the DIP Commitment Letter, the DIP Credit Agreement, will become due and payable (unless such loans and other obligations become due and payable earlier pursuant to the terms of the DIP Commitment Letter and this Order by way of acceleration or otherwise) thirty (30) days from the date this Order is entered if the Final Order has not been entered by the Court prior to such date.

2.    <u>Jurisdiction; Venue</u>. The Court has jurisdiction over the Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

3.    <u>Notice</u>. Notice of the Motion, the relief requested and the Interim Hearing was served by the Debtors on (i) the fifty largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Agent, (iii) any parties that have filed a notice of appearance pursuant to Bankruptcy Rule 2002, (iv) the Prepetition Agent, and (v) the United States Trustee for the

---

[4] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

[5] As set forth in the Motion, and as reflected in the Approved Budget, the Debtors do not anticipate borrowing any amounts under the DIP Financing Facility in advance of the Final Hearing.

3

District of Delaware (the "U.S. Trustee").  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested and the Interim Hearing constitutes due and sufficient notice, and no further notice of the relief sought at the Interim Hearing and the relief granted by this Order is necessary or required.

4.     Purpose and Necessity of Financing and Use of Cash Collateral.  The Debtors require the financing and use of Cash Collateral described in the Motion to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs consistent with the terms set forth in the DIP Commitment Letter, and for other purposes permitted by the DIP Commitment Letter. The Debtors are unable to obtain adequate unsecured credit allowable under § 503 of the Bankruptcy Code as an administrative expense or other financing under § 364(c) or (d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Commitment Letter within the time frame required by their needs to avoid immediate and irreparable harm.  The Debtors are unable to obtain financing on a postpetition basis without the Debtors granting the Superpriority Claims (as defined below) and the DIP Liens (as defined below).

5.     Good Cause.  The Debtors' ability to obtain sufficient working capital and liquidity under the DIP Commitment Letter is vital to the Debtors' estates and their creditors, so that the Debtors can continue to operate their businesses in the ordinary course, including preserving the jobs of their employees and maximizing the value of their assets.  The Debtors' estates, creditors, and employees will be immediately and irreparably harmed if this Order is not entered.  Consummation of the DIP Financing Facility in accordance with this Order and the DIP Commitment Letter is in the best interests of the Debtors' estates, creditors, and employees. Good cause thus has been shown for the interim relief sought in the Motion.

4

6. <u>Good Faith; Fair Consideration and Reasonably Equivalent Value</u>. The terms of the DIP Commitment Letter, including the interest rates and fees applicable thereto and intangible factors, are more favorable to the Debtors than those available from alternative sources. Based upon the record before the Court, the DIP Commitment Letter has been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent, and the DIP Lenders. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to this Order and the DIP Commitment Letter shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in § 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereby. The terms of the loan facility provided under the DIP Commitment Letter are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

7. <u>Immediate Entry of Order</u>. The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to enter into the DIP Commitment Letter and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the cash collateral necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses, to maximize the value of the Debtors' assets and further enhance the Debtors' prospects for a successful restructuring.

8. <u>Authorization to Use Cash Collateral</u>. The Debtors are authorized to use Cash

RLF1 5573046v. 1

Collateral during the period from the Petition Date through and including the Maturity Date, in accordance with the terms, conditions, and limitations set forth in the Approved Budget (a copy of which is attached as Exhibit "B") and otherwise pursuant and subject to the terms and conditions of the DIP Commitment Letter and this Order.

9. <u>Interim Borrowing</u>. [reserved].

10. <u>Superpriority Claim and DIP Liens</u>.

(a)    Except as provided in this Order with respect to the Carve-Out Expenses, the DIP Agent and the DIP Lenders are hereby granted, and all of the obligations of the Debtors under the DIP Commitment Letter and this Order (collectively, the "DIP Obligations") shall and hereby do constitute, an allowed superpriority administrative expense claim against each Debtor (the "Superpriority Claims") pursuant to § 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, all proceeds or other amounts received in respect of the Debtors' claims and causes of action arising under state or federal law under sections 541, 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code (collectively, the "Avoidance Actions"); provided, that the DIP Lenders preserve their rights, if any, to recoveries of such Avoidance

Actions to the extent they are determined to be prepetition collateral or the proceeds thereof. The Superpriority Claims granted pursuant to this paragraph shall be subject and subordinate in priority of payment only to, during the occurrence and continuance of an Event of Default or after the Maturity Date, payment of the Carve-Out Expenses. Except as set forth in this Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

(b)     Under Section 364(d) of the Bankruptcy Code, as security for the DIP Obligations, each of the DIP Agent, on behalf of itself and the DIP Lenders, is hereby granted, subject and subordinate in priority only to and only during the occurrence and continuance of an Event of Default or after the Maturity Date, payment of the Carve-Out Expenses, valid, enforceable and perfected first-priority priming security interests in and liens on (the "DIP Liens") all of the Collateral (as defined below). The DIP Liens shall have priority over any and all prepetition or postpetition liens and security interests, with the exception of the Permitted Liens as defined in the Prepetition Credit Agreement. "Collateral" includes all of the Debtors' property, assets, or interests in property or assets of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the Debtors' "estates" (within the meaning of the Bankruptcy Code), inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, fixtures, goods, investment property, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, trademarks, trade names, all deposit accounts, all securities accounts, all cash maintained in deposit and other accounts, all commercial tort claims, all causes of action (including, upon entry of the Final Order, the Avoidance Actions), all cash and non-cash proceeds, rents, products and profits of any

of the foregoing.

(c)     The DIP Liens shall be effective automatically and immediately upon the entry of this Order, and no lien or security interest granted to the DIP Agent or DIP Lenders under this Order or the DIP Commitment Letter, as approved by this Order, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under § 551 of the Bankruptcy Code or (ii) hereafter be subordinated to or made *pari passu* with any other lien or security interest created and/or perfected pursuant to § 364(c) or (d) of the Bankruptcy Code or otherwise.  The DIP Liens arising hereunder shall be and hereby are fully perfected security interests, such that no additional steps need be taken by the DIP Agent or the DIP Lenders to perfect such interests.  Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest (subject to the entry of the Final order) or the proceeds thereof or other Collateral related thereto shall have no force and effect with respect to the transactions granting the DIP Lenders a priority security interest in such leasehold interest, license, contract or agreement, or the proceeds of any assignment and/or sale thereof by any Debtors in favor of the DIP Agent or the DIP Lenders in accordance with the terms of the DIP Commitment Letter.

(d)     The DIP Liens and Superpriority Claims and other rights and remedies granted to the DIP Agent and DIP Lenders under this Order shall continue in the Chapter 11 Cases and in any superseding case or cases for the Debtors under any chapter of the Bankruptcy Code, and such liens, security interests and claims shall maintain their priority as provided in this Order until all the DIP Obligations have been indefeasibly paid in full in cash and the total

8

commitment has been terminated in accordance with the DIP Commitment Letter (and any subsequently approved DIP Loan Documents).

(e)     Notwithstanding anything in this Order to the contrary, the Debtors may seek the sale or factoring of their accounts receivable, such sale or factoring to be on terms acceptable to DIP Agent and DIP Lenders and Pre-Petition Agent and Pre-Petition Lenders.

