# EXHIBIT B

# DIP Commitment Letter

Debtor in Possession Financing Facility

Blitz U.S.A., Inc.
LAM 2011 Holdings, LLC
Blitz Acquisition Holdings, Inc.
Blitz Acquisition, LLC
Blitz RE Holdings, LLC
F3 Brands LLC

Summary of Terms and Conditions

This Summary of Terms and Conditions (this "Term Sheet") dated November 8, 2011 is for a debtor-in- possession credit facility for Blitz U.S.A., Inc., LAM 2011 Holdings, LLC, Blitz Acquisition Holdings, Inc., Blitz Acquisition, LLC, Blitz RE Holdings, LLC, and F3 Brands LLC (collectively, the "Debtors") in connection with the commencement by the Debtors of one of more cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

This Term Sheet does not attempt to describe all of the terms, conditions and requirements that would pertain to the facilities described herein, but rather is intended to outline certain material items around which the facilities will be structured and definitive documentation negotiated. This Term Sheet is not intended to limit the scope of discussion or negotiation of any and all matters whether or not set forth herein; provided, however, that neither the Agent and the Lenders, on the one hand, nor the Debtors, on the other hand, or any of their respective officers and directors have any fiduciary duty to the other and no such duty shall be created or required between the parties by the terms of the definitive documentation nor shall any term of the definitive documentation require such officers or directors to violate their existing fiduciary duties.

| | |
|---|---|
| Agent | BOKF, NA d/b/a Bank of Oklahoma (the "Agent"). |
| Lenders | BOKF, NA d/b/a Bank of Oklahoma, The F&M Bank & Trust Company, and Citizens Security Bank and Trust Company (the "Lenders"), all of which are also currently lenders under the First Amended and Restated Credit Agreement dated as of February 4, 2011 (as amended, the "Pre-Petition Credit Facility"), among Blitz Acquisition, LLC, Blitz U.S.A., Inc., Blitz RE Holdings, LLC as borrowers, F3 Brands LLC and certain affiliates signatory thereto as guarantors, BOKF, NA d/b/a Bank of Oklahoma, as administrative agent ("Pre-Petition Agent"), and the lenders from time to time party thereto ("Pre-Petition Lenders"). |
| Borrowers | Each Debtor shall be a Borrower, and shall be jointly and severally liable. |
| Borrowing Limits | The Lenders shall provide a revolving credit facility (the "DIP Financing Facility") in an aggregate principal amount not to exceed $5,000,000 (the "Maximum Loan Amount"). The DIP Financing Facility will be used to provide working capital to the Debtors in accordance with the aggregate net cash deficit as projected by the rolling 13-week budget prepared by Debtors in form and substance acceptable to the Lenders (the "Approved Budget") plus such additional amount needed to enable Borrowers to maintain a cash balance of approximately $1,500,000, not to exceed the Maximum Loan Amount. The initial Approved Budget is attached as Exhibit A hereto. The Debtors anticipate that there will be no need to draw on the DIP Financing Facility in the initial stages of the Chapter 11 Cases, and therefore the Interim DIP Order shall not approve any drawing on |

the DIP Financing Facility, but shall authorize entry into the DIP Financing Facility, certain stipulations regarding the Pre-Petition Credit Facility, and the use of Cash Collateral, all as set forth herein. For the avoidance of doubt, absent written consent of the Lenders, no Approved Budget shall provide for professional fees associated with the Chapter 11 Cases to exceed $500,000 on a roll-forward monthly basis (the "Professional Fee Cap"). The Debtors shall at all times employ an independent financial advisor acceptable to the Agent and the Lenders. The Professional Fee Cap shall not included fees and expenses incurred for employment of a broker, investment banker or auctioneer in connection with the efforts to sell F3 Brands LLC, Reliance Products Holdings, Inc. and the Excess Equipment, all of which shall be paid from the proceeds of the sale of such entities or equipment.

