```
               UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF DELAWARE
                                  .
                                  .
IN RE:                            .    Chapter 11
                                  .
Blitz USA, Inc., et al.,          .
                                  .
         Debtors.                 .    Bankruptcy #11-13603 (PJW)
.........................................................
```

```
                    Wilmington, DE
                    March 28, 2012
                      10:05 a.m.

              TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE PETER J. WALSH
             UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

For The Debtors:              Daniel DeFranceschi, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              920 N. King St.
                              Wilmington, DE, 19801

                              Michael Merchant, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              920 N. King St.
                              Wilmington, DE, 19801

                              Mark Kurtz, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              920 N. King St.
                              Wilmington, DE, 19801

                              Amanda Steele, Esq.
                              Richards Layton & Finger, PA
                              One Rodney Square
                              920 N. King St.
                              Wilmington, DE, 19801

2

                                      Paul Heath, Esq.
Richards Layton & Finger, PA
One Rodney Square
920 N. King St.
Wilmington, DE, 19801

**For Agent for Pre and:**    Margaret Manning, Esq.
**Post Petition Lenders**      Klehr Harrison Harvey
Branchburg & Ellers, LLP
919 Market Street-Ste. 1000
Wilmington, DE 19801

                                        Samuel Ory, Esq.
Frederic Dowart Lawyers
Old City Hall
124 E. Fourth St.
Tulsa, OK 74103

**For The Official Committee:**  Frank Monaco, Esq.
**Of Unsecured Creditors**     Womble Carlyle Sandridge
& Rice, LLP
222 Delaware Ave.-Ste. 1501
Wilmington, DE 19801

                                        Jeffrey Prol, Esq.
Lowenstein Sandler, PC
65 Livingston Ave.
Roseland, NJ 17168

**For Scepter Holdings, Inc.:**  Evelyn J. Meltzer, Esq.
Pepper Hamilton, LLP
Hercules Plaza, Ste. 5100
1313 Market St.
Wilmington, DE 19899

**For Wal-Mart:**              Jeremy Ryan, Esq.
Potter Anderson & Corroon, LLP
Hercules Plaza
1313 N. Market St.-6th Fl.
Wilmington, DE 19801

                                        Charles Hendricks, Esq.
Cavazos Hendricks Poirot
& Smitham, P.C.
Suite 570, Founders Square
900 Jackson St.
Dallas, TX 75202

| For Liberty Surplus:<br>Insurance | Maria Aprile Sawczuk, Esq.<br>Stevens & Lee, PC<br>1105 N. Market St., 7th Fl.<br>Wilmington, DE 19801 |
|---|---|
| | John C. Kilgannon, Esq.<br>Stevens & Lee, PC<br>1818 Market St., 29th Fl.<br>Philadelphia, PA 19103 |
| For Hopkins Manufacturing:<br>Corp. | Gabriel Morgan, Esq.<br>Weil Gotshal & Manges, LLP<br>767 Fifth Ave.<br>New York, NY 10153 |
| For The U.S. Trustee: | David Klauder, Esq.<br>Office of the United States<br>Trustee<br>844 King St., Room 2207<br>Wilmington, DE 19801 |

(Via Telephone)

| For The Debtor: | Luke Malamood, Esq.<br>Carter Conboy Case Blackmore<br>Maloney & Laird, PC<br>20 Corporate Woods Blvd.<br>Albany, NY 12211 |
|---|---|
| For Calder: | Henry Anderson, Esq.<br>The Anderson Law Firm<br>4600 Belair<br>Wichita Falls, TX 76310 |
| Audio Operator: | Michael Miller |
| Transcribing Firm: | Writer's Cramp, Inc.<br>6 Norton Rd.<br>Monmouth Jct., NJ 08852<br>732-329-0191 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

4

**Index**

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Maddock | | 18 | 27 | | |

**MOTIONS:**

**EXHIBITS:**      <u>Marked</u>   <u>Received</u>

**SUMMATION BY:**

**THE COURT: Finding**

1          THE CLERK:  Please rise.

2          THE COURT:  Please be seated.

3          MR. MERCHANT:  Good morning Your Honor.

4          THE COURT:  Good morning.

5          MR. MERCHANT:  Mike Merchant of Richards Layton &

6    Finger on behalf of the Debtors.  Your Honor there are three

7    matters on today's agenda.  The first one is the easy one,

8    that's the Extension of the Debtors' Period to Assume or

9    Reject Leases under Section 365(d)(4) of the Bankruptcy Code.

10   We had held off filing a Certificate of No Objection on this

11   motion, notwithstanding the fact that there were no

12   objections, because there was an issue as to how we were going

13   to deal with the rejection of a certain lease in connection

14   with the sale that you're gonna hear today.  That issue is

15   being resolved in connection with the Sale Order that will be

16   handed up later.  So there are no objections and no changes to

17   the Proposed Form of Order on the 365(d)(4) Extension Order.

18          THE COURT:  Okay.

19          MR. MERCHANT:  Unless Your Honor has any questions,

20   I can hand up the order.

21          THE COURT:  No questions.  Okay.  Next?

22          MR. MERCHANT:  Thank you, Your Honor.  The other two

23   matters on the agenda are both contested at this point.  There

24   is the F3 Brands Sale Motion, and there is the Debtors'

25   Request for Extension of the Exclusive Periods.  If it's

1    acceptable to Your Honor, we would like to handle the

2    Exclusivity Motion first.

3           THE COURT:  Okay.

4           MR. MERCHANT:  And I would like to proceed by

5    proffer in terms of presenting the Debtors' evidence in

6    support of that motion.  I have Fernando Maddock with me in

7    the Courtroom.  He is a Director at Zolfo Cooper, and if

8    acceptable to the Court, I'd like to enter his direct

9    testimony through proffer.

10          THE COURT:  Okay.  Any objections?

11          MR. PROL:  Judge, Jeff Prol on behalf of the

12    Committee.  We have no objection to proceed by proffer, but we

13    do want to reserve our right to cross examine.

14          THE COURT:  Okay.

15          MR. MERCHANT:  Thank you, Your Honor.  If I may

16    proceed.  With me in the Courtroom today is Fernando Maddock.

17    He is a Director with Zolfo Cooper, LLC.  If called to testify

18    at today's hearing, Mr. Maddock would testify as follows:

19      Mr. Maddock would testify that Zolfo Cooper was retained

20    on or around October 10th, 2011 to assist the Debtors with,

21    among other things, evaluating and challenging the Debtors'

22    Business Plan, developing long-term capital restructuring

23    alternatives, and planning for a possible Chapter 11

24    proceeding.  The Debtors commenced these Chapter 11 cases by

25    filing petitions under Chapter 11 of the Bankruptcy Code on

1  November 9th, 2011.  On December 5th, 2011, the Court entered

2  an order approving the retention of Zolfo Cooper as Bankruptcy

3  consultants and special financial advisors to the Debtors.  In

4  their capacity as Bankruptcy consultants and special financial

5  advisors, Mr. Maddock and his colleagues have worked very

6  closely with the Debtors on matters relating to the Chapter 11

7  cases and the overall operation of the Debtors' business.  If

8  called to testify, Mr. Maddock would testify that he believes

9  the Debtors have made significant progress in a number of

10  areas during the early stages of these Chapter 11 cases, as to

11  which he will testify through this proffer.  Mr. Maddock would

12  also testify that he has read the Creditors Committee's

13  objection to the Debtors' Request for an Extension of Their

14  Exclusive Periods and has attempted to respond to many of the

15  allegations set forth therein, and incorrect statements of

16  facts through this proffer.

17      The first area of testimony, Your Honor, will focus on

18  the progress that has been made to date in these Chapter 11

19  cases.  Mr. Maddock would testify that during the early stages

20  of these Chapter 11 cases, the Debtors were required to devote

21  significant time to the drafting and negotiation of a DIP

22  Credit Agreement.  As of the petition date, the Debtors had an

23  agreed DIP term sheet but had not begun to put together a DIP

24  Credit Agreement at the time that the First Day papers were

25  filed.  Accordingly, during the early stages of the Chapter 11

1   cases, the Debtors expended significant time and effort to the

2   negotiation of the DIP Credit Agreement that was filed with

3   the Court on November 28th, 2011.  The DIP Credit Agreement

4   included the consensual use of cash collateral and was

5   approved by the Court at a hearing held on December 12th,

6   2011.

7        Additionally, Mr. Maddock would testify that during the

8   early stages of the Chapter 11 cases, the Debtors developed a

9   six-month business plan which included, among other things,

10  the rollout of a significant price increase and reduction in

11  customer terms with the respect to the portable consumer

12  gasoline containers, which I'll refer to throughout this

13  proffer, Your Honor, as the PCGCs.  The six-month business

14  plan also focused on the sale of the excess equipment, the

15  sale of the F3 Brands business line, the sale of the Reliance

16  business line, and the potential payoff of the company's

17  secured bank debt.  As a result of such efforts, the Debtors

18  were able to submit to the DIP lenders and the pre-petition

19  lenders as well as the Creditors Committee a business plan in

20  December of 2011 that contemplated a payoff of the bank debt

21  and has garnered the approval of the bank group and the

22  Creditors Committee.

23       The changes to customer pricing and terms were announced

24  in January of 2012, and with effect of the pricing changes,

25  became effective on February 1st, 2012, and with respect to

1     the terms, became effective immediately.  Zolfo Cooper has

2     worked closely with the Debtors on the implementation of these

3     changes and believes that they are essential to a successful

4     reorganization of the Blitz entity.  The Debtors are closely

5     monitoring the effect of these changes to track their effect

6     on existing customer volumes and to see how competitors of the

7     Blitz business will react.  The successful implementation of

8     the business plan by the Debtors is a significant and

9     necessary predicate to a successful reorganization.  The

10    Debtors have kept the Creditors Committee fully informed of

11    the business plan and has solicited comments from the

12    Creditors Committee throughout the process.

13          Mr. Maddock would also testify that the Debtors, with the

14    assistance of Zolfo Cooper, have spent significant time

15    responding to informational requests from the Creditors

16    Committee.  Responding to these requests included, among other

17    things, fulfilling initial diligence requests which included

18    historical, financial, and operational data regarding the

19    Blitz and F3 Brands entities, and the Reliance entity, which

20    is a non-Debtor affiliate.  Providing copies of the -- they

21    also provided copies of the Debtors' six-month business plan

22    and dealing with followup inquiries regarding certain of the

23    assumptions set forth therein.  They included providing

24    various scenario analyses requested by the Creditors Committee

25    relating to the six-month business plan, and conducting

1    conference calls with the Creditors Committee's professionals

2    to review and answer questions regarding the Debtors'

3    schedules and Statement of Financial Affairs.   The Debtors

4    and/or Zolfo Cooper also had been providing the Creditors

5    Committee professionals with certain recurring deliverables

6    and communications, including but not limited to weekly

7    variance reports, monthly updated 13-week cash flows, monthly

8    historical financials for Blitz, F3 Brands, and Reliance,

9    identification of all transfers of Blitz to F3 Brands, a list

10   of all payments to critical vendors and potential lien

11   claimants, conference calls to review cash flows, variance

12   reports, payments to vendors, forecasts, etc.   They have also

13   had weekly calls to discuss monthly financials and key

14   operating results, and weekly conference calls to discuss the

15   F3 Brands sale process, including a discussion of bids, the

16   sale process, and the Incentive Compensation Plan related to

17   the F3 Brands' line of business.