11.     Acknowledgements.  Without prejudice to the rights of any official committee of creditors appointed in these cases (but subject to the limitations contained in paragraph 20), the Debtors acknowledge, represent, stipulate and agree that:

(a)     the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be made or given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, performance, validity and enforceability of the DIP Commitment Letter to which any Debtor is a party;

(b)     as consideration for entry into the DIP Commitment Letter, until such time as all DIP Obligations are indefeasibly paid in full in cash and the total commitment is terminated in accordance with the DIP Commitment Letter (and any subsequently approved DIP Document), and except with respect to the Carve-Out Expenses upon the occurrence and during the continuance of an Event of Default, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the DIP Liens and Adequate Protection Liens (as defined below) provided to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders under this Order, the Final Order, the DIP Commitment Letter or any subsequently approved DIP Loan Documents by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or security interest pursuant to § 364(c) or (d) of the

9

Bankruptcy Code or otherwise, other than any additional liens granted to the DIP Agent and the DIP Lenders in the Final Order as may be contemplated in the DIP Commitment Letter and the Motion;

(c)     as consideration for entry into the DIP Commitment Letter, until such time as all DIP Obligations are indefeasibly paid in full in cash and the total commitment is terminated in accordance with the DIP Commitment Letter and any subsequently approved DIP Documents, the Debtors shall not in any way or at any time, agree to pay an administrative expense claim against any of the Debtors of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, §§ 105, 326, 328, 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c) 726, 1113 and 1114 of the Bankruptcy Code having priority equal or superior to the priority of the Superpriority Claims as provided herein, except with respect to the Carve-Out Expenses upon the occurrence and during the continuance of an Event of Default;

(d)     certain of the Debtors have outstanding debt obligations pursuant to that certain First Amended and Restated Credit Agreement (the "Prepetition Credit Agreement"), dated February 4, 2011, among Blitz Acquisition, LLC, Blitz U.S.A., Inc., and Blitz RE Holdings, LLC as borrowers (collectively, the "Prepetition Borrowers"), Blitz Acquisition Holdings, Inc. as guarantor (the "Guarantor") F3 Brands LLC as guarantor (the "Additional Guarantor" and, together with the Guarantor, the "Prepetition Guarantors"), LAM 2011 Holdings, LLC (f/k/a Blitz Holdings, LLC) as parent, the Lenders party thereto (the "Prepetition Lenders") and BOKF, NA d/b/a Bank of Oklahoma as administrative agent ("Prepetition Agent") (as amended, supplemented, restated or otherwise modified from time to time, collectively "Prepetition Credit Facility");

10

(e)    the Prepetition Credit Facility consists of a $15 million revolving note facility, (the "Prepetition Revolving Facility") which includes a letter of credit facility and which is currently over-advanced, and a $20 million term note facility (the "Prepetition Term Note Facility");

(f)    as of the Petition Date, the principal outstanding under the Prepetition Revolving Facility was in the amount of $18,968,464.29, and the principal outstanding under the Prepetition Term Note Facility was $21,845,180.46 (collectively, the "Prepetition Indebtedness");

(g)    as more fully set forth in the Prepetition Credit Facility and the pre-petition Loan Documents as defined therein, each of the of the Prepetition Borrowers and Prepetition Guarantors granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, and to the Prepetition Lenders, a continuing lien and security interest to secure the Prepetition Indebtedness in the substantially all of the Prepetition Borrowers' and Prepetition Guarantors' assets, subject only to Permitted Liens as defined in the Prepetition Credit Facility (the "Prepetition Collateral");

(h)    all of the Prepetition Borrowers' and Prepetition Guarantors' cash, including cash in deposit accounts, whether as originally collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Agent for the benefit of the Prepetition Lenders;

(i)    the obligations of Debtors under the Prepetition Credit Agreement are (i) legal, valid, binding and enforceable against each Debtor, and (ii) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  The Debtors do not have, hereby

11

forever release and are forever barred from bringing or asserting any claims, counterclaims, causes of action, defense or setoff rights relating to the Prepetition Credit Facility, whether arising under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise against the Prepetition Agent, the Prepetition Lenders and their respective officers, directors, employees or attorneys.

(j)    the Prepetition Agent and Prepetition Lenders have liens and security interests in and to the Prepetition Collateral, and such liens and security interests are legal, valid, enforceable, non-avoidable and duly perfected and are not subject to avoidance, attack, objection, recoupment, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise; and, as of the Petition Date, and without giving effect to this Interim Order, there are no liens or security interests having priority over the liens and security interests of the Prepetition Agent and Prepetition Lenders, subject only to Permitted Liens as defined in the Prepetition Credit Agreement; and the liens and security interests granted to the Prepetition Agent and Prepetition Lenders were granted for fair consideration and reasonably equivalent value.

12.    <u>Fees and Expenses</u>. All fees, costs, charges and expenses required to be paid by the Debtors to the DIP Agent and/or the DIP Lenders under the DIP Commitment Letter are hereby approved. Upon funding after entry of a Final Order, the DIP Lenders' shall receive a fee (the "Origination Fee") in the amount of $75,000, payable upon funding of the DIP Financing Facility. The unused line fee shall be LIBOR plus 1.00% annum times the Maximum Loan Amount less the sum of the outstanding daily balance. The Debtors shall, within ten (10) days following receipt of a written invoice, with copies being provided to the

Office of the U.S. Trustee and any Committee appointed in these cases, indefeasibly pay each of the DIP Agent and the DIP Lenders for their reasonable out-of-pocket fees (including professional fees), costs, charges and expenses, arising before or after the Petition Date, that are payable or reimbursable under the DIP Commitment Letter. None of the DIP Agent's or DIP Lenders' costs, fees, charges, or expenses shall be required to be maintained in accordance with the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with the Court. Upon the closing and funding of the DIP Financing Facility, the Debtors shall pay all accrued and unpaid prepetition nondefault rate interest owing to the Prepetition Lenders, and all invoiced and unpaid fees and expenses incurred by the Prepetition Agents or any of the Prepetition Lenders in connection with the Prepetition Credit Facility, under the Prepetition Credit Facility.

13. <u>Indemnity</u>. Whether or not the DIP Financing Facility is consummated, each Debtor shall indemnify and hold harmless the DIP Agent, each DIP Lender, their respective subsidiaries and affiliates, and their respective shareholders, members, partners, officers, directors, employees, agents and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted against such entity or individual in connection with this transaction, except to the extent any of the foregoing results from the willful misconduct of such entity or individual as determined by a final judgment of a court of competent jurisdiction.

14. <u>Recording and Filing Fees</u>. All fees and costs and/or expenses payable by the Debtors in connection with the recording, filing and insuring of financing statements, mortgages and financing statements to confirm the perfection of the security interests granted or authorized by this Order are hereby approved and shall be promptly paid in full by the Debtors without the

RLF1 5573046v. 1

necessity of the Debtors, the DIP Lenders or the DIP Agent filing any further application with the Court for approval or payment of such fees, costs and/or expenses.

15.     Authority to Execute and Deliver Necessary Documents. Without limiting Paragraph 10(c) above, each of the Debtors is hereby authorized and empowered to enter into and deliver the DIP Commitment Letter, the DIP Credit Agreement and the other DIP Loan Documents, including, but not limited to, UCC financing statements and mortgages or deeds of trust as necessary or appropriate; provided, however, that such documents, with the exception of the DIP Commitment Letter, are not being approved by this Order and shall be subject to the consideration of the Court of the Final Hearing. Each of the Debtors is hereby further authorized, empowered and directed (a) to perform all of its obligations under the DIP Commitment Letter to give effect to the terms of the financing provided for in the DIP Commitment Letter as approved by this Order, (b) to perform all acts required under the DIP Commitment Letter and this Order, including, without limitation, the payment of all principal, interest, charges, fees, and the reimbursement of present and future reasonable costs and expenses (including without limitation, reasonable attorneys' fees and legal expenses) paid or incurred by the DIP Lenders or the DIP Agent as provided for in this Order and the DIP Commitment Letter, DIP, all of which unpaid principal, interest, charges, fees, reasonable attorneys' fees and the reimbursement of present and future reasonable costs and expenses shall be included and constitute part of the principal amount of the DIP Obligations, be deemed a Superpriority Claim having the same priority as all other DIP Obligations hereunder and be secured by valid and perfected DIP Liens as and to the extent provided for in this Order and the DIP Commitment Letter, and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be required or necessary for the

14

Debtors to perform all of their obligations under this Order and the DIP Commitment Letter, without further order of the Court and pending the Final Hearing. The DIP Obligations shall constitute valid and binding obligations of each of the Debtors enforceable against each of them, and each of their successors and assigns, in accordance with their terms and the terms of this Order.