| | |
|---|---|
| Interest Rate | Interest will accrue on all extensions of credit at LIBOR plus 8.00% per annum. Upon the occurrence and during the continuance of an event of default under the DIP Financing Facility, interest shall accrue at the non-default rate plus 2.00% per annum. |
| Origination Fee | The fee for origination of the DIP Financing Facility (the "Origination Fee") shall be $75,000. |
| Unused Line Fee | LIBOR plus 1.00% per annum times the Maximum Loan Amount less the sum of the outstanding daily balance. |
| Letters of Credit | N/A. |
| Use of Proceeds | The proceeds of the DIP Financing Facility and Cash Collateral shall be used solely to pay the post-petition operating expenses of the Debtors and other costs and expenses of administration of the Debtors' Chapter 11 Cases solely in accordance with the Approved Budget and the DIP Financing Credit Agreement, including the payment of any prepetition amounts authorized by the Bankruptcy Court. |
| | For the avoidance of doubt, no proceeds of the DIP Financing Facility and no Cash Collateral (including the Carve-Out Expenses), may be used (a) to seek the modification, stay, or amendment of the DIP Orders without the consent of the Agent, (b) to oppose any action, including a motion seeking relief from the stay, by the holders of the DIP Financing Facility or the Agent, (c) to fund any action which constitutes an Event of Default under the DIP Financing Credit Agreement or the DIP Orders. |
| | Not more than $10,000 may be used to pay the expenses of a Creditors' Committee to investigate the extent, validity and priority of the claims and liens under the Pre-Petition Credit Facility. In no event may any Cash Collateral or DIP Proceeds be used to challenge any liens or claims (or the priority thereof) under the Pre-Petition Credit Facility. |
| Maturity | All obligations under the DIP Financing Facility will become due and payable on the date that is the earliest to occur of the following dates (the "Maturity Date"): |
| | (a) 30 days after the entry of the Interim DIP Order if a final order ("Final DIP Order" and collectively with the Interim DIP Order, the "DIP Orders"), in form and substance acceptable to the Lenders, has not been entered on or prior to such date; |
| | (b) if the Final DIP Order has been entered on or prior to 30 days following the date of entry of the Interim DIP Order, then June 30, 2012; |

|  | (c) the effective date of a plan of reorganization in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court; |
|---|---|
|  | and |
|  | (d) such earlier date on which all of the obligations under the DIP Financing Facility shall become due and payable in accordance with the terms of the DIP Financing Credit Agreement. |
| Benchmarks: | The Debtors shall have accomplished each of the following tasks by the dates set forth below (the "Benchmark Requirements"). |
|  | (a) Debtors shall have identified a stalking horse bidder, and have entered into a stalking horse asset purchase agreement for the sale of F3 Brands LLC on terms acceptable to the Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders) on or before January 16, 2012, to the extent of the then outstanding and unpaid allowed claims of Lenders and/or the Pre-Petition Lenders. |
|  | (b) Debtors shall have filed a motion to approve the sale of F3 Brands LLC on terms acceptable to the Agent and Lenders on or before January 18, 2012. |
|  | (c) A sale of F3 Brands LLC on terms acceptable to Agent and Lenders shall have occurred on or before March 16, 2012. |
|  | (d) A sales broker acceptable to Agent and Lenders shall have been engaged on terms acceptable to Agent and Lenders to sell Reliance Products Holdings, Inc. on or before December 16, 2011. |
|  | (e) A prospectus shall have been prepared and circulated broadly (as determined by the sales broker) to potential buyers of Reliance Products Holdings, Inc. on or before January 16, 2012. |
|  | (f) A sale of Reliance Products Holdings, Inc. on terms acceptable to the Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders) on or before May 31, 2012. |
|  | (g) On or before December 15, 2011, Debtors shall have formulated and presented to Agent and Lenders, for review by the Agent and Lenders, a business plan for the period January 1, 2012 through June 30, 2012 (the "Business Plan") which will address, among other things, (i) a plan to reverse negative cash flow and net income, (ii) milestones for resolution of Chapter 11 Cases (including filing Chapter 11 Plan and outline thereof); and (iii) addressing product liability concerns post-reorganization (including any insurance needs). The Business Plan will address employee incentive compensation for accomplishing all Benchmark Requirements. |
|  | (h) On or before November 30, 2011, Debtors will identify any excess equipment and other assets ("Excess Equipment") to be sold and present a plan for such sale, such plan to be acceptable to Agent and Lenders (including that all sale proceeds will be paid to Agent for the benefit of Lenders and/or Pre-Petition Agent for the benefit of Pre-Petition Lenders). |
|  | (i) All Excess Equipment shall have been liquidated on or before February 28, 2012. |