18       Moreover, the Debtors' counsel has provided certain

19   insurance information of the Debtors to the Creditors

20   Committee.   While the Creditors Committee has complained as to

21   the timeliness of this information being provided, Mr. Maddock

22   would testify that any delay in providing the instruments

23   information was caused mostly by the Creditors Committee's

24   delay in executing appropriate confidentiality stipulations.

25       Mr. Maddock would also testify that consistent with their

1    obligations under the DIP Credit Agreement, the Debtors

2    completed an auction of certain excess equipment that was no

3    longer integral to the Blitz or F3 business lines, and it

4    provided the Creditors Committee professionals information as

5    to the excess equipment.  The auction was held at the Blitz

6    facility on February 28th, 2012 and generated a sales price of

7    a little over $47,000.

8         As this Court will hear today, the Debtors have also

9    completed an auction for the sale of its F3 Brands business

10   line.  This process involved extensive negotiation over the

11   terms of a stalking horse Asset Purchase Agreement, the

12   solicitation and analysis of competing bids, and a robust

13   auction which was held on Monday, March 26th.  In connection

14   with the sale of the F3 business line, the Debtors also

15   negotiated the terms of severance and incentive plans for

16   employees of F3 Brands that were structured to retain certain

17   employees to the closing of the sale and any related

18   transition period, and to incentivize the employees to

19   maximize the sale proceeds recovered in connection with the

20   transaction.  The negotiation of the Severance and Incentive

21   Plans took considerable time, as the Debtors agreed to

22   significantly modify the proposed version of the plans in

23   order to address certain concerns raised by the Creditors

24   Committee and the Office of the United States Trustee.

25        Mr. Maddock would testify that the auction has resulted

1    in a level of proceeds beyond the Debtors' expectations and

2    fortunately, it is expected to result in most of the F3

3    Brands' employees retaining their jobs in Miami, Oklahoma.

4    The Creditors Committee was kept fully advised throughout the

5    entire process, including the marketing of F3 Brands, the

6    review of stalking horse bids, the ultimate selection of the

7    stalking horse bidder, the negotiation of the stalking horse

8    APA, the review of any qualified bids, the selection of

9    Hopkins as a qualified bidder, and the review and negotiation

10   of the various agreements and the Forms of Order associated

11   with the F3 marketing and sales process.  Indeed, the

12   Creditors Committee served as a consultation party in

13   connection with the auction for the F3 assets.

14        Mr. Maddock would also testify that the Debtors oppose

15   the due diligence efforts by Boylan Partners, a party that has

16   expressed an interest in acquiring the Blitz business by

17   providing access to financial information and operations.  The

18   Creditors Committee and the Debtors' DIP lenders have been

19   kept fully informed of these developments.

20        Zolfo Cooper has also actively been working with the

21   Debtors in an effort to arrange insurance coverage for the

22   Debtors for after July 31st, 2012.  The Creditors Committee

23   has been kept in the loop on this issue and has been asked for

24   any suggestions that it may have in this regard.

25        The Debtors have also had several conversations with Wal-

1   Mart, one of their key customers and a Defendant in many of

2   the PCGC personal injury lawsuits relating to the Blitz PCGCs.

3   Some of the lawsuits involve Wal-Mart and the Debtors as co-

4   Defendants, and others involve direct suits naming only Wal-

5   Mart as a Defendant.  The Debtors and Wal-Mart are parties to

6   a joint defense agreement in connection with the PCGC

7   litigation.  Wal-Mart is also an additional named insured on

8   the Debtors' product line liability insurance policies, and

9   has contractual indemnification rights against the Debtors

10  with respect to the PCGC sold by the Debtors to Wal-Mart and

11  resold by Wal-Mart.

12       Mr. Maddock would testify that these discussions have

13  focused on the Debtors' continuing business with Wal-Mart,

14  Wal-Mart's pre-Petition offset rights, and the potential stay

15  of the Consumer Product Liability suits facing Wal-Mart.

16  These discussions with Wal-Mart did involve some initial

17  discussion regarding the potential structure of a Chapter 11

18  Plan and the concept of Wal-Mart contributing something into a

19  trust.  These discussions, however, were very preliminary and

20  similar in nature to the early conversation that the Debtors

21  had with the Creditors Committee regarding Plan concepts.

22  Wal-Mart has not agreed to do anything in connection with the

23  Plan, and essentially just listened to the concepts suggested

24  by the Debtors.  The Creditors Committee was not invited to

25  these initial meetings at Wal-Mart's request, but the nature

1    of the discussions at these meetings has since been shared

2    with the Creditors Committee.  Moreover, the Debtors have

3    taken the lead in arranging conversations between the

4    Creditors Committee counsel and Bankruptcy counsel of

5    Wal-Mart.

6         Zolfo Cooper would testify that in their view, it is

7    premature to engage in serious substantive discussions over a

8    potential Wal-Mart contribution into a trust at this juncture,

9    as the size of the potential PCGC personal injury claims has

10   yet to be estimated.  Indeed, it is for this reason that the

11   Debtors have not had discussions with Wal-Mart, Kinderhook, or

12   Crestwood regarding making contributions into a Creditors'

13   trust under a Plan.  In fact, Mr. Maddock would testify that

14   the Debtors have not had any discussions with Crestwood

15   regarding a Plan or settlement of their claim.  Moreover, all

16   discussions with Kinderhook have been limited to their counsel

17   or with the Kinderhook members of the Debtors' Board of

18   Directors in their capacity as Directors of the Debtors'

19   board.  There have been no discussions with Kinderhook

20   business people about contributing into a Creditor trust under

21   a Plan.  The Debtors have, however, discussed this concept

22   generally with several of their insurers.  These discussions

23   have been very preliminary and to date, there have been no

24   indications that these past insurers desire to negotiate with

25   the Debtors as a group.  The Debtors have kept the Committee

1    counsel apprised of the extent and nature of these

2    discussions.  With respect to the Debtors' Plan efforts, the

3    Debtors have had an initial meeting with the Creditors

4    Committee to discuss the constructs for a possible Plan of

5    Reorganization.  Mr. Maddock would testify, however, that

6    these discussions were very preliminary and that the Debtors'

7    ability to move forward with a Chapter 11 Plan will depend on,

8    among other things, the Debtors' ability to pay off or

9    reinstate their secured debt, which will depend on the

10   proceeds realized from the asset sales and going-forward

11   operations.  And the Debtors also must get a handle on the

12   magnitude of the potential liability on current and future

13   PCGC personal injury claims.  In this regard, the Debtors have

14   received fee proposals from several reputable economists firms

15   with experience in estimating consumer product personal injury

16   claims.  The Debtors have also requested additional names from

17   the Creditors Committee.  The Debtors have also compiled a

18   list of potential futures representative candidates for

19   interview, and have requested additional names from the

20   Creditors Committee.  And additionally, the Debtors have

21   requested authority from the lenders to pay for the economists

22   and anticipate requesting authority to fund a futures claims

23   representative once they receive cost estimates from the

24   candidates.  This request, Your Honor, is under review by

25   lenders' counsel and the lenders.

1        With respect to the status of the Reliance sale, Your

2   Honor, notwithstanding the significant progress just

3   discussed, the Creditors Committee has cited to the status of

4   the Reliance sale process in support of its efforts to

5   terminate exclusivity.  In response to this assertion, Mr.

6   Maddock would testify that Reliance is a non-Debtor affiliate

7   of the Debtors and that the sale of Reliance was included as a

8   condition under the DIP Agreement solely at the demand of the

9   DIP lenders.  Neither Richards Layton & Finger nor Zolfo

10  Cooper represent Reliance.  Consistent with the Debtors'

11  requirements under the DIP Agreement, however, the Debtors

12  have been in contact with the Reliance board regarding a sale

13  of the company.  Mr. Maddock would testify that based on his

14  knowledge and belief, the Reliance sale has been somewhat

15  delayed primarily due to serious medical issues facing two

16  senior officers at Reliance and/or their families.  As a

17  result of this delay, Mr. Maddock would testify that the

18  Debtors' board has considered replacing the Reliance board,

19  but ultimately concluded that doing so would negatively impact

20  the enterprise value of Reliance as certain board members have

21  key client relationships that are critical to the value of the

22  business.  Accordingly, the Debtors have continued to monitor

23  the performance of Reliance to ensure that the estate is not

24  losing value as a result of any delay.  Reliance continues to

25  perform better than budgeted through February, 2012.  Mr.

1     Maddock would testify that the Debtors have kept the lender

2     group informed of the status of the Reliance sales process and

3     the operating performance of Reliance.  The Debtors have

4     requested a waiver of the requirement to sell Reliance by May

5     31st, 2012, and this request is currently under consideration

6     by the lender group.  Moreover, the Debtors have been informed

7     that Reliance is currently working through issues relating to

8     the employment agreement of one of their senior officers and

9     the retention of an investment banker to assist with the sale

10    process.  Reliance has informed us that they expect to

11    consummate a sale no later than June 30th, 2012.  The

12    Creditors Committee has been kept apprised as to the status of

13    the Reliance sale.

14          Your Honor, in conclusion, Mr. Maddock would testify that

15    based on the progress made to date in these Chapter 11 cases

16    and the requested extension of the -- would testify that based

17    on the progress made to date, the Debtors' request of an

18    extension of the exclusive filing and solicitation periods is

19    warranted.  Moreover, Mr. Maddock would testify that the

20    Debtors' dealings with the Creditors Committee to date have

21    been entirely in good faith, and that the requested extension

22    is not being used in any way to pressure Unsecured Creditors

23    into accepting an unfavorable resolution of these cases.  Your

24    Honor, that would conclude Mr. Maddock's direct testimony.

25                THE COURT:  Okay.  Anyone wish to cross examine?

1              MR. PROL:  Yes, Your Honor the Committee would like

2    to cross examine.

3              THE COURT:  Pardon?

4              MR. PROL:  The Committee would like to cross examine.

5              THE COURT:  Okay.  Have the witness take the stand,

6    please.