16. _Amendments_. The Debtors, the DIP Agent and the DIP Lenders may enter into any amendments or modifications to the DIP Commitment Letter without the need of further notice and hearing or order of this Court, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders may agree and a copy of which is delivered to any statutory committee (a "Committee") and the U.S. Trustee; _provided_, _however_, that notice of any material modification or amendment shall be provided to any committee and the U.S. Trustee, each of which shall have five (5) days from the date of such notice within which to object in writing; _provided_, _further_, _however_, that if any such objection is timely made, then such modification or amendment shall be permitted only pursuant to an order of the Court (or upon withdrawal of the objection).

17. _Carve-Out_. (a) The DIP Liens and the Superpriority Claims shall be subject to the Carve-Out Expenses. "Carve Out Expenses" shall mean (i) allowed, accrued, but unpaid professional fees of the Debtors and each Committee consistent with the Approved Budget which have been incurred prior to the occurrence of an Event of Default, regardless of when such amounts are allowed and authorized to be paid, (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and each Committee consistent with the Budget which are incurred after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $500,000 (the "Carve-Out Amount"), and (iii) fees payable to the U.S.

15

Trustee pursuant to 28 U.S.C. §1930 and to the clerk of the Bankruptcy Court; provided, however, that the Carve-Out Expenses shall not include (a) any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (b) any fees or expenses of a Chapter 7 trustee, (c) any fees or disbursements arising after the conversion of any of the Chapter 11 Cases to a Chapter 7 Case (d) any fees or disbursements related to the preparation for, or commencement and prosecution of any Challenge (as defined below) except as specifically permitted by this Order or (e) any fees or disbursements related to any Challenge or objection to the debt or collateral position of the DIP Agent or the DIP Lenders or hindering or delaying the DIP Agent's or any DIP Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing. So long as no Event of Default has occurred, the Debtors shall be permitted to pay trustee fees and professional fees allowed and payable under Bankruptcy Code sections 330, 331 and 503, as provided in the DIP Commitment Letter and the Budget. Any payment of Carve-Out Expenses incurred after the occurrence and during the continuance of an Event of Default, including any payment of professional fees, shall permanently reduce the Carve-Out Amount on a dollar-for-dollar basis. The DIP Agent and the DIP Lenders' obligation to fund or otherwise permit payment of the Carve-Out Expenses from the proceeds of their Collateral shall be (i) added to and made part of the DIP Obligations, (ii) secured by the Collateral, and (iii) otherwise entitled to the protections granted under this Order, the DIP Commitment Letter, the Bankruptcy Code and applicable law.

(b)     Nothing contained in this Order shall be construed: (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed

16

on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the DIP Agent or the DIP Lenders to object to the reasonableness of such amounts.

(c)     Neither Cash Collateral nor proceeds of any of the DIP Financing Facility shall be used to request (i) the use of Cash Collateral without the DIP Agent's and the DIP Lenders' prior written consent, or (ii) authorization to obtain postpetition loans or other financial accommodations pursuant to § 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders without the consent of the DIP Lenders.

(d)     Neither Cash Collateral nor proceeds of any of the DIP Financing shall be used for the payment or reimbursement of any fees or disbursements of the Debtors, any Committees or any trustee appointed in these Chapter 11 Cases incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter (i) asserting claims pursuant to §§ 542, 544, 545, 546, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether arising under state law, the Bankruptcy Code or other federal law) against any of the DIP Lenders, the DIP Agent, the Prepetition Agent, or the Prepetition Lenders, including any action with respect to the validity and extent of the DIP Obligations or the Prepetition Indebtedness or the validity, extent and priority of liens and security interests securing the DIP Obligations or the Prepetition Indebtedness; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Lenders' and/or the DIP Agent's liens on and security interests in the Collateral, or the Prepetition Agent's and/or the Prepetition Lenders' liens on and security interests in the Prepetition Collateral; or (iii) seeking to modify

any of the rights granted to the DIP Agent or the DIP Lenders or the Adequate Protection Claims and Adequate Protection Liens granted to the Prepetition Agent and Prepetition Lenders under this Order or the DIP Commitment Letter. Notwithstanding the foregoing restrictions, up to an aggregate of $10,000 of Cash Collateral or proceeds of the DIP Loans may be used to pay professional fees and expenses incurred by a Committee to investigate the extent, validity and priority of claims and liens of the Prepetition Agents and/or the Prepetition Lenders relating to the Prepetition Credit Facility, but not to challenge any liens or claims under the Prepetition Credit Facility.

18. <u>Limitation On Additional Surcharges</u>. Subject to entry of the Final Order, except to the extent of the Carve-Out Expenses, no costs or expenses of administration or other surcharge, lien, assessment or claim incurred on or after the Petition Date of any person or entity shall be imposed against any of the Collateral, the Prepetition Collateral, any Prepetition Lenders, the Prepetition Agent, any DIP Lenders, or DIP Agent, nor shall the Collateral, the Prepetition Collateral, any Prepetition Lenders, the Prepetition Agent, any DIP Lenders or DIP Agent be subject to surcharge by any party-in-interest for any amounts arising or accruing after the Petition Date pursuant to §§ 506(c), 552(b) or 105(a) of the Bankruptcy Code or similar principle of law. No action, inaction, or acquiescence by the Prepetition Lenders, the Prepetition Agent, the DIP Lenders or DIP Agent in these cases, including the Prepetition Lenders' or the DIP Lenders' funding of the Debtors' ongoing operations under this Order or the Final Order, or the DIP Commitment Letter, shall be deemed to be or shall be considered as evidence of any alleged consent by the Prepetition Lenders, the Prepetition Agent, the DIP Lenders or DIP Agent to a charge against the Prepetition Collateral, the Collateral, any Prepetition Lender, the Prepetition Agent, any DIP Lender, or DIP Agent pursuant to §§ 506(c),

RLF1 5573046v. 1

552(b) or 105(a) of the Bankruptcy Code. Subject to the entry of the Final Order, neither the Prepetition Lenders, the Prepetition Agent, the DIP Agent nor the DIP Lenders shall be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the Prepetition Collateral.

19. <u>Adequate Protection</u>. The Prepetition Borrowers and Prepetition Guarantors under the Prepetition Credit Facility granted the Prepetition Agents, and the Prepetition Lenders mortgages, liens and security interests in substantially all the assets owned by the Prepetition Borrowers and Prepetition Guarantors (the "Prepetition Collateral"), as more fully described in the Prepetition Credit Facility documents. The Prepetition Agents and the Prepetition Lenders are entitled, pursuant to sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the diminution in value of the Prepetition Collateral, but only as permitted by the Bankruptcy Code. As adequate protection, the Prepetition Agent the Prepetition Lenders are hereby granted the following:

(a) <u>Adequate Protection Claims</u>. The Prepetition Agent and Prepetition Lenders are granted allowed superpriority administrative expenses claims against the Debtors (the "Adequate Protection Claims") as provided in section 507(b) of the Bankruptcy Code. The Adequate Protection Claims shall have recourse to and be payable from all Prepetition Collateral or Collateral. Notwithstanding the foregoing, the Adequate Protection Claims shall be subordinate and subject to (i) the Carve-Out Expenses and (ii) the Superpriority Claims granted in respect of the DIP Obligations.

(b) <u>Adequate Protection Liens</u>. To the extent of diminution in value of the collateral securing the Prepetition Credit Facility, as additional adequate protection, the

19

Prepetition Lenders are hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the Collateral (the "Adequate Protection Liens") to secure any Adequate Protection Claim, subject and subordinate only to (i) the DIP Liens, and (ii) the Carve-Out Expenses.

(c)     <u>Interest and Fees</u>.  As additional adequate protection, during the period until the Maturity Date, the Prepetition Lenders shall receive payments from the Debtors equal to interest calculated at the non-default rate under the Prepetition Credit Agreement, and reasonable attorneys' fees.