| Events of Default | Customary and appropriate for financings of this type and for this transaction in particular (subject to customary and appropriate grace periods), and customary bankruptcy defaults, including, without limitation any of the foregoing (herein, an "Event of Default"): |
|---|---|

(a) the Interim DIP Order or the Final DIP Order shall have been stayed, amended, modified, reversed or vacated without the consent of the Lenders;

(b) the Final DIP Order shall not have been entered within 30 days from the entry of the Interim DIP Order;

(c) appointment of a trustee, or appointment of an examiner with expanded powers;

(d) subject to the payments permitted by the Approved Budget and amounts paid on account of pre-petition claims pursuant to any order of the Court, the payment by a Debtor of, or application by any Debtor for authority to pay, any pre-petition claim without the Lenders' consent;

(e) the allowance of any claim under Section 506(c) of the Bankruptcy Code against the Agent or the Lenders, or against any agent or lender in connection with the Pre-Petition Credit Facilities;

(f) without the Lenders' consent, the board of directors of any Debtor authorizes (or the Debtors shall file a motion seeking approval of, or bidding procedures in respect of) the sale of all or substantially all of the assets of such Debtor, either pursuant to Section 363 of the Bankruptcy Code or otherwise;

(g) the dismissal of any of the Chapter 11 Cases, or the conversion of any Chapter 11 Case to a Chapter 7 Case, or any Debtor shall file a motion or other pleading seeking the dismissal of its Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(h) the entry of an order by the Bankruptcy Court granting relief from the automatic stay to allow any creditor to execute upon or enforce a lien on any Collateral unless the Agent consents to the entry of such order;

(i) the failure to meet any Benchmark Requirement as of the date set forth above (whereupon there will be no further advances under the DIP Financing Facility, and the DIP Financing Facility shall be repaid in full within 30 days);

(j) the failure to meet the Budget Compliance requirements;

(k) the Debtors shall propose any plan of reorganization, other than a plan which either (i) provides for the payment in full in cash on the effective date of all obligations under the DIP Financing Facility or (ii) is acceptable to the Lenders in their sole and absolute discretion;

(l) failure to achieve certain milestones to be agreed with respect to the timing of a plan of reorganization process;

(m) An order is entered confirming a plan of reorganization which does not provide for payment in full in cash of all obligations under the DIP Financing Facility on or before the effective date of such plan and for the continuation of the liens and priorities granted to the Lenders until such plan effective date; and

|  | (n) except for the Carve Out Expenses and except as otherwise provided by the DIP Orders, the entry of an order in granting any super priority administrative claim or lien equal or superior to that granted on behalf of the Agent and the Lenders. |
|---|---|
| Collateral | Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, all obligations of the Debtors under the DIP Financing Facility will be secured by first priority priming liens and security interests (subject to any prior Permitted Liens as defined in the Prepetition Credit Agreement) in and to all of the Debtors' assets, including avoidance actions under Chapter 5 of the Bankruptcy Code (the "Collateral"). Such liens on the Collateral will be valid, enforceable and perfected first-priority priming liens and security interests, with priority over any and all prepetition or post-petition liens and security interests, subject only to the Carve-Out Expenses. The Agent and the Lenders shall also have a superpriority administrative expense claim under section 364(c)(1) against the Debtors for the amount of all obligations under the DIP Financing Facility. Notwithstanding the foregoing, Debtors may seek the sale or factoring of their accounts receivable, such sale or factoring to be on terms acceptable to Agent and Lenders and Pre-Petition Agent and Lenders. |
| Conditions | In addition to those customarily found in credit agreements for similar secured financings, all extensions of credit under the DIP Financing Facility and any use of Cash Collateral will be subject to the following conditions precedent: |

(a) Blitz Acquisitions Holdings, Inc. shall have provided a consent and agreement in form and substance acceptable to Agent and Lenders wherein Blitz Acquisitions Holdings, Inc. shall undertake to meet all of the Benchmark Requirements in respect of Reliance Products Holdings, Inc.