7               FERNANDO MADDOCK, DEBTORS'S WITNESS, SWORN

8              THE CLERK:  Would you please state your full name and

9    spell your last name for the record?

10             MR. MADDOCK:  Fernando Maddock.  M-A-D-D-O-C-K.

11                       CROSS EXAMINATION

12   BY MR. PROL:

13   Q.  Good morning, Mr. Maddock.  During the proffer by your

14   counsel, there was an indication that there was a final DIP

15   order entered in this case on December 12th, 2011.  Are you

16   familiar with that document?

17   A.  I am.

18   Q.  And under that order, the Debtor was authorized to borrow

19   up to $5 million in DIP financing from the pre-petition lender

20   group, is that correct?

21   A.  Correct.

22   Q.  And that order also authorizes the use of cash collateral,

23   is that correct?

24   A.  Correct.

25   Q.  When the DIP Motion was filed, the Committee questioned

1   the need for DIP financing in this case, is that correct?

2   A.   Correct.

3   Q.   And in fact, the Committee questioned the need to make

4   concessions to the lender group based upon the fact that the

5   projections here showed that DIP financing was not needed in

6   order to continue to operate the business, is that correct?

7   A.   I don't remember what the Committee questioned relative to

8   whether or not they needed the DIP or not.

9   Q.   And in fact, to date, the Debtors have not drawn down a

10  single dollar under the DIP financing, is that correct?

11  A.   That's correct.

12  Q.   Now the DIP Financing Order provides for certain sale

13  benchmarks to be met with regard to the sale of the F3

14  business, is that correct?

15  A.   Correct.

16  Q.   And it also provides for sale benchmarks with regard to

17  the Reliance sale, is that correct?

18  A.   Correct.

19  Q.   In fact, the DIP Order and the related DIP Financing

20  Agreement required that the Debtors identify a stalking horse

21  bidder and enter into a stalking horse Purchase Agreement for

22  F3 Brands on or before January 16th, is that correct?

23  A.   That sounds correct.  I don't remember the date exactly,

24  but that sounds correct.

25  Q.   And did the Debtors meet that benchmark?

1   A.  I do not believe they did.

2   Q.  The DIP Order also requires that a motion was required to

3   be filed to approve the sale of F3 Brands on or before January

4   18th.  Was that benchmark met?

5   A.  I don't believe it was.

6   Q.  The DIP order also requires that the sale of F3 Brands be

7   concluded on or before March 16th of 2012, and that obviously

8   hasn't been met, has it?

9   A.  Correct.

10  Q.  The DIP Order requires that a broker be engaged to sell

11  Reliance Products on or before December 16th.  Has that

12  benchmark been met?

13  A.  No.

14  Q.  It further requires that a Prospectus be prepared and

15  circulated with regard to the Reliance Products sale on or

16  before January 16th.  Has that benchmark been met?

17  A.  No.

18  Q.  It requires the sale of the Reliance Products business on

19  or before May 31, 2012, is that correct?

20  A.  Correct.

21  Q.  At any time did the Debtors obtain a waiver from the

22  lenders with regard to any of these benchmarks?

23  A.  A waiver has been requested with regard to the benchmark

24  for the sale of Reliance.

25  Q.  But there are no other waivers of any of the other

1    benchmarks?

2    A.   Not to my knowledge.

3    Q.   The DIP order also required that on or before December

4    15th the Debtors provide the lenders with a Business plan for

5    the period January 1, 2012 through June 30, 2012.  Was that

6    benchmark met?

7    A.   Yes, it was.

8    Q.   And when was that business plan delivered?

9    A.   It was delivered on or before the date that you just

10   mentioned.

11   Q.   And that business plan was required to address a number of

12   items, including the filing of a Plan of Reorganization and an

13   outline of that Plan?

14   A.   I don't know if that was the case.

15   Q.   You don't know if that was required?

16   A.   I don't know if that was required.  I don't remember if

17   that was required, given that date.

18   Q.   I have here a copy of the final DIP Order and a copy of

19   the DIP Financing Agreement.  If I were to show you that

20   document, would that refresh your recollection?

21   A.   Sure, I just don't remember the language.

22              MR. PROL:  Judge, may I approach please?

23              THE COURT:  Yes.

24        (Mr. Prol approaches the witness)

25

1    A.  Okay.

2    BY MR. PROL:

3    Q.  Do you recognize the documents --

4    A.  I do.

5    Q.  -- I handed up to you?

6    A.  I do.

7    Q.  And what are they?

8    A.  I recognize the documents, sorry.

9    Q.  What documents do you have in front of you?

10   A.  The final DIP Order.

11   Q.  And the document attached to the final DIP Order is a copy

12   of the DIP Financing Agreement?

13   A.  Yes.

14   Q.  It's my only copy, if I could --

15   A.  Yeah, sure.  I just didn't remember the date.

16   Q.  So I will repeat my question whether or not the business

17   plan that the Debtors were required to deliver was required to

18   include milestones for the resolutions of the Chapter 11

19   cases, including the filing of a Plan and the outline of the

20   terms of the Plan?

21   A.  Yes.

22   Q.  And do you recall what the business plan said with regard

23   to the benchmark for the filing of a Plan of Reorganization?

24   A.  I do not.

25   Q.  Do you know if a benchmark was included in that business

1    plan?

2    A.  I do not.

3    Q.  Could you describe for the Court the outline of the Plan

4    of Reorganization that was set forth in the business plan that

5    was delivered to (indiscern.)?

6    A.  No.

7    Q.  Now, during your proffer, your attorney indicated that the

8    Committee met with the Debtors during the very early stages of

9    this case to discuss the outlines of a Plan.  Do you remember

10   that testimony?

11   A.  I do.

12   Q.  And were you at that meeting?

13   A.  I was not.

14   Q.  Are you aware of the discussions that took place at that

15   meeting?

16   A.  I am.

17   Q.  And are you aware of the nature of the type of Plan of

18   Reorganization that the Debtors are contemplating?

19            MR. DAFRANCESCHI:  Your Honor, I'd just like to

20   object on this point.  Those discussions were held under the

21   protections of Federal Rule of Evidence 408.  It's a

22   compromise and settlement discussion.  So if he's planning on

23   getting too far into the nature of what we talked about, I'm

24   going to object to that.  The general topic is fine.  We've

25   touched on some of the general topics in the direct, but

1  beyond that, I don't think it'd be appropriate at this point.

2           MR. PROL:  Your Honor, I don't intend to go further

3  than what they discussed other than to talk about the general

4  parameters of a Plan that we discussed.

5           THE COURT:  Okay.  Proceed.

6  BY MR. PROL:

7  Q.  Was one of the general parameters of the Plan the Debtors

8  compensating a trust for the benefit of the tort claimants who

9  have asserted claims against Blitz with regard to the

10 allegedly defective gas cans that they manufactured?

11 A.  My understanding is that there was general concepts that

12 were discussed regarding a trust.

13 Q.  Was there a discussion generally about the assets that

14 would be contributed to that trust?

15 A.  Generally.

16 Q.  And did those assets include the Debtors' insurance

17 coverage?

18 A.  Generally.

19 Q.  And I think in your proffer the other things that were

20 discussed as being contributed to the trust were contributions

21 or claims against Wal-Mart?

22 A.  Correct.

23 Q.  And Wal-Mart is a key customer of the Debtors?

24 A.  Correct.

25 Q.  And is also a Defendant in a number of the tort claims

1    that have been brought?

2    A.  Correct.

3    Q.  Was there also discussion with regard to contributions

4    being made by Kinderhook?

5    A.  Again, I think there was a general discussion.

6    Q.  And Kinderhook, just so the record is clear, is the

7    ultimate parent of the Debtors, is that correct?

8    A.  Correct.

9    Q.  There was also a discussion with regard to potential

10   contributions by an entity known as Crestwood, correct?

11   A.  Correct.

12   Q.  And Crestwood is the former owner of the Blitz business?

13   A.  Correct.

14   Q.  In your proffer, there was mention of the fact that the

15   Debtors have spoken generally with their insurance carriers

16   with regard to a Plan, is that correct?

17   A.  Generally.

18   Q.  Was the Committee involved in those conversations?

19   A.  No.

20   Q.  Were you involved in those conversations?

21   A.  I was not directly involved in those conversations.

22   Q.  How many insurance carriers are there that have provided

23   coverage that relate to the tort claims that have been

24   brought?

25   A.  I don't know.

1   Q.  You don't know?

2   A.  I do not.

3   Q.  Do you know how many carriers the Debtors have spoken to

4   at this point?

5   A.  I do not.

6   Q.  Do you know how many conversations the Debtors have had

7   with Kinderhook with regard to the terms of the Plan of

8   Reorganization?

9   A.  None.

10  Q.  None?

11  A.  None.

12  Q.  And how about with Crestwood?

13  A.  None.

14  Q.  Does the Debtor presently have liability insurance in

15  place to cover it for potential claims arising out of their

16  gas cans?

17  A.  Yes.

18  Q.  And when does that insurance expire?

19  A.  I believe July 30th, July 31st, 2012.

20  Q.  And there was mention in your proffer that the Debtors are

21  engaged in efforts to attempt to obtain insurance coverage

22  going forward from July 30th?

23  A.  Correct.

24  Q.  And what is the status of those discussions?

25  A.  Ongoing.

1   Q.  And are the Debtors experiencing difficulty in obtaining

2   insurance?

3   A.  Discussions are ongoing, just continuing.

4        (Pause in proceedings)

5            MR. PROL:  I have nothing further, Your Honor.

6            THE COURT:  Okay.  Anyone else wish to cross examine?

7   Any redirect?

8            MR. MERCHANT:  Briefly.

9                      REDIRECT EXAMINATION

10  BY MR. MERCHANT:

11  Q.  Mr. Maddock, with regard to the early meeting with the

12  Creditors Committee regarding the constructs of a plan, would

13  you describe that meeting as preliminary?

14  A.  Yes, I would.

15  Q.  Do you know if any decisions were made --

16  A.  No.

17  Q.  -- at that meeting?

18  A.  No, I don't.

19  Q.  Okay.  With respect to the Reliance sale, you testified

20  that Reliance is not a Debtor, correct?

21  A.  Correct.

22  Q.  Okay.  So is it essentially up to Reliance and the

23  Reliance Board in order to move the sale process further --

24  A.  Yes.

25  Q.  -- forward?

1   A.  Yes, it is.

2   Q.  Okay.  And was it your testimony that the Blitz Board has

3   considered replacing the Reliance Board --

4   A.  Yes --

5   Q.  -- in order to move the sale process forward?

6   A.  Yes, they have.

7   Q.  And did Blitz make a decision as to whether to do that or

8   not?