(d)     <u>Reservation of Rights to Seek Additional Adequate Protection</u>.  The grant of adequate protection to the Prepetition Agent and Prepetition Lenders is without prejudice to the right of the Prepetition Agent and Prepetition Lenders to seek modification of the grant of adequate protection provided by this Order so as to provide different or additional adequate protection; provided, however, that any such additional or modified adequate protection shall at all times be subordinate and junior to the Carve-Out Expenses and the claims and liens granted to the DIP Agent and the DIP Lenders under this Order and the DIP Commitment Letter.

20.     <u>Challenge to Prepetition Indebtedness</u>.  If an official committee of creditors is appointed in these cases, then such committee shall have until the later of: (i) sixty days following the date of appointment of members to such committee, (ii) a later date consented to by the Prepetition Agent and Prepetition Lenders; or (iii) a date ordered by the Court (the "Investigation Termination   Date") to file an adversary proceeding or contested matter (a) challenging or objecting to the validity, perfection, enforceability, or priority of the Prepetition

RLF1 5573046v. 1

Agent's and Prepetition Lenders' security interests in and liens on the Prepetition Collateral or the amount and allowance of the Prepetition Indebtedness, or (b) otherwise asserting any claims or causes of action against the Prepetition Agent or Prepetition Lenders (any action under (a) or (b), a "Challenge"). If a Challenge is not filed on or before the Investigation Termination Date, then (w) all of the agreements, acknowledgments, representations, and stipulations contained in paragraph 11 of this Order shall be irrevocably binding on the estates and all parties in interest (including,

without limitation, a receiver, administrator, or trustee appointed in any of the these cases or in any jurisdiction) without further action by any party or this Court and the Debtors, the Committee and any other party in interest (including, without limitation, a receiver, administrator, trustee, examiner with expanded powers, responsible officer, or other estate representative appointed in any of these cases or in any jurisdiction) shall thereafter be forever barred from bringing any Challenge, (x) the obligations of the Debtors under the Prepetition Credit Agreement shall constitute allowed claims for all purposes in these cases and any subsequent Chapter 7 cases, (y) the Prepetition Agent's and Prepetition Lenders' security interests in and liens upon the Prepetition Collateral shall be determined to be, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination or otherwise avoidable, and (z) the Prepetition Indebtedness and the Prepetition Lenders' security interests in and liens on the Prepetition Collateral shall not be subject to any further Challenge by the Debtors or any other party in interest, including, without limitation, any Committee, receiver, administrator, trustee, examiner with expanded powers, responsible officer, or other estate representative appointed in any of these cases.

    21.   <u>Additional Perfection Measures</u>. (a) The liens, security interests, and

RLF1 5573046v. 1

priorities granted to the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders pursuant to this Order and the DIP Commitment Letter with respect to property of the Debtors' estates shall be perfected by operation of law immediately upon entry of this Order by the Court.

(b) Neither the Debtors nor the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders shall be required to enter into or to obtain landlord waivers, mortgagee waivers, bailee waivers or warehouseman waivers or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office, or any similar agency with respect to intellectual property), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the security interests, DIP Liens or Adequate Protection Liens granted pursuant to this Order.

(c) If the Prepetition Agent, Prepetition Lenders, DIP Agent or the DIP Lenders, in their sole discretion, choose to obtain consents from any licensor or similarly situated party-in- interest, to file financing statements, notices of lien or similar instruments, to record financing statements, mortgages or deeds of trust, or to otherwise confirm perfection of such security interests and liens: (i) the Prepetition Agent, Prepetition Lenders, the DIP Agent and the DIP Lenders are authorized and empowered to file or record financing statements, mortgages, deeds of trust or similar instruments which secure the DIP Obligations or the Adequate Protection Liens; (ii) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Order; and (iii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(d) In lieu of obtaining such consents or filing such financing statements,

22

notices of lien or similar instruments, the Prepetition Agent, Prepetition Lenders, DIP Agent or the DIP Lenders may, in their discretion, choose to file a true and complete copy of this Order in any place at which any such instruments would or could be filed, together with a description of Collateral located within the geographic area covered by such place of filing, and such filing shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Order.

(e)     Federal, state and local governmental agencies, authorities and instrumentalities that have jurisdiction over the Collateral are hereby directed to accept for filing a certified copy of this Order or an acknowledgement of this Order.

22.    The Prepetition Agent, Prepetition Lenders, DIP Agent and the DIP Lenders may deliver a copy of this Order to any third parties having possession of control of Collateral.

23.    <u>Access to Information</u>.  The Debtors shall permit representatives, agents and/or employees of the DIP Agent and the DIP Lenders to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non- privileged information as they may reasonably request.

24.    <u>Access to Collateral</u>. Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the DIP Lenders contained in this Order or the DIP Commitment Letter, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Agreement, upon five (5) business days' written notice to the landlord of any leased premises upon which any Collateral is located (a "Landlord"), that an Event of Default or a Default by the Debtors of any of their obligations under the DIP Commitment Letter or this Order has occurred and is continuing, the DIP Agent and DIP

Lenders may, subject to any separate agreement by and between such Landlord and the DIP Agent or DIP Lenders, enter upon any leased premises of any of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the Landlord thereunder; provided, however, that the DIP Agent and DIP Lenders shall only pay base rent as defined in the lease with any such Landlord (or other agreement between DIP Agent or DIP Lenders and the Landlord) and additional rent obligations of the Debtors (limited to charges for utilities, unless otherwise agreed between the Landlord and DIP Lender) that first arise after the DIP Agent's written notice referenced above and that are payable during the period of such occupancy by the DIP Lenders, calculated on a per diem basis. Nothing herein shall require the Debtors to assume and assign to the DIP Agent or the DIP Lenders any lease under § 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Agent or the DIP Lenders in this paragraph.

25. Event of Default. The date upon which any of the following events occur and are continuing beyond any applicable grace period set forth below shall each be an, "Event of Default" hereunder:

(a) the Debtors fail to make a payment to the DIP Lenders as and when required by the DIP Commitment Letter or this Order, or otherwise fail to comply in any material respect with any of the terms or conditions of the DIP Commitment Letter and/or this Order; and

(b) the occurrence of an "Event of Default" under the DIP Commitment Letter.

26. Automatic Stay Modified. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and

24

the DIP Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Commitment Letter, including acceleration of the DIP Obligations which shall become due and payable with interest at the default rate and (ii) rights to (a) terminate the total commitment under the DIP Commitment Letter, (b) freeze monies or balances in the Debtors' accounts, (c) set off monies or balances of the Debtors in accounts maintained by the DIP Agent or DIP Lenders, (d) accelerate the DIP Obligations, (e) charge interest at the default rate, and (f) exercise the rights and remedies available under this Order and/or applicable law (including the Uniform Commercial Code as in effect in any jurisdiction), including foreclosing upon and selling all or any portion of the DIP Collateral. In any hearing regarding the DIP Agent's or DIP Lenders' exercise of rights or remedies under this paragraph, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and each of the Debtors hereby waives any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Order or the DIP Commitment Letter. The DIP Agent's or DIP Lenders' delay or failure to exercise rights and remedies under the DIP Commitment Letter or this Order shall not constitute a waiver of DIP Agent's or the DIP Lenders' rights, unless any waiver is made pursuant to a written instrument executed in accordance with the terms of the DIP Commitment Letter.

27. <u>Termination of Authorization to Use Cash Collateral</u>. Unless the Debtors obtain the prior written consent of the DIP Agent and DIP Lenders, until the entry of the Final Order, the Debtors are authorized to use Cash Collateral only in accordance with the line items set forth in the Budget. Upon the occurrence and during the continuance of an Event of Default

25

under the DIP Commitment Letter or of this Order, the DIP Lenders shall have no further obligation to provide financing under the DIP Commitment Letter as approved by this Order, and the authorization to use Cash Collateral under the terms of this Order shall automatically terminate; provided, however, that if the Debtors' right to use Cash Collateral has been terminated pursuant to the provisions of this Order, such right may be extended only upon (i) consent of the DIP Agent, (ii) the DIP Obligations and the Prepetition Indebtedness having been otherwise paid in full, or (iii) further Order of this Court entered upon and after appropriate notice and opportunity for a hearing being provided to the DIP Agent and the DIP Lenders. The DIP Agent and the DIP Lenders shall have no obligation to agree to such an extension under any circumstances and may elect or not elect to agree to such an extension as they determine in its sole and absolute discretion.