(b) The Agent shall have received a copy of the first Approved Budget (which shall be attached to Interim DIP Order), in form and substance satisfactory to the Lenders in their sole discretion;

(c) The Bankruptcy Court shall have entered an interim order approving the DIP Financing Facility and the use of Cash Collateral as outlined herein and granting the priority liens and administrative expense claims referred to herein, in form and substance acceptable to the Lenders, no later than 5 business days following the commencement of the Chapter 11 Cases;

(d) All first day motions filed by the Debtors and all first day orders entered on the docket of the Bankruptcy Court shall be satisfactory to the Lenders;

(e) No material adverse change shall have occurred with respect to the, operations, properties, or financial condition of the Debtors, taken as a whole, since the commencement of the Chapter 11 Cases;

(f) A final order approving the DIP Financing Facility in form and substance acceptable to the Agent and the Lenders shall have been entered and become a final order, no longer subject to appeal, no appeal having been filed, and no stay or modification not consented to by the Agent the Lenders having been entered.

(g) No continuing default or event of default; and

|  | (h) Each borrowing shall be consistent with the most recent Approved Budget subject to any variances as permitted by the DIP Financing Credit Agreement. |
|---|---|
| Unpaid Interest/Fees | Upon the closing of the DIP Financing Facility, the Borrowers shall pay all accrued and unpaid prepetition nondefault rate interest owing to the lenders under the Pre- Petition Revolver Facility and all invoiced and unpaid fees and expenses incurred in connection with the Pre-Petition Credit Facility and the DIP Financing Facility. |
| Adequate Protection | As adequate protection for their prepetition secured claims against the Debtors, the DIP Orders shall (i) provide the agents and lenders under the Pre-Petition Credit Facility with allowed superpriority administrative expense claims against the Debtors under Section 507(b) of the Bankruptcy Code (which shall be junior in right of payment to all obligations under the DIP Financing Facility), (ii) provide the lenders under the Pre-Petition Credit Facility with additional and replacement liens on all property of the Debtors (including Unencumbered Collateral) to the extent of any diminution in value of the collateral securing the Prepetition Credit Facility, and (iii) during the period up until the entry of the Final Order, provide that the lenders under the Pre-Petition Credit Facility shall receive payments equal to interest at the non-default rate (and the parties shall preserve all rights with respect to post-petition interest at the default rate). |
| Lien Challenges | The Debtors shall stipulate to the amount, priority and validity of the claim and liens of the lenders and agent under the Pre-Petition Credit Facility, and shall release any and all claims against the lenders and the agent under the Pre-Petition Credit Facility. Until the later of sixty days following the appointment of a Creditors' Committee, or such other date as the Lenders may agree, the Creditors Committee (but no other person or entity) may challenge the liens on the prepetition collateral securing obligations under the Pre-Petition Credit Facilities or the amount and allowance of the prepetition indebtedness thereunder. |
| Indemnification | Whether or not this transaction is consummated, each Debtor shall indemnify and hold harmless the Agent, each Lender, their respective subsidiaries and affiliates, and their respective officers, directors, employees, agents and advisors from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted against such entity or individual in connection with this transaction, except to the extent any of the foregoing results from the willful misconduct of such entity or individual as determined by a final judgment of a court of competent jurisdiction. |
| Repayments | The obligations under the DIP Financing Facility, or any portion thereof, may be voluntarily repaid at any time prior to Maturity Date without prepayment premium or penalty. |
|  | Unless otherwise permitted to be retained by the Debtors pursuant to the Approved Budget, the Debtors shall use the net cash proceeds of the following to make mandatory repayments of the obligations, at the option of the DIP Lenders, either (A) under the DIP Financing Facility (with carveouts, materiality thresholds and reinvestment rights, if any, to be agreed -- and with such payment to be a permanent reduction of availability at the option of DIP Lenders), or (B) under the Pre-petition Credit Facility, to be applied in accordance with its terms: (1) asset dispositions other than in the ordinary course of business (which dispositions shall be permitted only with the prior consent of the Lenders), (2) the issuance of equity or equity interests by the Debtors, (3) income tax refunds, (4) insurance proceeds (excluding casualty insurance proceeds used to restore or replace the affected properties), (5) proceeds of judgments or settlements, (6) purchase price adjustments received in connection with any purchase agreement. |