9   A.  They made a decision not to do that.

10  Q.  And why did they decide not to do that?

11  A.  Because certain Board members have key relationships with

12  customers that would be prohibitive in terms of the value --

13  ongoing value of Reliance over time.

14  Q.  Did you feel that the Debtors have done what they can in

15  order to move that Reliance sale process along?

16  A.  I do.

17  Q.  Okay.  And do you feel that that sale process is moving

18  along at this point?

19  A.  It is.

20          MR. MERCHANT:  Your Honor, I have no further

21  questions.

22          THE COURT:  Okay.  Any recross?

23          MR. PROL:  No, Your Honor.

24          THE COURT:  Okay, you may step down, thank you.

25      (Witness steps down)

1          MR. MERCHANT:  Your Honor, I think it's clear from

2    the testimony of Mr. Maddock that the Debtors have made

3    significant progress during the first four months of these

4    Chapter 11 cases.  He testified that they had to fully

5    negotiate a DIP Credit Agreement and get the DIP facility in

6    place.  They negotiated a six-month business plan which

7    involved an 85% increase in sales price and a reduction in

8    customer terms to 10 days with respect to the sale of the

9    PCGCs.  That business plan is -- and those sale changes and

10   terms are critical to the Debtors' ability to reorganize.  And

11   the Debtors and Zolfo Cooper are in the process of closely

12   monitoring the effect that those changes will have on

13   customers and sales to see where this business is in terms of

14   putting a Plan forward with respect to a reorganized Blitz.

15        The business plan also focuses on the sale of the excess

16   equipment, which came before Your Honor and has been approved

17   and completed.  It involved the sale of the three brands,

18   which Your Honor will hear today we've had a full and robust

19   auction process and realized a sale price in excess of what

20   was budgeted early on in these cases.  Your Honor has also

21   heard detailed testimony regarding where things stand with the

22   Reliance sale process and what the Debtors are doing to move

23   that along.  And the business plan also involved, you know,

24   potential payoff of the company's secured debt, which these

25   bank -- these sales will go a long way towards getting us

1    there.  And in addition, the changes in sale price and net

2    terms and how that affects sales going forward, because the

3    Debtor will also influence it because the Debtors' operations

4    will also be influential in paying down that bank debt over

5    time.  So we've been waiting to see how those things pay out

6    because where that bank debt stands will be crucial in terms

7    of what we put forth in a proposed Plan of Reorganization.

8    The business plan was submitted to the secured lenders, as

9    well as the Creditors Committee.  They've been involved in the

10   process.

11       Your Honor, additionally, Mr. Maddock testified regarding

12   the -- you know, the time that him and the company have spent

13   in responding to informational requests from the Committee, in

14   providing insurance information, in exploring replacement

15   insurance coverage for July 31st, 2012 going forward.  I've

16   already mentioned the auctions of the excess equipment, that

17   the sale of the F3 business line.  The Debtors have also spend

18   significant time putting forth a severance and incentive plan

19   to retain F3 employees in connection with the F3 sale.  They

20   hosted due diligence for the one interested party, the Boylan

21   Partners, who has expressed an interest in acquiring the Blitz

22   business.  They also had key discussions with key customers,

23   Your Honor.

24       Mr. Maddock also testified regarding discussions that the

25   Debtors have had with Wal-Mart, one of their key customers and

1    a Defendant in many of the PCGC personal injury litigations.

2    These discussions have focused on the continuing business with

3    Wal-Mart, which is absolutely critical to the Blitz business

4    going forward.  They've focused on Wal-Mart's pre-petition

5    offset rights and a potential stay of the PCGC liability suits

6    facing Wal-Mart.  The Debtors have had some initial

7    discussions with Wal-Mart regarding the constructs of a

8    potential Chapter 11 Plan, but those discussions have been

9    preliminary.  At those discussions, I think Wal-Mart's

10   participation can be described mostly as listening, listening

11   to what the Debtors put forward, and there clearly have been

12   no decisions made on any of that.  The Creditors Committee was

13   not invited to that initial discussion based on the request of

14   Wal-Mart.  But we've since put counsel to Wal-Mart in touch

15   with counsel to the Creditors Committee, and we're hoping to

16   move things forward.

17        Your Honor, Mr. Maddock also testified that there have

18   been no discussions with the Kinderhook business people

19   regarding a potential contribution into a plan trust

20   structure.  There have been no conversations with Crestwood on

21   that, as well.  And I'm not highlighting those to show a lack

22   of progress, I'm highlighting those to show that, you know,

23   the Committee, notwithstanding what they set forth in their

24   objection, are not being excluded from the process.  The

25   Debtors merely feel at this point that it's too premature to

1   start discussing a contribution into a plan trust structure

2   when we haven't even been able to estimate the potential PCGC

3   liability claims at this point.

4        Give me one second, Your Honor.  Your Honor, I think Mr.

5   Maddock has given -- provided some detailed testimony with

6   regard to the status of the Reliance sale, so I'll avoid being

7   repetitive on that point.  But needless to say, that process

8   is moving forward, the Reliance -- Reliance is in the process

9   of retaining an investment banker and have given us

10  indications that they expect to consummate a sale of the

11  Reliance business no later than June 30th.  We've requested an

12  extension and a waiver from the lender group with regards to

13  the requirements under the DIP credit agreement, and that

14  request is currently under consideration.

15       Your Honor, with regards to the Debtors' ability to get a

16  handle on the magnitude of the potential liability of the PCGC

17  claims, Mr. Maddock testified that the Debtors have taken

18  certain steps to move that process forward.  We've received

19  fee proposals from several reputable economist firms and with

20  experience in handling and estimating those types of claims.

21  We've also requested additional recommendations from the

22  Creditors Committee.  We've also compiled a list of potential

23  futures representative candidates for interview and have

24  requested additional recommendations for the Creditors

25  Committee in that area as well.  And we've also requested

1    authority from the lenders to pay the economists and

2    anticipate requesting authority to fund a futures claims

3    representative, once they receive cost estimates from the

4    candidates.

5         Your Honor, the final point that I want to touch on is

6    the good faith requirement.  I think based on Mr. Maddock's

7    testimony, it's clear that the Debtors have been acting in

8    these cases and in dealing with the Committee in good faith

9    throughout.  I have to say that counsel and our client was

10   frustrated, to say it lightly, to see many paragraphs in the

11   Committee's objection devoted to a pre-petition sanctions

12   order issued out of a Texas District Court related to a pre-

13   petition cause of action.  That discovery sanctions order is

14   on appeal.  It has also been stayed; there's a consensual stay

15   of that order in that action.  For an initial matter, we

16   viewed that decision in a pre-petition cause of action in

17   Texas to be entirely irrelevant to the Debtors' request for an

18   extension of exclusivity in this case.  But I simply wanted to

19   note for the Court that that decision is on appeal.  We

20   dispute the findings in that opinion.  I could spend time up

21   here going into why we dispute it and why, with all due

22   respect to that Court, we feel that that decision was

23   improper, but we think that it's so irrelevant that I don't

24   want to belabor this hearing with a discussion of those

25   issues, other than to note that it is on appeal, it has been

1    stayed, we disagree with it.  And we would also note that

2    those type of motions in the PCGC litigation are actually

3    somewhat common.  It's not something we see in bankruptcy

4    Court often, but they are common in those types of actions,

5    and there have been several instances which aren't cited in

6    the Debtors' -- in the Committee's papers where those types of

7    motions have been denied with respect to Blitz.  There's the

8    Gati (ph.) decision, the Cicada (ph.) litigation, the Calder

9    (ph.) litigation and the Thornton (ph.) litigation.  So I

10   simply wanted to note those for the record, Your Honor.

11          MR. PROL:  Your Honor, I'll try to be brief, and I

12   won't repeat all of the arguments made in my papers, but I do

13   want to start with just a general recitation of some of the

14   law related to the Motion to the Extension of Exclusivity.

15   The decision, as Your Honor is well aware, is committed to

16   your sound discretion.  But Court's have recognized that they

17   should not routinely grant extensions of exclusivity, even if

18   they are made early in a case, absent a showing of cause where

19   there is a pending objection to the request.  And there's a

20   nine part test, I guess, that Courts generally consider with

21   regard to extensions of exclusivity, but I want to focus in on

22   three of those nine elements.  The elements I'd like to really

23   focus on are the existence of good faith progress towards a

24   reorganization, whether or not the Debtors made progress in

25   negotiating with Creditors, and whether the Debtor is seeking

1    the extension to pressure Creditors.

2        Your Honor, notwithstanding the fact that we're also here

3    today to consider the sale of the Reliance -- I'm sorry, the

4    F3 business, which is indeed a step forward, we don't believe

5    that there's any other progress that's been made here towards

6    a reorganization.  In testimony today, the Debtors

7    acknowledged that they had one preliminary meeting with the

8    Committee with regard to the terms of the Plan.  There was

9    also a preliminary discussion with Wal-Mart apparently, but

10   there's been no other meetings or discussions with any of the

11   other key Creditor constituencies here.

12       This case in on a fast track, Your Honor.  This is not a

13   case where there's going to be seriatim extensions of

14   exclusivity.  The DIP financing and the use of cash collateral

15   expire as of June 30th, and the way that the DIP Order is

16   drafted, the DIP lenders are expecting to be paid down

17   significantly before we get to that date through the sale of

18   F3 and the sale of Reliance.

19       But, okay, the benchmarks set forth in the DIP Order with

20   regard to any of those sales have not been made.  The Debtors

21   have not declared a default with regard to the F3 process,

22   thank goodness.  They've not yet declared default with regard

23   to Reliance, but the Reliance sale is far behind schedule.

24   And that waiver, as I understand it, was only very recently

25   requested.  And unless and until that waiver is granted, we

1    are at risk with respect to the Reliance sale.  I don't think

2    as we stand here today that anyone contemplates that if the

3    bank says no, that that sale could be consummated within the

4    parameters of what's required by the DIP Order.

5         And the Debtors' failure to meet deadlines and involve

6    the Committee in the process here is really nothing new.  The

7    Debtors have a long history in the tort system where, you

8    know, delay and hardball litigation tactics have prevailed.

9    We believe the Green decision is highly relevant, and that's

10   why we attached it to the papers.  In the Green decision, the

11   -- you know, the Court made a finding that the Debtors were

12   involved in improper litigation tactics, including destruction

13   of books and records and relevant information with regard to

14   that litigation, and we think that those type of tactics

15   continue here in the bankruptcy case.  There is repeated

16   delay.  The testimony or argument with regard to production of

17   insurance related documents, one of the key components of the

18   funding this trust will be an assignment of the Debtors'

19   insurance coverage program, and it took months to get all of

20   that information.  Yeah, there was some delay, a couple of

21   weeks, with regard to the signing of the confidentiality

22   agreement, but that agreement's been signed for months.  And

23   the trickle and the slow flow of documentation there is simply

24   inexcusable, given the tight deadlines that we have here.