28. No Responsible Person/Fiduciary and Limits on Lender's Liability. In making the decision to enter into the DIP Financing Facility, administering the DIP Financing, and extending other financial accommodations to the Debtors under the DIP Commitment Letter or to collect the indebtedness and obligations of the Debtors, the DIP Agent and DIP Lenders (a) shall not owe any fiduciary duty to the Debtors, their creditors, shareholders or estates; and (b) shall not be considered to be exercising control over any operations of the Debtors or acting in any way as a responsible person, an owner or an operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute). Nothing in this Order or the DIP Commitment Letter or any other documents related to this transaction shall in any way be

26

construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders of any liability for any claims arising from the pre-petition or post-petition activities of the Debtors or any of their affiliates in the operation of their businesses or in connection with their restructuring efforts.

29.     Successors and Assigns.  The DIP Commitment Letter and the provisions of this Order shall be binding upon the DIP Agent, the DIP Lenders, the Prepetition Agent, Prepetition Lenders, the Debtors and their respective successors and assigns, and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent, Prepetition Lenders and the Debtors and their respective successors and assigns including, without limitation, any trustee, responsible officer, examiner with expanded powers, estate administrator or representative, or similar person appointed in a case for the Debtors under any chapter of the Bankruptcy Code.

30.     No Third Party Beneficiary.  Except with respect to any of the DIP Lenders, the Prepetition Agent, Prepetition Lenders, the DIP Agent, their delegates, indemnified parties pursuant to paragraph 13, successors and assigns, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

31.     Binding Nature of Agreement.  The DIP Commitment Letter constitutes a legal, valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms.  The rights, remedies, powers, privileges, liens and priorities of the DIP Agent and DIP Lenders and the Prepetition Agent and Prepetition Lenders provided for in this Order and in the DIP Commitment Letter shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code, unless and until the Prepetition Indebtedness and DIP Obligations have first been paid in full in cash and completely

satisfied and the total commitment is terminated in accordance with any subsequent approved DIP Credit Agreement.

32. <u>No Marshalling</u>. Subject to entry of the Final Order, neither the DIP Lenders nor the Prepetition Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine.

33. <u>Section 552(b)</u>. In light of their agreement to subordinate their liens and superpriority claims (i) to the Carve Out in the case of the DIP Lenders, and (ii) to the Carve Out and the DIP Liens in the case of the Prepetition Lenders, each of the DIP Lenders and Prepetition Lenders is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply with respect to proceeds, product, offspring or profits of any of the Collateral or Prepetition Collateral.

34. <u>Subsequent Reversal or Modification</u>. This Order is entered pursuant to § 364 of the Bankruptcy Code, granting the DIP Agent and DIP Lenders all protections afforded by § 364(e) of the Bankruptcy Code. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the DIP Agent and the DIP Lenders or the Prepetition Agent and Prepetition Lenders prior to the date of receipt by the DIP Lenders or the Prepetition Lenders of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Commitment Letter. Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the DIP Agent and DIP Lenders or the Prepetition Agent and Prepetition Lenders prior to written notice to the DIP Agent, the DIP Lenders and the Prepetition Lenders of the effective

RLF1 5573046v. 1

date of such action shall be governed in all respects by the original provisions of this Order, and DIP Agent and DIP Lenders and the Prepetition Agent and Prepetition Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Commitment Letter with respect to all such indebtedness, obligation or liability.

35.    <u>No Waivers</u>.  (a)  This Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Agent, the DIP Lenders, the Prepetition Agent, or Prepetition Lenders may have to bring or be heard on any matter brought before this Court.

(b)    The rights and obligations of the Debtors and the rights, claims, liens, security interests and priorities of the DIP Agent and the DIP Lenders arising under this Order are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted by the Debtors under the DIP Commitment Letter.

(c)    Without limiting the generality of the foregoing subparagraphs, the DIP Agent and/or the DIP Lenders may petition this Court for any such additional protection they may reasonably require with respect to the DIP Indebtedness or otherwise.

36.    <u>Sale/Conversion/Dismissal</u>.  (a) No motion shall be filed by the Debtors seeking, and no order shall be entered by the Court providing for, either the sale of the ownership of the stock of any of the Debtors or the sale of any of the assets of the Debtors under § 363 of the Bankruptcy Code without the express written consent of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to any such transaction or the entry of such an order by the Court unless such transaction is expressly permitted in the DIP Commitment Letter.

(b)    If an order is entered (i) dismissing any of these cases under §§ 305 or 1112 of the Bankruptcy Code or otherwise, (ii) converting these Chapter 11 cases under § 1112

29

of the Bankruptcy Code or (iii) appointing a chapter 11 trustee or an examiner with expanded powers, such order shall provide that (x) the liens, security interests and Superpriority Claims granted to the DIP Agent and the DIP Lenders hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Order until all DIP Obligations and the Prepetition Indebtedness shall have been indefeasibly paid in full in cash and the total commitment shall have been terminated, and (y) this Court shall retain jurisdiction to the fullest extent permitted by law, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Superpriority Claims of the DIP Agent and DIP Lenders, as the case may be.

37. <u>Injunction</u>. Except as provided in the DIP Credit Agreement, this Order and the Final Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases, (a) granting liens in the Collateral or any portion thereof to any other parties, pursuant to § 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, *pari passu* with or junior to the liens of the DIP Agent and DIP Lenders, except for the Adequate Protection Liens and liens granted to the DIP Agent, on behalf of itself and the DIP Lenders, in accordance with the Final Order as contemplated by the DIP Commitment Letter and the Motion and/or (b) (i) using the Cash Collateral, and (ii) applying to the Bankruptcy Court for an order authorizing the use of the Cash Collateral or the Collateral, except in accordance with the DIP Commitment Letter and this Order.

38. <u>Survival</u>. The liens, lien priority, administrative priorities and other rights and remedies with respect to the Debtors granted to the DIP Agent and the DIP Lenders pursuant to the DIP Commitment Letter and this Order (specifically including, but not limited to, the

existence, perfection and priority of the liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Debtor (pursuant to § 364 of the Bankruptcy Code or otherwise), by any dismissal or conversion of any of the Chapter 11 Cases, or by the confirmation of a plan of reorganization in any of the Chapter 11 Cases which does not (i) contain a provision for termination of the total commitment and payment in full in cash of the Prepetition Indebtedness and all Obligations of the Debtors hereunder and under the DIP Commitment Letter and the Prepetition Credit Agreement on or before the effective date of such plan or plans upon entry thereof and (ii) provide for the continuation of the liens and security interests granted to the DIP Agent and the DIP Lenders, and the priorities thereof until the earlier of (A) such plan effective date, and (B) the date the Prepetition Indebtedness and the DIP Obligations are paid in full in cash and the total commitment is terminated, or by any other act or omission whatsoever.

39. <u>Priority of Terms</u>. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Commitment Letter, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Commitment Letter, the terms and provisions of this Order shall govern.

40. <u>Adequate Notice</u>. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court. Under the circumstances, no other or further notice of the request for the relief granted at the Interim Hearing is required. The Debtors shall promptly mail copies of this Order

and notice of the Final Hearing to all parties entitled to notice. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received on or before _____, 2011 at 4:00 p.m. (Eastern Time) by the following: (a) counsel to the Debtors, Richards, Layton & Finger, P.A., 920 N. King Street, Wilmington, DE 19801, Attn: Daniel J. DeFranceschi and Michael J. Merchant, (b) counsel to the DIP Agent, Frederic Dorwart, Lawyers, 124 East Fourth Street, Tulsa, OK, 74103, Attn: Samuel S. Ory; (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, attn: Richard Scheparcarter; and (d) counsel to any Committee appointed in the chapter 11 cases. The Court shall conduct a Final Hearing on the Motion commencing on _____, 2011 at _____ . m. (Eastern Time).