|  |  |
|---|---|
|  | Amounts repaid under the DIP Financing Facility may not be re-borrowed, absent consent of the Lenders |
| Carve Out | The Agent's and Lenders' liens and administrative claims shall be subject to the prior payment of the Carve Out Expenses. "Carve Out Expenses" shall mean (i) allowed, accrued, but unpaid professional fees of the Debtors and one official committee of creditors consistent with the Approved Budget which have been incurred prior to the occurrence of an Event of Default (regardless of when deemed allowed, and authorized to be paid), (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and such official committee of creditors which are actually and reasonably incurred after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $500,000, and (iii) fees payable to the U.S. trustee pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court; provided, however, that the Carve-Out Expenses shall not include (a) any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (b) any fees or expenses of a Chapter 7 trustee, (c) any fees or disbursements arising after the conversion of any of the Chapter 11 Cases to a Chapter 7 Case (d) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of investigation of prepetition secured claims except as specifically permitted by the DIP Orders or (e) any fees or disbursements related to any challenge or objection to the debt or collateral position of the DIP Agent or the Lenders or hindering or delaying the DIP Agent's or any Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing

The Agent shall have the right to establish reserves against borrowing availability under the DIP Financing Facility with respect to the Carve Out Expenses. |
| Budget Compliance | The DIP Financing Credit Agreement shall provide that the Debtors shall be required, absent consent of the Lenders, to comply with the Approved Budget as follows, and any failure to do so shall constitute an Event of Default:

(i) the Debtors' aggregate cumulative (over any consecutive 4 week period) revenue for any period, as compared to such amounts as set forth in the Approved Budget for such period, shall have not have a negative variance exceeding 10%;

(ii) the Debtors' operating expenses (over any consecutive 4 week period), for any period, for both any individual line item or on an aggregate cumulative basis over all line items, as compared to such amounts as set forth in the Approved Budget for such period, shall not have a positive variance exceeding 10%. |
| Reps/Covenants | The DIP Financing Credit Agreement shall provide for customary and appropriate representations, warranties and affirmative and negative covenants for financings of this type and for this transaction in particular (with carveouts and qualifications to be agreed) including, without limitation, restrictions regarding:

(a) incurrence of indebtedness and liens;

(b) asset dispositions other than equipment in the ordinary course of business;

(c) sale and leaseback transactions;

(d) changes Debtors' corporate or organizational existence; |

(e) payment of dividends;

(f) acquisitions and investments;

(g) transactions with affiliates; and

(h) modifications to material contracts, assumption of prepetition contracts and entry into material postpetition contracts.

In addition, the Debtors shall discuss the terms of a possible post effective date exit financing facility with the Lenders as soon as practical. The Debtors shall provide reasonable details on a regular basis regarding discussions with potential exit lenders. The Debtors shall provide the Lenders with a right of first refusal with respect to any post effective date financing facility entered into with lenders other than the Lenders.

| | |
|---|---|
| Governing Law | Delaware |
| Assignments, Voting etc. | The DIP Financing Credit Agreement will contain provisions that are customary for facilities of this type and which are otherwise acceptable to the Lenders, and will include a requirement for unanimous votes on certain critical issues, such as the application of mandatory repayments. |
| Expenses | All reasonable costs and expenses of Agent and Lenders in connection with the Chapter 11 Cases or the DIP Financing Facility shall be reimbursed by the Debtors on a current basis. |
| Documentation | The DIP Financing Facility shall be documenting in a credit agreement (the "DIP Financing Credit Agreement") and such other documents, agreements, certificates and opinions as reasonably required by Agent or Lenders, all in form and substance acceptable to Agent and Lenders in their sole discretion. |