25    Judge, this case has to be concluded, more or less, by June

1    30th.  And we don't see that on the current track that we're

2    on, that we can possibly be in a position where we have a

3    consensual Plan or Reorganization for that date.  We're facing

4    real deadlines here with regard to the expiration of the DIP,

5    potential defaults into the DIP, expiration of the use of cash

6    collateral, and we would respectfully request that the Court

7    open up the process here.  We believe the best track forward

8    to creation of a consensual Plan is to open up the process to

9    allow the parties, the Committee and other Creditor

10   constituencies, to engage in direct negotiations with each

11   other towards attempting to come up with a consensual Plan of

12   Reorganization.  Thank you.

13        THE COURT:  Anyone else wish to be heard?  Okay, I'm

14   going to grant the application, and I'm going to be brief.

15   This is not a big case, but I think it's very, very

16   complicated.  I can't imagine how the personal injury pending

17   actions and the ones that haven't even yet been filed, I have

18   no idea how that can be resolved; whether it can be done

19   through a trust, who's going to contribute to the trust.  But

20   I think that the Debtor should remain in charge of that

21   matter.  And it's only 90 days being requested, and I think

22   it's appropriate, and we are making progress.  Hopefully I

23   will approve the sale transaction.  Next.

24        MR. MERCHANT:  Thank you, Your Honor.  I'd like to

25   hand up a Proposed Form of Order on the Exclusivity Motion.

1   It --

2            THE COURT:  Okay.

3            MR. MERCHANT:  -- has not changed.

4            THE COURT:  Okay.

5       (Pause in proceedings)

6            MR. MERCHANT:  Your Honor, that was the only matter I

7   was handling.  Is it acceptable to the Court if I can be

8   excused?

9            THE COURT:  Yes.

10           MR. MERCHANT:  Thank you.

11      (Pause in proceedings)

12           THE COURT:  Yes.

13           MR. DEFRANCESCHI:  Your Honor, for the record, Dan

14  DeFranceschi from Richards Layton & Finger on behalf of the

15  Debtors.  The item on the agenda next up is the Motion to

16  Approve the Sale of the F3 Brands Assets.  I'm pleased to

17  report that, as Your Honor is already aware, this past Monday

18  we did hold an auction.  Two parties participated, the

19  stalking horse bidder, Scepter, and Hopkins Manufacturing,

20  which was the sole qualified bidder pursuant to the bidding

21  procedures.

22      There were several rounds during that auction process,

23  and when factoring in the working capital adjustments and the

24  cash price, the expected purchase price rose from an initial

25  stalking horse price, which would be approximately $16,886,000

1   and change up to a winning bid of approximately $17,411,000

2   and change, and that's exclusive of the breakup fee, which was

3   $438,500, which also would be paid in addition to that.

4        What I'd propose to do, Your Honor, is proffer two

5   witnesses in support of the sale.  One would be our investment

6   banker, Mr. Daniel Smith, who Your Honor heard a proffer from

7   in connection with the hearing on the 21st when we approved

8   the amended bidding procedures and the breakup fee.  And then

9   also Jim King, who is in-house counsel with the company.

10  Before I do that, I would like to -- because I think there are

11  some parties here who may not want to stay for the entirety of

12  the hearing, they certainly can, but all of the objections

13  have been resolved except for the pending objection with the

14  Creditors Committee.  And what I could do, if it please the

15  Court, is before getting into the proffer, I could advise Your

16  Honor how we've resolved those objections so that those

17  parties, should they desire, they could not spend the rest of

18  the afternoon here --

19           THE COURT:  Okay --

20           MR. DEFRANCESCHI:  -- on the contested hearing.

21           THE COURT:  -- go ahead.

22           MR. DEFRANCESCHI:  With respect to Wal-Mart, Wal-

23  Mart, Your Honor's heard a lot about them, and they've been

24  somewhat active in the case in protecting their positions.

25  They had filed what amounts to essentially two limited

1    objections; one to the sale motion, one to the cure notice.

2    The -- that objection's been resolved through discussions

3    between Wal-Mart and the purchaser.  And as I understand it,

4    what we're going to do to resolve that is remove Wal-Mart from

5    the list of contracts that were going to be assumed and

6    assigned.  They're on the excluded contracts list.  The

7    parties will independently enter into a new contract, a new

8    supplier agreement.  And pursuant to the Asset Purchase

9    Agreement, as I understand it, there are certain provisions in

10   that, I think it's Sections 2.3(a) and (b), all of the

11   liabilities of F3 Brands under the contract arising after the

12   closing date or for product warranties, returns and rebates

13   related to products sold by F3 Brands on or after October 1,

14   2011 in the ordinary course of business pursuant to product

15   warranties, product returns and rebates and all accounts

16   payable incurred by F3 Brands in the ordinary course not to

17   exceed $360,000 in amount as reflected in the calculation and

18   final working capital on the post-petition accounts payable

19   line item.  The bottom line is, as I understand it, any

20   liabilities from that date forward will be worked out between

21   Hopkins and Wal-Mart.  So as I understand it, that objection

22   is now resolved.

23            THE COURT:  Okay.

24            MR. DEFRANCESCHI:  There was an objection filed by --

25   I think two objections, actually, or a supplemental objection

1    filed by the Untied States with respect to an old agreement, I

2    think it's the NextCom (ph.) agreement that I believe was

3    originally on the list of contracts to be assumed and

4    assigned.  We've resolved that by removing it from the list of

5    contracts to be assumed and assigned.  So I understand the

6    cure and sale motion objections by the United States have been

7    resolved and will be withdrawn.  I'm reminded by my partner,

8    Mr. Heath, that we are also representing that there are no

9    other agreements with the Federal Government that we're aware

10   of.

11        There was a letter objection or response from a Mark

12   Bennett, who -- I guess it was essentially a cure objection.

13   We've resolved that by not assuming and assigning that

14   agreement, so there's no cure to fight about because it's not

15   included in the contracts being assumed and assigned.

16        And then there was an objection filed I believe by

17   Liberty, it was a limited objection.  That objection I believe

18   objected to the, I believe, perceived ambiguity as to whether

19   or not their insurance agreements with the Debtors were being

20   assumed and assigned and whether we were assigning any

21   proceeds on pending claims.  That's been resolved, and I

22   wanted to state on the records that the Debtors are not

23   assuming and assigning the Liberty insurance policy.  In

24   addition, we've added language to paragraph 20 of the Sale

25   Order which states, "Notwithstanding anything in the Asset

1    Purchase Agreement to the contrary with respect to insurance

2    proceeds received by the Debtors for claims made before the

3    closing date under insurance policies primarily related to the

4    purchased assets, the Debtors shall transfer all such proceeds

5    to purchaser within three business days of receipt."  So if we

6    get them, we'll transfer them, but we're not assuming and

7    assigning the policies or the proceeds directly.  And I

8    believe that resolves that objection.

9         It leaves the Committee objection, which I think when we

10   go through the proffer, most of it will be resolved.  I think

11   we'll find that the only piece left -- they've essentially

12   objected on two bases; one, that there are -- that the sale

13   agreements as they understood them and based on their

14   understanding of discussions with us, were going to leave

15   behind certain administrative expenses that would remain

16   unpaid and, not to put words in their mouth, but with no

17   escrow set aside for it or no prospect for the payment of

18   those admins.  And then there's also an objection related to

19   documents are being transferred, not surprisingly, to the

20   purchaser.  There are contractual provisions which, among

21   other things, provide that if those documents -- that allow

22   Debtors to have continued access to those documents.  But

23   there's a provision, I believe, in the agreement that would

24   allow the parties, the purchaser, to, for example, give 90 day

25   notice of a decision to destroy the documents.  So -- and the

1    Committee's been made a noticed party to that, or will be made

2    a noticed party to that.  But I think before we get to that

3    piece of the hearing, I think the parties wanted to take a few

4    minutes to try and work that one out; I think we're going to

5    be able to work that objection out, and we'll take a break

6    when we get to that.

7        With respect to the administrative expense issues, I

8    think the proffer will show, which I will be making, that we

9    believe we have accounted for the payment of all the

10   administrative expense claims, except for we haven't accounted

11   for the universe of potential 503(b)(9) claims.  There is a

12   possibility -- there's been no bar date set so we don't know

13   what those claims actually will turn out to be.  There's a

14   possibility that those 20-day receipt goods could total as

15   much as 700, $750,000, based on a conservative look at what it

16   may be.  The number may come in much lower, don't know.

17       I think what Your Honor will hear, though, is we'll have

18   argument on that point, and the gist of the argument is that,

19   you know, this case had been run for the benefit of the

20   Secured Creditor, and the Secured Creditor ought to pay the

21   freight if you're going to use the bankruptcy process to

22   liquidate the collateral.  We'll talk more about that as the

23   hearing goes on, but with respect to 503(b)(9) claims, I think

24   Your Honor will hear argument from the Debtors and perhaps

25   from the bank that even if there were some binding precedent

1   that held that a Secured Creditor has to pay the freight on

2   admins, that 503(b)(9) claims are not the type of

3   administrative expense claim that that theory should apply to,

4   and there's a simply reason for that.  That theory applies to

5   the situation where a Secured Creditor essentially runs a case

6   -- causes a Debtor to run a case to solely liquidate its

7   collateral and uses the bankruptcy process to gain the

8   advantage of that, and Administrative Creditors who are

9   essentially working with the Debtor during the bankruptcy case

10  shouldn't be harmed by some decision that strips the company

11  of all the value, gives it to the Secured Creditor, and leaves

12  those ordinary course Administrative Creditors who dealt with

13  the Debtor during the pendency of the case, leaves them behind

14  with nothing.  On the day this bankruptcy case was filed,

15  those 503(b)(9) claims were set.  They haven't changed.  The

16  only reason that they get a priority is because Congress

17  amended the Code to make clear that they do have a priority.

18  But given that there is no controlling case law that I'm aware

19  of that says that those claims have to be paid on the back of

20  the Secured Creditor, we're going to argue to Your Honor that

21  they should not be included in any kind of a forced or coerced

22  set-aside of the Secured Creditors' proceeds on the sale.

23   There will be another point or two that I'll make on that, I

24  just wanted to give a preliminary overview of where we are on

25  those points.  And with that, I'm prepared to offer into

1    evidence by proffer I suppose first the proffer of Daniel

2    Smith, who is the Capstone Financial Group principle, who is

3    the Debtors' investment banker who ran the whole process for

4    us.  And with the permission of the Court, I'd like to do that

5    now.