41. The Debtors shall file an executed version of the DIP Credit Agreement and proposed Final Order, along with a notice identifying any provisions that need to be disclosed pursuant to Local Rule 4001-2(a)(ii) (and not already disclosed in the Motion), no later than _____, 2011 at ___:___ __.m. (Eastern Time), and serve such documents on all parties that were served with the Motion.

42. Retention of Jurisdiction. This Court shall retain jurisdiction over all matter pertaining to the implementation, interpretation and enforcement of this Order.

43. Binding Effect of Order. The terms of this Order shall be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

RLF1 5573046v. 1

44. <u>Entry of Order; Effect</u>. This Order shall take effect immediately upon execution, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Order on the Court's docket in these Chapter 11 Cases.

Dated: _____, 2011
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 5573046v. 1

# EXHIBIT "A" TERM SHEET

Debtor in Possession Financing Facility

Blitz U.S.A., Inc.
LAM 2011 Holdings, LLC
Blitz Acquisition Holdings, Inc.
Blitz Acquisition, LLC
Blitz RE Holdings, LLC
F3 Brands LLC

Summary of Terms and Conditions

This Summary of Terms and Conditions (this "Term Sheet") dated November 8, 2011 is for a debtor-in- possession credit facility for Blitz U.S.A., Inc., LAM 2011 Holdings, LLC, Blitz Acquisition Holdings, Inc., Blitz Acquisition, LLC, Blitz RE Holdings, LLC, and F3 Brands LLC (collectively, the "Debtors") in connection with the commencement by the Debtors of one of more cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

This Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the facilities described herein, but rather is intended to outline certain material items around which the facilities will be structured and definitive documentation negotiated. This Term Sheet is not intended to limit the scope of discussion or negotiation of any and all matters whether or not set forth herein; provided, however, that neither the Agent and the Lenders, on the one hand, nor the Debtors, on the other hand, or any of their respective officers and directors have any fiduciary duty to the other and no such duty shall be created or required between the parties by the terms of the definitive documentation nor shall any term of the definitive documentation require such officers or directors to violate their existing fiduciary duties.

| | |
|---|---|
| Agent | BOKF, NA d/b/a Bank of Oklahoma (the "Agent"). |
| Lenders | BOKF, NA d/b/a Bank of Oklahoma, The F&M Bank & Trust Company, and Citizens Security Bank and Trust Company (the "Lenders"), all of which are also currently lenders under the First Amended and Restated Credit Agreement dated as of February 4, 2011 (as amended, the "Pre-Petition Credit Facility"), among Blitz U.S.A., Inc., Blitz RE Holdings, LLC as borrowers, F3 Brands LLC and certain affiliates signatory thereto as guarantors, BOKF, NA d/b/a Bank of Oklahoma, as administrative agent ("Pre-Petition Agent"), and the lenders from time to time party thereto ("Pre-Petition Lenders"). |
| Borrowers | Each Debtor shall be a Borrower, and shall be jointly and severally liable. |
| Borrowing Limits | The Lenders shall provide a revolving credit facility (the "DIP Financing Facility") in an aggregate principal amount not to exceed $5,000,000 (the "Maximum Loan Amount"). The DIP Financing Facility will be used to provide working capital to the Debtors in accordance with the aggregate net cash deficit as projected by the rolling 13-week budget prepared by Debtors in form and substance acceptable to the Lenders (the "Approved Budget") plus such additional amount needed to enable Borrowers to maintain a cash balance of approximately $1,500,000, not to exceed the Maximum Loan Amount. The initial Approved Budget is attached as Exhibit A hereto. The Debtors anticipate that there will be no need to draw on the DIP Financing Facility in the initial stages of the Chapter 11 Cases, and therefore the Interim DIP Order shall not approve any drawing on |

the DIP Financing Facility, but shall authorize entry into the DIP Financing Facility, certain stipulations regarding the Pre-Petition Credit Facility, and the use of Cash Collateral, all as set forth herein. For the avoidance of doubt, absent written consent of the Lenders, no Approved Budget shall provide for professional fees associated with the Chapter 11 Cases to exceed $500,000 on a roll-forward monthly basis (the "Professional Fee Cap"). The Debtors shall at all times employ an independent financial advisor acceptable to the Agent and the Lenders. The Professional Fee Cap shall not included fees and expenses incurred for employment of a broker, investment banker or auctioneer in connection with the efforts to sell F3 Brands LLC, Reliance Products Holdings, Inc. and the Excess Equipment, all of which shall be paid from the proceeds of the sale of such entities or equipment.

| | |
|---|---|
| Interest Rate | Interest will accrue on all extensions of credit at LIBOR plus 8.00% per annum. Upon the occurrence and during the continuance of an event of default under the DIP Financing Facility, interest shall accrue at the non-default rate plus 2.00% per annum. |
| Origination Fee | The fee for origination of the DIP Financing Facility (the "Origination Fee") shall be $75,000. |
| Unused Line Fee | LIBOR plus 1.00% per annum times the Maximum Loan Amount less the sum of the outstanding daily balance. |
| Letters of Credit | N/A. |
| Use of Proceeds | The proceeds of the DIP Financing Facility and Cash Collateral shall be used solely to pay the post-petition operating expenses of the Debtors and other costs and expenses of administration of the Debtors' Chapter 11 Cases solely in accordance with the Approved Budget and the DIP Financing Credit Agreement, including the payment of any prepetition amounts authorized by the Bankruptcy Court. |

For the avoidance of doubt, no proceeds of the DIP Financing Facility and no Cash Collateral (including the Carve-Out Expenses), may be used (a) to seek the modification, stay, or amendment of the DIP Orders without the consent of the Agent, (b) to oppose any action, including a motion seeking relief from the stay, by the holders of the DIP Financing Facility or the Agent, (c) to fund any action which constitutes an Event of Default under the DIP Financing Credit Agreement or the DIP Orders.

Not more than $10,000 may be used to pay the expenses of a Creditors' Committee to investigate the extent, validity and priority of the claims and liens under the Pre-Petition Credit Facility. In no event may any Cash Collateral or DIP Proceeds be used to challenge any liens or claims (or the priority thereof) under the Pre-Petition Credit Facility.

| | |
|---|---|
| Maturity | All obligations under the DIP Financing Facility will become due and payable on the date that is the earliest to occur of the following dates (the "Maturity Date"): |

(a)　　30 days after the entry of the Interim DIP Order if a final order ("Final DIP Order" and collectively with the Interim DIP Order, the "DIP Orders"), in form and substance acceptable to the Lenders, has not been entered on or prior to such date;

(b)　　if the Final DIP Order has been entered on or prior to 30 days following the date of entry of the Interim DIP Order, then June 30, 2012;

(c)      the effective date of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court;

and

(d)      such earlier date on which all of the obligations under the DIP Financing Facility shall become due and payable in accordance with the terms of the DIP Financing Credit Agreement.

Benchmarks:          The Debtors shall have accomplished each of the following tasks by the dates set forth below (the "Benchmark Requirements").

(a)      Debtors shall have identified a stalking horse bidder, and have entered into a stalking horse asset purchase agreement for the sale of F3 Brands LLC on terms acceptable to the Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders) on or before January 16, 2012, to the extent of the then outstanding and unpaid allowed claims of Lenders and/or the Pre-Petition Lenders.

(b)      Debtors shall have filed a motion to approve the sale of F3 Brands LLC on terms acceptable to the Agent and Lenders on or before January 18, 2012.

(c)      A sale of F3 Brands LLC on terms acceptable to Agent and Lenders shall have occurred on or before March 16, 2012.

(d)      A sales broker acceptable to Agent and Lenders shall have been engaged on terms acceptable to Agent and Lenders to sell Reliance Products Holdings, Inc. on or before December 16, 2011.

(e)      A prospectus shall have been prepared and circulated broadly (as determined by the sales broker) to potential buyers of Reliance Products Holdings, Inc. on or before January 16, 2012.

(f)      A sale of Reliance Products Holdings, Inc. on terms acceptable to the Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders) on or before May 31, 2012.