Blitz USA, Inc.
13 Week Forecast - Consolidated
($'s)

| Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 11/12/2011 | 11/19/2011 | 11/26/2011 | 12/3/2011 | 12/10/2011 | 12/17/2011 | 12/24/2011 | 12/31/2011 | 1/7/2012 | 1/14/2012 | 1/21/2012 | 1/28/2012 | 2/4/2012 | Total |
| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| AR Collections[1] | $ 1,654,356 | $ 1,642,650 | $ 1,243,216 | $ 1,638,535 | $ 1,464,713 | $ 906,908 | $ 957,767 | $ 922,482 | $ 1,089,236 | $ 1,089,236 | $ 1,089,236 | $ 1,089,236 | $ 1,089,236 | $ 15,876,806 |
| Total Cash Receipts | 1,654,356 | 1,642,650 | 1,243,216 | 1,638,535 | 1,464,713 | 906,908 | 957,767 | 922,482 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | 1,089,236 | 15,876,806 |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll & Taxes | 156,000 | 227,000 | 156,000 | 156,000 | 156,000 | 156,000 | 227,000 | 156,000 | 156,000 | 156,000 | 227,000 | 156,000 | 156,000 | 2,241,000 |
| Benefits | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 79,500 | 1,033,500 |
| Raw Material Payments[2] | 212,317 | 212,317 | 212,317 | 212,317 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 707,724 | 7,218,784 |
| All Other[3] | - | - | 120,000 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 223,846 | 2,358,465 |
| Subtotal | 447,817 | 518,817 | 567,817 | 671,664 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,167,070 | 12,851,749 |
| Note Payments[4] | - | - | 120,000 | | | | | 120,000 | | | | | 120,000 | 360,000 |
| Revolver | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Product Liability | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Fees - Debtor | - | - | - | - | - | - | - | 450,000 | - | - | - | - | 450,000 | 900,000 |
| Restructuring Fees - Creditor | - | - | - | - | - | - | - | 50,000 | - | - | - | - | 50,000 | 100,000 |
| US Trustee Fee | - | - | - | - | - | - | - | 13,000 | - | - | - | - | - | 13,000 |
| Capital Purchases | - | 217,747 | - | - | 145,176 | - | - | - | - | - | - | - | - | 362,923 |
| Total Disbursements | 447,817 | 736,564 | 687,817 | 671,664 | 1,312,246 | 1,167,070 | 1,238,070 | 1,800,070 | 1,167,070 | 1,167,070 | 1,238,070 | 1,167,070 | 1,787,070 | 14,587,672 |
| Projected Change in Cash | 1,206,539 | 906,086 | 555,399 | 966,871 | 152,467 | (260,162) | (280,303) | (877,588) | (77,835) | (77,835) | (148,835) | (77,835) | (697,835) | 1,289,134 |
| CASH, beginning of period | 647,403 | 1,853,942 | 2,760,028 | 3,315,427 | 4,282,298 | 4,434,765 | 4,174,602 | 3,894,299 | 3,016,710 | 2,938,876 | 2,861,041 | 2,712,207 | 2,634,372 | 647,403 |
| CASH, end of period | $ 1,853,942 | $ 2,760,028 | $ 3,315,427 | $ 4,282,298 | $ 4,434,765 | $ 4,174,602 | $ 3,894,299 | $ 3,016,710 | $ 2,938,876 | $ 2,861,041 | $ 2,712,207 | $ 2,634,372 | $ 1,936,537 | $ 1,936,537 |

[1] Projecting a 5% decline in revenues beginning after the filing (collections 60 days later) as large, single source retailers move to expand their supply base to competitors

[2] Company will have the benefit of the stay for approximately 28 days (terms will be reduced from 38 days to 28 days) with the exception of critical vendors which we estimate to be 30% of the current accounts payable

[3] Company will have the benefit of the stay for 30 days but will be required to post a utilities deposit of $120,000 30 days following the filing and an additional $200,000 for other emergency deposits within one week of the filing.

[4] Limited to the payment of interest