6              THE COURT:  Okay.  Any objection to the proffer?

7              MR. PROL:  No, objection, Your Honor, just reserve

8    the right to cross.

9              THE COURT:  Certainly.  Proceed.

10             MR. DEFRANCESCHI:  Thank you.  Mr. Smith, if you can

11   stand up so the Court can identify you.

12             MR. SMITH:  Good morning, Your Honor.

13             THE COURT:  Okay.

14             MR. DEFRANCESCHI:  If called to testify, Mr. Smith

15   would testify as follows.  He is the President of the

16   investment banking firm, Capstone Financial Group; I'll refer

17   to them as either Capstone or CFG for this proffer.  Mr. Smith

18   would testify that in December 2011, the Debtors engaged CFG

19   as their investment banker to assist the Debtors related to a

20   potential sale of the Debtors' F3 Brands, LLC business line.

21   Mr. Smith would further testify that under his supervision,

22   Capstone led a targeted marketing process in contemplation of

23   a proposed sale of the Debtors' F3 Brands business division

24   assets as a going concern.  Mr. Smith would reference and

25   fully incorporate his testimony from the bid procedures

1   hearing held on March 21st, which Your Honor may recall, where
2   we went through the whole marketing process.

3       Mr. Smith would testify that following the bid procedures
4   hearing, the Court entered an order approving the amended bid
5   procedures on March 21st.  He would also testify that the
6   order approving the amended bid procedures provided that bids
7   for the assets were due on or before March 23 at 12 noon
8   Eastern time and, to the extent necessary, an auction would be
9   held at the offices of Richards, Layton & Finger on March 26th
10  at 10 am Eastern time.

11      Mr. Smith would testify that on March 23rd, prior to the
12  bid deadline, the Debtors received required bid materials from
13  one additional bidder.  After reviewing the bid, Debtors
14  determined that the bid was a qualified bid.  As required by
15  the bid procedures, the Debtors served on the stalking horse
16  bidder a copy of the qualified bid.  Prior to the commencement
17  of the auction, CFG developed a methodology for valuing the
18  various components of the bids.  CFG and the Debtors explained
19  and provided to all of the bidders the valuation ascribed by
20  the Debtors to the stalking horse bid, as well as the Hopkins
21  qualified bid.

22      As stated at the auction, the Sceptor stalking horse bid
23  was pegged at a purchase price of $14.5 million plus
24  adjustment subject to the working capital benchmark as
25  outlined in the APA.  Subsequently, the Hopkins bid was valued

1   at $112,000 higher than the Scepter bid, including the working

2   capital adjustment and all other aspects of the APA and

3   ancillary documents were pretty much even.  Therefore, in

4   consultation with the Committee and the DIP lender, the

5   Hopkins bid was deemed the superior bid.

6        Pursuant to section 3.1 of the Hopkins Asset Purchase

7   Agreement, the purchase price shall either decrease or

8   increase by the amount by which the estimated working capital

9   at closing differs from the working capital target of

10  $7,650,333.  No later than three business days prior to

11  closing, the Debtors are to provide to the purchaser a good

12  faith estimate of the working capital as of the closing date.

13  If this number is greater than the working capital target,

14  then the purchase price is increased by the difference.  If

15  the number is less than the working capital target, the

16  purchase price is decreased by the difference.  The estimated

17  working capital at closing as provided to Hopkins was

18  $10,036,766, which results in an additional amount of

19  $2,386,433 added to the purchase price.

20       On March 26th, 2012, the Debtors conducted an auction at

21  the offices of Richards Layton & Finger in Wilmington,

22  Delaware.  Mr. Smith would testify that the auction was

23  conducted fairly and in good faith, without collusion and in

24  accordance with the approved bidding procedures.  The auction

25  included four rounds of spirited and competitive bidding from

1   both bidders.

2       At the auction, Hopkins Manufacturing Corporation was

3   selected as the successful bidder.  The Debtors determined in

4   their business judgment, and in consultation with the

5   Committee and the Debtors' prepetition and post-petition

6   lenders, that the final offer at the auction, which was made

7   by Hopkins Manufacturing, was and is the highest and best

8   offer for the assets, and will provide a greater recovery for

9   the Debtors' estates than would be provided by any other

10  available alternative.  The Hopkins bid, including the working

11  capital adjustment, is valued at $17,849,933, including the

12  breakup fee.  This represents an amount of -- this represents

13  an amount of $963,500.15, including the breakup fee, and a net

14  of $525,500.15 when the breakup fee is excluded in additional

15  value above the original bid.

16      With respect to the standards for the approval of the 363

17  sale, Mr. Smith would testify first that he agrees that the

18  Debtors, in the exercise of their business judgment and in

19  consultation with the Committee and the lender, determined

20  that the consideration offered by Hopkins under the terms of

21  the APA is reasonable and represents the highest value offered

22  for the purchased assets, and that the combined components of

23  the Hopkins bid is the highest and best bid received.

24      Mr. Smith would also testify that the Debtors' marketing

25  process, the bidding procedures, and the timeline established

1    thereunder provided adequate and sufficient notice to

2    prospective purchasers that may have wished to bid on the

3    purchased assets.  Mr. Smith would testify that he agrees that

4    the Debtor conducted an open and fair process, with the Debtor

5    taking reasonable steps to address all issues that were raised

6    with respect to the bidding process.  Mr. Smith agrees the

7    proposed transaction is the result of a good faith arm's

8    length negotiation between the Debtors and Hopkins.

9         In addition, with respect to certain expenses, Mr. Smith

10   would testify that pursuant to the APA, Hopkins has agreed to

11   assume all of the line item expenses for the Debtors' F3 brand

12   business lines current liabilities as outlined in the APA's

13   required estimated working capital calculation, which include

14   accrued payroll liabilities in the amount of $141,570, accrued

15   profit sharing bonus in the estimated amount of $271,438,

16   excluding the severance plan which was approved by the

17   Bankruptcy Court, and which, pursuant to the Court's prior

18   order, will be paid directly from the proceeds of the sale.

19   Also includes accrued group insurance in the estimated amount

20   of $231,953, and accrued worker's compensation in the

21   estimated amount of $15,293.

22        In addition, Hopkins has agreed to assume accrued

23   advertising which include rebates in the estimated amount of

24   $362,687, accrued discounts in the estimated amount of

25   $17,500, accrued commissions of independent contractors in the

1  estimated amount of $25,801, accrued taxes in the amount of

2  $35,657, and other items totaling an estimated amount of

3  $91,634.

4        Testimony further would include that, pursuant to Section

5  2.3 of the APA, Hopkins has agreed to assume liabilities for

6  all accounts payable incurred by F3 Brands in the ordinary

7  course of business, not to exceed $360,000.  Mr. Smith would

8  testify that Capstone, in consultation with the Debtors, has

9  estimated that the post-petition payables will not exceed the

10 $360,000 cap provided for in the asset purchase agreement.

11 That would conclude Mr. Smith's testimony.

12        THE COURT:  Okay.  Cross-examination?

13        MR. PROL:  Your Honor, before questioning Mr. Smith,

14 perhaps we could hear the other proffer, and that way I would

15 know all the evidence that's in and I would know whether or

16 not I actually need to cross-examine him on various issues.

17        THE COURT:  Okay.

18        MR. PROL:  Thank you.

19        MR. DEFRANCESCHI:  Your Honor, the next proffer would

20 be a proffer of James King.  If -- Mr. King, if you could

21 stand up for the Court.  The proffer would be as follows:  Mr.

22 King would testify that he is general counsel of Blitz USA,

23 Inc. and its affiliated Debtors.  In such capacity, he is

24 generally familiar with the Debtors' day-to-day operations,

25 financial condition, books and records, and business affairs,

1      as well as the events leading up to the filing of these

2      Chapter 11 cases, and the Debtors' entry into the asset

3      purchase agreement with the purchaser.

4           Mr. King would testify that on March 15, 2012, the

5      Debtors and Scepter Holdings, Inc. entered into a stalking

6      horse purchase agreement, whereby Scepter agreed to purchase

7      substantially all of the Debtors' assets related to the F3

8      Brands business division.  Mr. King would testify that

9      negotiations between Debtors and Scepter were conducted at

10     arm's length and in good faith.  Mr. King would further

11     testify that in accordance with the amended bid procedures

12     entered by this Court on March 21, the Debtors received an

13     additional bid from Hopkins Manufacturing for the assets

14     before the bid deadline on March 23.  Mr. King would testify

15     that based on advice from counsel and its advisors, including

16     Capstone Financial Group, the Debtors' investment bankers

17     engaged to market and sell the F3 assets, and in consultation

18     with the Committee and the DIP lenders, and the pre-petition

19     lenders, the Debtors determined that the Hopkins bid was a

20     qualified bid.

21          Mr. King would testify that on March 26, 2012, the

22     Debtors conducted an auction; that the auction was conducted

23     fairly and in good faith without collusion and in accordance

24     with the bidding procedures.  Mr. King would testify that

25     after four rounds of competitive bidding from both bidders,

1  the Debtors, based on the advice of counsel and its advisors,

2  and in consultation with counsel for the Creditors Committee

3  and the lenders, determined that the bid of Hopkins

4  Manufacturing was the winning bid, and Hopkins Manufacturing

5  Corporation was selected as the successful bidder.  He would

6  further testify that on March 28, 2012, the Debtors and

7  Hopkins Manufacturing executed the asset purchase agreement.

8       Mr. King would testify that in the exercise of their

9  business judgment, in consultation with their advisors,

10  including Capstone, the investment bankers retained by the

11  Debtors, that the Debtors have determined that the

12  consideration offered by the successful bidder under the terms

13  of the APA is fair and reasonable, and represents the highest

14  value offered for the Debtors' assets, and will provide a

15  greater recovery for the Debtors' estates than would be

16  provided by any other currently available alternative, and

17  will generate sufficient proceeds to provide a substantial

18  return to the Debtors' estate.  Mr. King would further testify

19  that the negotiations between the successful bidder and the

20  Debtor were conducted at arm's length and in good faith.  He

21  would testify that no other person or entity or group of

22  persons or entities has offered to purchase the assets for an

23  amount that would give equal or greater economic value to the

24  Debtors than the value provided by the successful bidder

25  pursuant to the APA.

1       Mr. King would further testify that there are compelling

2   circumstances to consummate the transactions contemplated by

3   the APA, and that such action is an appropriate exercise of

4   the Debtors' business judgment, and is in the best interest of

5   the Debtors, their estates, and their Creditors.  Mr. King

6   would testify that such business reasons include the risk of

7   default under the Debtors' post-petition secured credit

8   facility if the sale is not consummated quickly, that the APA

9   constitutes the highest and best offer for the assets, and

10  that the APA presents the best opportunity to maximize the

11  value of the assets for the Debtors and their Creditors.  Mr.