(g)      On or before December 15, 2011, Debtors shall have formulated and presented to Agent and Lenders, for review by the Agent and Lenders, a business plan for the period January 1, 2012 through June 30, 2012  (the "Business Plan") which will address, among other things, (i) a plan to reverse negative cash flow and net income, (ii) milestones for resolution of Chapter 11 Cases (including filing Chapter 11 Plan and outline thereof); and (iii) addressing product liability concerns post-reorganization (including any insurance needs).  The Business Plan will address employee incentive compensation for accomplishing all Benchmark Requirements.

(h)      On or before November 30, 2011, Debtors will identify any excess equipment and other assets ("Excess Equipment") to be sold and present a plan for such sale, such plan to be acceptable to Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders).

(i)      All Excess Equipment shall have been liquidated on or before February 28, 2012.

| Events of Default | Customary and appropriate for financings of this type and for this transaction in particular (subject to customary and appropriate grace periods), and customary bankruptcy defaults, including, without limitation any of the foregoing (herein, an "Event of Default"): |

(a)     the Interim DIP Order or the Final DIP Order shall have been stayed, amended, modified, reversed or vacated without the consent of the Lenders;

(b)     the Final DIP Order shall not have been entered within 30 days from the entry of the Interim DIP Order;

(c)     appointment of a trustee, or appointment of an examiner with expanded powers;

(d)     subject to the payments permitted by the Approved Budget and amounts paid on account of pre-petition claims pursuant to any order of the Court, the payment by a Debtor of, or application by any Debtor for authority to pay, any pre-petition claim without the Lenders' consent;

(e)     the allowance of any claim under Section 506(c) of the Bankruptcy Code against the Agent or the Lenders, or against any agent or lender in connection with the Pre-Petition Credit Facilities;

(f)     without the Lenders' consent, the board of directors of any Debtor authorizes (or the Debtors shall file a motion seeking approval of, or bidding procedures in respect of) the sale of all or substantially all of the assets of such Debtor, either pursuant to Section 363 of the Bankruptcy Code or otherwise;

(g)     the dismissal of any of the Chapter 11 Cases, or the conversion of any Chapter 11 Case to a Chapter 7 Case, or any Debtor shall file a motion or other pleading seeking the dismissal of its Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(h)     the entry of an order by the Bankruptcy Court granting relief from the automatic stay to allow any creditor to execute upon or enforce a lien on any Collateral unless the Agent consents to the entry of such order;

(i)     the failure to meet any Benchmark Requirement as of the date set forth above (whereupon there will be no further advances under the DIP Financing Facility, and the DIP Financing Facility shall be repaid in full within 30 days);

(j)     the failure to meet the Budget Compliance requirements;

(k)     the Debtors shall propose any plan of reorganization, other than a plan which either (i) provides for the payment in full in cash on the effective date of all obligations under the DIP Financing Facility or (ii) is acceptable to the Lenders in their sole and absolute discretion;

(l)     failure to achieve certain milestones to be agreed with respect to the timing of a plan of reorganization process;

(m)     An order is entered confirming a plan of reorganization which does not provide for payment in full in cash of all obligations under the DIP Financing Facility on or before the effective date of such plan and for the continuation of the liens and priorities granted to the Lenders until such plan effective date; and

(n)	except for the Carve Out Expenses and except as otherwise provided by the DIP Orders, the entry of an order in granting any super priority administrative claim or lien equal or superior to that granted on behalf of the Agent and the Lenders.

Collateral	Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Debtors under the DIP Financing Facility will be secured by first priority priming liens and security interests (subject to any prior Permitted Liens as defined in the Prepetition Credit Agreement) in and to all of the Debtors' assets, including avoidance actions under Chapter 5 of the Bankruptcy Code (the "Collateral"). Such liens on the Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or post-petition liens and security interests, subject only to the Carve-Out Expenses. The Agent and the Lenders shall also have a superpriority administrative expense claim under section 364(c)(1) against the Debtors for the amount of all obligations under the DIP Financing Facility. Notwithstanding the foregoing, Debtors may seek the sale or factoring of their accounts receivable, such sale or factoring to be on terms acceptable to Agent and Lenders and Pre-Petition Agent and Lenders.

Conditions	In addition to those customarily found in credit agreements for similar secured financings, all extensions of credit under the DIP Financing Facility and any use of Cash Collateral will be subject to the following conditions precedent:

(a)	Blitz Acquisitions Holdings, Inc. shall have provided a consent and agreement in form and substance acceptable to Agent and Lenders wherein Blitz Acquisitions Holdings, Inc. shall undertake to meet all of the Benchmark Requirements in respect of Reliance Products Holdings, Inc.

(b)	The Agent shall have received a copy of the first Approved Budget (which shall be attached to Interim DIP Order), in form and substance satisfactory to the Lenders in their sole discretion;

(c)	The Bankruptcy Court shall have entered an interim order approving the DIP Financing Facility and the use of Cash Collateral as outlined herein and granting the priority liens and administrative expense claims referred to herein, in form and substance acceptable to the Lenders, no later than 5 business days following the commencement of the Chapter 11 Cases;

(d)	All first day motions filed by the Debtors and all first day orders entered on the docket of the Bankruptcy Court shall be satisfactory to the Lenders;

(e)	No material adverse change shall have occurred with respect to the, operations, properties, or financial condition of the Debtors, taken as a whole, since the commencement of the Chapter 11 Cases;

(f)	A final order approving the DIP Financing Facility in form and substance acceptable to the Agent and the Lenders shall have been entered and become a final order, no longer subject to appeal, no appeal having been filed, and no stay or modification not consented to by the Agent the Lenders having been entered.

(g)	No continuing default or event of default; and

(h)     Each borrowing shall be consistent with the most recent Approved Budget subject to any variances as permitted by the DIP Financing Credit Agreement.

**Unpaid Interest/Fees**  Upon the closing of the DIP Financing Facility, the Borrowers shall pay all accrued and unpaid prepetition nondefault rate interest owing to the lenders under the Pre- Petition Revolver Facility and all invoiced and unpaid fees and expenses incurred in connection with the Pre-Petition Credit Facility and the DIP Financing Facility.

**Adequate Protection**  As adequate protection for their prepetition secured claims against the Debtors, the DIP Orders shall (i) provide the agents and lenders under the Pre-Petition Credit Facility with allowed superpriority administrative expense claims against the Debtors under Section 507(b) of the Bankruptcy Code (which shall be junior in right of payment to all obligations under the DIP Financing Facility), (ii) provide the lenders under the Pre-Petition Credit Facility with additional and replacement liens on all property of the Debtors (including Unencumbered Collateral) to the extent of any diminution in value of the collateral securing the Prepetition Credit Facility, and (iii) during the period up until the entry of the Final Order, provide that the lenders under the Pre-Petition Credit Facility shall receive payments equal to interest at the non-default rate (and the parties shall preserve all rights with respect to post-petition interest at the default rate).

**Lien Challenges**  The Debtors shall stipulate to the amount, priority and validity of the claim and liens of the lenders and agent under the Pre-Petition Credit Facility, and shall release any and all claims against the lenders and the agent under the Pre-Petition Credit Facility. Until the later of sixty days following the appointment of a Creditors' Committee, or such other date as the Lenders may agree, the Creditors Committee (but no other person or entity) may challenge the liens on the prepetition collateral securing obligations under the Pre-Petition Credit Facilities or the amount and allowance of the prepetition indebtedness thereunder.

**Indemnification**  Whether or not this transaction is consummated, each Debtor shall indemnify and hold harmless the Agent, each Lender, their respective subsidiaries and affiliates, and their respective officers, directors, employees, agents and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted against such entity or individual in connection with this transaction, except to the extent any of the foregoing results from the willful misconduct of such entity or individual as determined by a final judgment of a court of competent jurisdiction.

**Repayments**  The obligations under the DIP Financing Facility, or any portion thereof, may be voluntarily repaid at any time prior to Maturity Date without prepayment premium or penalty.