12  King would testify that the proposed sale transaction with the

13  successful bidder is the result of lengthy and comprehensive

14  efforts by the Debtors, their management and professionals, to

15  locate a going concern sale transaction.  Mr. King would

16  testify that neither the successful bidder nor any of its

17  affiliates, officers, directors, members, partners, principals

18  or shareholders or any of their respective representatives,

19  successors or assigns is an insider of any of the Debtors.

20  The Debtors and the successful bidder do not share any

21  officers, directors, or controlling stockholders.

22      He would further testify that to the best of his

23  knowledge, the Debtors conducted an open and fair auction

24  process in accordance with the Court's bidding procedures

25  order, and the Debtors, taking reasonable steps to address all

1    issues and questions that were raised during the bidding

2    process, and that no other entity has offered to purchase the

3    Debtors' assets for greater economic value to the Debtors than

4    that which is contained in the APA.

5        Mr. King would testify that the auction was conducted so

6    as to provide full and fair information to all of the bidders.

7    Prior to beginning the auction, the Debtors explained and

8    provided to all bidders the valuation described by the Debtors

9    to the stalking horse bid, as well as the Hopkins qualified

10   bid.  Mr. King would further testify that the auction was

11   conducted in a manner intended to maximize value for the

12   estates.

13       Therefore, he would testify consummation of the proposed

14   sale is in the best interest of the Debtors, their Creditors,

15   their estates, and other parties in interest.  Mr. King would

16   further testify that the assumption and assignment of the

17   assigned contracts is integral to the asset purchase agreement

18   and is in the best interest of the Debtors and their estates.

19   Finally, Mr. King would testify that time is of the essence in

20   consummating this sale.

21       That would conclude Mr. King's proffer, and if I could

22   have a moment, there may be one additional proffer.

23           THE COURT:  Okay.

24       (Pause in proceedings)

25           MR. DEFRANCESCHI:  Your Honor, I have one more

1    proffer, and that would be a proffer I'd like to offer of

2    Fernando Maddock, who previously proffered and was cross

3    examined.  As you can see, Mr. Maddock is still in Court.

4              THE COURT:  Okay.

5              MR. DEFRANCESCHI:  I'm going to just incorporate his

6    background from the prior proffer.  I won't repeat that.  Mr.

7    Maddock would testify with respect to the Committee's argument

8    that the following expenses are not being covered by the asset

9    purchase agreement, those being real estate taxes due and

10   owing, unpaid post-petition medical reimbursements and

11   expenses, 503(b)(9) claims, and post-petition payables that

12   exceed $360,000.  Mr. Maddock would testify that pursuant to

13   the APA, Hopkins has agreed to assume all of the line item

14   expenses for the Debtors' F3 Brands business lines current

15   liabilities as outlined in the APA's required estimated

16   working capital calculation, which include accrued payroll

17   liabilities in the amount of $141,570, accrued profit sharing

18   bonus in the estimated amount of $271,438, excluding the

19   severance plan approved by the Bankruptcy Court, which will be

20   paid directly from the proceeds of the sale, accrued group

21   insurance in the estimated amount of $231,953, and accrued

22   workers' compensation in the estimated amount of $15,293.

23   These items that I just identified, the group insurance and

24   workers' comp, include the unpaid post-petition medical

25   reimbursements cited by the Committee in their objection.  In

1    addition, pursuant to Section 11.2(b) of the APA, the

2    purchasers are responsible for all unpaid and accrued

3    vacation.

4         Further, Mr. Maddock would testify that Hopkins has

5    agreed to assume approved advertising which includes rebates

6    in the estimated amount of $362,687.  He would further testify

7    as to the inclusion of accrued discounts in the estimated

8    amount of $17,500, and accrued commissions of independent

9    contractors in the estimated amount of $25,801.  There are

10   also accrued taxes in the estimated amount of $35,657, which

11   include real estate taxes due and owing related to the

12   property that is transferred to Hopkins.  There are

13   additionally other items estimated in the amount of $91,634.

14        In addition, pursuant to section 2.3(b) of the asset

15   purchase agreement, Hopkins has agreed to assume liabilities

16   for all accounts payable incurred by F3 Brands in the ordinary

17   course of business, not to exceed $360,000.  In addition, he

18   would testify that the Debtors have estimated that the post-

19   petition payables will not exceed the $360,000 cap provided

20   for in the asset purchase agreement.  He would further testify

21   that there are no known environmental liabilities with respect

22   to F3 and the Debtors being sold.  And that would conclude his

23   proffer.

24             THE COURT:  Okay.  Cross examination?

25             MR. PROL:  Your Honor, rather than cross examining at

1    this time, I think that there's -- they want to take a break

2    to talk about the document preservation issue.  If I could

3    just talk with them about some clarifications on the proffer,

4    we may eliminate the need for cross-examination entirely.  So

5    I would request that we take a break now.

6              THE COURT:  Okay, but don't we still have the

7    503(b)(9) issue?

8              MR. DEFRANCESCHI:  There's -- as outlined before,

9    there's still the 503(b)(9).  I view that, Your Honor, as an

10   issue that's going to require some argument, because they are

11   not being picked up.

12             THE COURT:  I think it may be more than argument.  I

13   mean, the --

14             MR. DEFRANCESCHI:  Well, the fact is they're not

15   being picked up, so that's my facts.

16             THE COURT:  I didn't get the Committee's objection

17   until late yesterday.  I probably spent a half hour with it.

18   This would not be the first Chapter 11 administratively

19   insolvent case that I've ever had, but they cited cases that I

20   haven't gone back to look at.  The only observation I made was

21   they were pretty old cases.

22             MR. DEFRANCESCHI:  That is correct, Your Honor.

23             THE COURT:  And I think, as I said, this would not be

24   the first administratively insolvent Chapter 11 case involving

25   a sale.

1         MR. DEFRANCESCHI:  I can probably address some of

2    those points briefly.  First of all, I'm not going to concede

3    that we're administratively insolvent.

4         THE COURT:  Why don't we take a break and see --

5         MR. DEFRANCESCHI:  Okay.

6         THE COURT:  -- if it's still an issue.

7         MR. DEFRANCESCHI:  Okay, thank you, Your Honor.

8         THE COURT:  How much time do you need?

9         MR. DEFRANCESCHI:  How much time do you think you

10   need to talk, if you want to talk?

11        UNIDENTIFIED SPEAKER:  10, 20 minutes.

12        MR. DEFRANCESCHI:  Yeah.  It's 11:30.  Do you want to

13   do 12 noon, or --

14        UNIDENTIFIED SPEAKER:  Noon would be all right.

15        MR. DEFRANCESCHI:  Is noon okay with Your Honor?

16   That way --

17        THE COURT:  12 o'clock, that's fine.

18        MR. DEFRANCESCHI:  Thank you, Your Honor.

19     (Recess)

20        THE CLERK:  Please rise.

21        THE COURT:  Please be seated.

22        MR. HEATH:  Good afternoon, Your Honor, Paul Heath of

23   Richards Layton & Finger on behalf of the Debtors.  Your

24   Honor, I think we've been able to resolve one piece of the

25   Committee's objection to the sale, and that issue is related

1    to the Committee's concern about the preservation of records.

2    I think we've reached an agreement, and I'll try to state it

3    on the record.  If I misstate it, I'm sure Mr. Prol will

4    correct me.  It's probably gonna be likely.

5        First, Your Honor, we've agreed to, by Tuesday of next

6    week, the Debtors will provide a list of the computers and

7    servers being transferred, as part of the F3 sale, to the

8    Committee.  We will endeavor, as part of providing that list,

9    to identify what information generally is on the servers.  If

10   there are categories, we're going to attempt to do that.  So

11   that's by Tuesday of next week.

12       Additionally, Your Honor, I'm confirming on the record

13   that as of the point in time that F3 was split, that was

14   October 1st, 2011, all documents that were Blitz documents at

15   that time have been preserved, and that includes, Your Honor,

16   I think that there were hard drives removed at the time and

17   there were mirror images made at that time, so that all those

18   documents are preserved.

19       Your Honor, we've also agreed that, pending further

20   discussion and working out the terms with the Committee, that

21   counsel for the personal injury claimants will have, and we

22   consent to their right to mirror certain or any of the

23   computer hard drives that they're interested in mirroring at

24   their cost.  We're still trying to work out the mechanics of

25   that, but we're agreeing to their right to do so, and we're

1    consenting to them doing that.  And again, we'll be working

2    with them to work out the mechanics, if they desire to do that

3    once they have an idea of what documents are in this universe.

4         Lastly, Your Honor, we're going to be adding language to

5    the sale order, which will include the Committee as a notice

6    party in section 10.11 of the Asset Purchase Agreement.  So

7    section 10.11 of the Asset Purchase Agreement deals with the

8    preservation of records.  It requires the Debtors and

9    purchaser to maintain records for a six-year period.  It

10   establishes a procedure by which either of the Debtors or the

11   purchaser can seek to destroy documents with a 90-day notice,

12   essentially.  We're gonna add the Committee as a notice party

13   to that -- any 90-day notice that's given, so that in the

14   event they're interested in those documents, but would object

15   to their destruction, they'd be on notice and could take the

16   steps they deem necessary.  We'll add that language to the

17   sale order.  And I think, with that, Your Honor, that piece of

18   the Committee's objection was resolved.

19        MR. PROL:  Your Honor, just two small clarifications.

20   With regard to the tort claimant's right --

21        THE COURT:  I'm sorry, please come to the podium.

22        MR. PROL:  Sorry, Your Honor.  With regard to the

23   tort claimant's right to mirror the computers, I just wanted

24   to make it clear that it's not only the computers, but also

25   the servers that are being turned over.  And secondly, with

1   regard to the notice part, it's not only the Committee going

2   to be added, but once the case is concluded or the Committee

3   is disbanded, the Committee chairperson, who is the co-chair

4   of the tort side of the Committee, will be replaced in the

5   document as the notice party, so that there will be an ongoing

6   notice requirement.

7            THE COURT:  Okay.

8            MR. HEATH:  I confirm that for the record, Your

9   Honor, that language added so the seller will provide for that

10  additional notice in the event of the disbandment of the

11  Committee, Your Honor, and we did consent and agree to the

12  mirroring of the servers as well.