Unless otherwise permitted to be retained by the Debtors pursuant to the Approved Budget, the Debtors shall use the net cash proceeds of the following to make mandatory repayments of the obligations, at the option of the DIP Lenders, either (A) under the DIP Financing Facility (with carveouts, materiality thresholds and reinvestment rights, if any, to be agreed – and with such payment to be a permanent reduction of availability at the option of DIP Lenders), or (B) under the Pre-petition Credit Facility, to be applied in accordance with its terms: (1) asset dispositions other than in the ordinary course of business (which dispositions shall be permitted only with the prior consent of the Lenders), (2) the issuance of equity or equity interests by the Debtors, (3) income tax refunds, (4) insurance proceeds (excluding casualty insurance proceeds used to restore or replace the affected properties), (5) proceeds of judgments or settlements, (6) purchase price adjustments received in connection with any purchase agreement.

Amounts repaid under the DIP Financing Facility may not be re-borrowed, absent consent of the Lenders

**Carve Out**

The Agent's and Lenders' liens and administrative claims shall be subject to the prior payment of the Carve Out Expenses. "Carve Out Expenses" shall mean (i) allowed, accrued, but unpaid professional fees of the Debtors and one official committee of creditors consistent with the Approved Budget which have been incurred prior to the occurrence of an Event of Default (regardless of when deemed allowed, and authorized to be paid), (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and such official committee of creditors which are actually and reasonably incurred after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $500,000, and (iii) fees payable to the U.S. trustee pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court; provided, however, that the Carve-Out Expenses shall not include (a) any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (b) any fees or expenses of a Chapter 7 trustee, (c) any fees or disbursements arising after the conversion of any of the Chapter 11 Cases to a Chapter 7 Case (d) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of investigation of prepetition secured claims except as specifically permitted by the DIP Orders or (e) any fees or disbursements related to any challenge or objection to the debt or collateral position of the DIP Agent or the Lenders or hindering or delaying the DIP Agent's or any Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing

The Agent shall have the right to establish reserves against borrowing availability under the DIP Financing Facility with respect to the Carve Out Expenses.

**Budget Compliance**

The DIP Financing Credit Agreement shall provide that the Debtors shall be required, absent consent of the Lenders, to comply with the Approved Budget as follows, and any failure to do so shall constitute an Event of Default:

(i) the Debtors' aggregate cumulative (over any consecutive 4 week period) revenue for any period, as compared to such amounts as set forth in the Approved Budget for such period, shall have not have a negative variance exceeding 10%;

(ii) the Debtors' operating expenses (over any consecutive 4 week period), for any period, for both any individual line item or on an aggregate cumulative basis over all line items, as compared to such amounts as set forth in the Approved Budget for such period, shall not have a positive variance exceeding 10%.

**Reps/Covenants**

The DIP Financing Credit Agreement shall provide for customary and appropriate representations, warranties and affirmative and negative covenants for financings of this type and for this transaction in particular (with carveouts and qualifications to be agreed) including, without limitation, restrictions regarding:

(a) incurrence of indebtedness and liens;

(b) asset dispositions other than equipment in the ordinary course of business;

(c) sale and leaseback transactions;

(d) changes Debtors' corporate or organizational existence;

(e)     payment of dividends;

(f)     acquisitions and investments;

(g)     transactions with affiliates; and

(h)     modifications to material contracts, assumption of prepetition contracts and entry into material postpetition contracts.

In addition, the Debtors shall discuss the terms of a possible post effective date exit financing facility with the Lenders as soon as practical. The Debtors shall provide reasonable details on a regular basis regarding discussions with potential exit lenders. The Debtors shall provide the Lenders with a right of first refusal with respect to any post effective date financing facility entered into with lenders other than the Lenders.

| | |
|---|---|
| Governing Law | Delaware |
| Assignments, Voting etc. | The DIP Financing Credit Agreement will contain provisions that are customary for facilities of this type and which are otherwise acceptable to the Lenders, and will include a requirement for unanimous votes on certain critical issues, such as the application of mandatory repayments. |
| Expenses | All reasonable costs and expenses of Agent and Lenders in connection with the Chapter 11 Cases or the DIP Financing Facility shall be reimbursed by the Debtors on a current basis. |
| Documentation | The DIP Financing Facility shall be documenting in a credit agreement (the "DIP Financing Credit Agreement") and such other documents, agreements, certificates and opinions as reasonably required by Agent or Lenders, all in form and substance acceptable to Agent and Lenders in their sole discretion. |

# EXHIBIT "B" APPROVED BUDGET

## Blitz USA, Inc.
### 13 Week Forecast - Consolidated
($'s)

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 11/12/2011 | 11/19/2011 | 11/26/2011 | 12/3/2011 | 12/10/2011 | 12/17/2011 | 12/24/2011 | 12/31/2011 | 1/7/2012 | 1/14/2012 | 1/21/2012 | 1/28/2012 | 2/4/2012 | |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| AR Collections¹ | $ 1,654,356 | 1,642,650 | 1,243,216 | 1,639,535 | 1,464,713 | 905,908 | 957,767 | 922,482 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | $ 15,876,806 |
| Total Cash Receipts | 1,654,356 | 1,642,650 | 1,243,216 | 1,638,535 | 1,464,713 | 905,908 | 957,767 | 922,482 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | 15,876,806 |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll & Taxes | 156,000 | 227,000 | 156,000 | 156,000 | 156,000 | 156,000 | 227,000 | 156,000 | 156,000 | 156,000 | 227,000 | 156,000 | 156,000 | 2,241,000 |
| Benefits | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 1,033,500 |
| Raw Material Payments² | 212,317 | 212,317 | 212,317 | 212,317 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 7,218,784 |
| All Other³ | - | - | 120,000 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 2,358,465 |
| Subtotal | 447,817 | 518,817 | 567,817 | 671,664 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,167,070 | 12,851,749 |
| Note Payments⁴ | - | - | 120,000 | - | - | - | - | 120,000 | - | - | - | - | 120,000 | 360,000 |
| Revolver | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Product Liability | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Fees - Debtor | - | - | - | - | - | - | - | 450,000 | - | - | - | - | 450,000 | 900,000 |
| Restructuring Fees - Creditor | - | - | - | - | - | - | - | 50,000 | - | - | - | - | 50,000 | 100,000 |
| US Trustee Fee | - | - | - | - | - | - | - | 13,000 | - | - | - | - | - | 13,000 |
| Capital Purchases | - | 217,747 | - | - | 145,176 | - | - | - | - | - | - | - | - | 362,923 |
| Total Disbursements | 447,817 | 736,564 | 687,817 | 671,664 | 1,312,246 | 1,167,070 | 1,238,070 | 1,800,070 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,787,070 | 14,587,672 |
| Projected Change in Cash | 1,206,539 | 906,086 | 555,399 | 966,871 | 152,467 | (260,162) | (280,303) | (877,588) | (77,835) | (77,835) | (148,835) | (77,835) | (697,835) | 1,289,134 |
| CASH, beginning of period | 647,403 | 1,853,942 | 2,760,028 | 3,315,427 | 4,282,298 | 4,434,765 | 4,174,602 | 3,894,299 | 3,016,710 | 2,938,876 | 2,861,041 | 2,712,207 | 2,634,372 | 647,403 |
| CASH, end of period | $ 1,853,942 | 2,760,028 | 3,315,427 | 4,282,298 | 4,434,765 | 4,174,602 | 3,894,299 | 3,016,710 | 2,938,876 | 2,861,041 | 2,712,207 | 2,634,372 | 1,936,537 | $ 1,936,537 |

¹Projecting a 5% decline in revenues beginning after the filing (collections 60 days later) as large, single source retailers move to expand their supply base to competitors

²Company will have the benefit of the stay for approximately 28 days (terms will be reduced from 38 days to 28 days) with the exception of critical vendors which we estimate to be 30% of the current accounts payable

³Company will have the benefit of the stay for 30 days but will be required to post a utilities deposit of $120,000 30 days following the filing and an additional $200,000 for other emergency deposits within one week of the filing.

⁴Limited to the payment of interest