13           UNIDENTIFIED SPEAKER:  Yes.

14           MR. HEATH:  Your Honor, this was part of our

15  agreement.  Our client is asking us to confirm this on the

16  record, that the mirroring and the actual turnover of the

17  documents pursuant to any discovery request, whether it's

18  informal or formal, are two separate pieces.  We're agreeing

19  that the documents that the computer -- the documents on the

20  computers can be mirrored, but that doesn't mean that we're

21  agreeing to turn them over, because they still may -- we still

22  may need to review them for privilege, and there may be other

23  issues, if formal document discovery and the protections that

24  we would have with discovery, the mirroring and actual

25  turnover are two separate issues.  That's it, Your Honor.

1           THE COURT:  Okay.  I'm sorry, do we have any

2   unresolved matters?

3           MR. DEFRANCESCHI:  Yes, we do, Your Honor.

4           THE COURT:  Okay, and that is?

5           MR. DEFRANCESCHI:  Well, there's two things.  One I

6   need to make a -- three things I'd like to do:  make a

7   clarification; I misspoke slightly on the arrangement with

8   Wal-Mart to resolve their objection, so I want to read into

9   the record what that is.  Second, I wanted to just hand up to

10  Your Honor and submit for the record a copy of the transcript

11  of the auction.  And then the issue --

12          THE COURT:  I have that.

13          MR. DEFRANCESCHI:  Oh, do you have it?

14          THE COURT:  Yes.

15          MR. DEFRANCESCHI:  Okay, then I won't do that.  Then

16  the issue that remains is I believe we are in agreement that

17  the only admin that's not provided for with the sale are the

18  503(b)(9)'s, and that would be --

19          THE COURT:  Okay, and the administrative claims that

20  are other than the 503(b)(9) --

21          MR. DEFRANCESCHI:  Are covered.

22          THE COURT:  -- are either being assumed by the buyer

23  or are taken or allowed for the sale proceeds or --

24          MR. DEFRANCESCHI:  They're --

25          THE COURT:  -- taken out of the sale proceeds?

1       MR. DEFRANCESCHI:  Yeah, and as -- that's consistent

2   with the testimony that all the admins that we're aware of

3   have been reserved for, essentially, and will come out of,

4   essentially, from the sale -- either sale proceeds, or they'll

5   be assumed by the buyer.

6       THE COURT:  Okay.

7       MR. DEFRANCESCHI:  And so what's left are the

8   503(b)(9) claims, and I'm happy to argue my points on that, if

9   Your -- if it please the Court, as to why they should not be -

10  - why they should not be an issue.  Because ultimately with

11  what's -- the effort here is the Committee -- I don't believe

12  they want to hold up the sale.  I think what they want is

13  essentially a reserve for those claims to be taken out of the

14  bank's proceeds.  What I'd like to -- there's a few things

15  that I'd like to address on that point.

16      THE COURT:  Let me make this suggestion.  As I said,

17  I only had a limited opportunity to read the Committee's

18  objection, but I think I need something in writing from you as

19  to why you believe that the 503(b)(9) claims are different

20  from other administrative claimants, and the Committee can

21  respond to that.  And my suggestion is that you reserve that

22  seven -- is it 700,000?

23      MR. DEFRANCESCHI:  There was a $750,000 maximum

24  potential exposure.  Keep in mind, there hasn't been a single

25  claim filed, so we don't know what the actual amount really

1    is.  And --

2               THE COURT:  Well, my suggestion is you hold back that

3    $750,000 until I've had an opportunity to have written

4    submissions on this issue and decide the issue.

5               MR. DEFRANCESCHI:  Could I have just one minute on

6    that, Your Honor?

7               THE COURT:  Okay.

8         (Pause in proceedings)

9               MR. DEFRANCESCHI:  If Your Honor would like papers,

10   we'll certainly submit those.  A couple points on that:  one,

11   I think we should have a timeframe on that as soon as

12   possible.  I suggest that our papers be due in a week.  The

13   hold-back of that money, obviously Your Honor can rule as the

14   Court desires, that is not -- just so we're clear, it's my

15   understanding that is not a permitted use of the bank's cash

16   collateral.  So from the Debtors' standpoint, we're not

17   permitted to do that absent Court order.  The bank, of course,

18   reserves all rights with respect to that, given that, you

19   know, in the priority scheme, they certainly come above those

20   Creditors.  So we can do that.  I would suggest we take --

21   what is today, Wednesday?  We can submit a response to the

22   arguments raised by the Committee by next Wednesday.  And will

23   Your Honor want to set a hearing date for argument on that?

24               THE COURT:  Yes, I'll give the Committee an

25   opportunity to respond to your submission.

1          MR. DEFRANCESCHI:  Okay.  I would propose seven days

2     for them as well.

3          THE COURT:  Okay.

4          MR. DEFRANCESCHI:  And then -- I don't know, do we

5     know what our hearing schedule is after that, Mandy?

6          MR. ORY:  Your Honor, I don't mean to complicate

7     this, but the Committee has already submitted papers, they've

8     sort of said their piece.  I think it's a pretty

9     straightforward issue.  Let the Debtors and the bank maybe say

10     their piece and hopefully we could get to a resolution, you

11     know, and get the money dealt with, as opposed to, you know, a

12     long process here with more briefing and, you know, if the

13     concern is administrative insolvency, it seems, you know, why

14     are we running up more fees on this issue?  So I just --

15     obviously we'll do whatever you say, but I'd like to get this

16     resolved as quickly as possible.

17          THE COURT:  Okay, do we have a hearing date in April?

18          MR. DEFRANCESCHI:  April 19th at 9:30.  It's -- yeah,

19     the only thing on right now is interim fee.  Interim fees is

20     the only thing on right now.

21          THE COURT:  Okay, does the Committee wish to have an

22     opportunity to respond to --

23          MR. PROL:  Yes.

24          THE COURT:  -- what the Debtor is saying?

25          MR. PROL:  Yes, we do, Your Honor, and based upon

1    that calendar, I don't think it would delay the process if the

2    Debtors can file in seven days, we're happy to respond to that

3    within seven days as well.

4              MR. DEFRANCESCHI:  I don't have a calendar in front

5    of me.  Will that give us enough time for His Honor to review

6    the papers in advance of that hearing?  How many days is that?

7    I just --

8              MR. PROL:  Let's see.  Today's the 29th.  That would

9    make their papers due on the 5th, and our papers due on the

10   12th, which would be a week before the hearing.

11             MR. DEFRANCESCHI:  Is that acceptable to Your Honor?

12             THE COURT:  Yes.

13             MR. DEFRANCESCHI:  Okay.

14             THE COURT:  Yes.

15             MR. DEFRANCESCHI:  All right, well, we will do that.

16   The only thing that remains, then, there's two things.  One,

17   let me read into the record that Wal-Mart language that I

18   messed up the first time on the resolution of the Wal-Mart

19   objection.

20             THE COURT:  Okay.

21             MR. DEFRANCESCHI:  Okay, and I'll just read it.  For

22   the record, Hopkins has not agreed to include the provisions

23   of section 2.3(a)(i) and 2.3(b) in their supplier agreement

24   with Wal-Mart.  Rather, they have agreed to include language

25   to the effect of Section 2.3(a)(ii) of the APA, which states

1   that Hopkins will assume liability for product warranties,

2   returns and rebates related to products sold by F3 Brands on

3   or after October 1, 2011, in the ordinary course of business,

4   pursuant to product warranties, product returns, and rebates.

5   Period.  End of story.

6           THE COURT:  Okay.

7           MR. DEFRANCESCHI:  And then the only other thing,

8   Your Honor, and this is -- we have, as you know, we had a

9   bidder prevail other than the stalking horse, so as is usual,

10  the stalking horse bidder had a certain form of sale order;

11  it's changed as a result of -- as a result of the new -- the -

12  - Hopkins winning in the auction.  Many of the -- I would say

13  that none of the changes are, in any way, detrimental to the

14  estate or any party.  However, I believe Your Honor has been

15  presented with a blackline, and you'll see, there are a lot of

16  blackline changes.  I can attempt to walk through all of them,

17  or what we could do is we could take a recess and have Your

18  Honor review them, and then I can respond to any questions you

19  may have.  I don't know which would be more preferable.  Going

20  through them in Court could take 45 minutes.

21          THE COURT:  Yes.  Has the Committee seen the changes?

22          MR. PROL:  Your Honor, we did receive a draft

23  yesterday.  I believe there was another draft circulated this

24  morning while I was on the train, which I have not yet had the

25  chance to review.

1           MR. DEFRANCESCHI:  The only change, I believe, that

2    came this morning was we added language to this agreement to

3    account for the breakup fee being paid directly by the

4    Debtors, as opposed to out of the proceeds directly from the

5    new -- the winning bidder.  The original setup for the breakup

6    fees provided that it would be paid first out of the proceeds

7    of -- from the seller -- or from the buyer, but if it wasn't,

8    then the Debtor would pay it from the proceeds.  Well, the

9    asset purchase agreement with Hopkins provides not that

10   they're gonna pay it, but that they'll pay us and we'll pay

11   Scepter.  So the additional language does that, and we'll be

12   happy to show it to -- and we're actually gonna pay it out of

13   the escrow.

14           THE COURT:  And how about language to cover the issue

15   that remains open?

16           MR. DEFRANCESCHI:  And we have to add that language

17   as well.  So if -- what we could do is we could submit an

18   order on a certification of counsel.  We're trying to close

19   this transaction by Friday, and I understand Your Honor has

20   other commitments this afternoon.

21           THE COURT:  Yes.  I assume you can get together with

22   the Committee's counsel and put in the additional language

23   protecting the --

24           MR. DEFRANCESCHI:  Yes.

25           THE COURT:  -- 503(b)(9) issues, and submit it under

1   certification.

2          MR. DEFRANCESCHI:  Okay.

3          THE COURT:  Is that agreeable?

4          MR. PROL:  That's fine, Your Honor.  We're actually

5   meeting this afternoon on some other issues, so we'll be

6   around all day and should be able to get that resolved before

7   close of business today.

8          THE COURT:  Okay.

9          MR. DEFRANCESCHI:  Yeah, we'll do that.

10         THE COURT:  Very good.

11         MR. DEFRANCESCHI:  Thank you, Your Honor.  We

12  appreciate it.

13         THE COURT:  Anything else?

14         MR. DEFRANCESCHI:  I don't believe so.

15         THE COURT:  Okay, we stand in recess.

16         MR. DEFRANCESCHI:  Thank you.

17         MR. PROL:  Thank you, Judge.

18      (Court adjourned)

19

20

21

22

23

24

25

70

1                           **CERTIFICATION**
2
3     I certify that the foregoing is a correct transcript from the
4     electronic sound recording of the proceedings in the above-
5     entitled matter.
6
7     *Lewis Parham*                           3/29/12
8
9     _____        _____
10    **Signature of Transcriber**                 **Date**