IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BLITZ U.S.A. Inc., et al. | ) | Case No. 11-13603(PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## MEMORANDUM OPINION

Daniel J. DeFranceschi
Michael J. Merchant
Julie A. Finocchiaro
Amanda R. Steele
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Counsel to the Debtors and
Debtors in Possession

Francis A. Monaco, Jr.
Kevin Mangan
WOMBLE CARLYLE SANDRIDGE &
RICE LLP
222 Delaware Avenue, Ste. 1501
Wilmington, DE 19801

Jeffrey Prol
Mary E. Seymour
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068

Counsel to the Official
Committee of Unsecured
Creditors

Dated: July 9, 2012

2

**WALSH, J.** *[signature]*

This opinion is with respect to the amended motion seeking authorization to make payments associated with an employee bonus plan (the "Motion") by Blitz USA, Inc. ("Blitz"). (Doc. # 418.)  For the reasons detailed below, I will grant the Motion.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. §157(A), (M), and (O).

### Background[1]

Blitz manufactures portable consumer gas containers, which are distributed through various retailers.  Prior to entering bankruptcy, Blitz spent millions of dollars to defend numerous product liability lawsuits alleging injuries sustained in the use of Blitz's gas cans.  In part, the influx of litigation and rapidly escalating defense costs led Blitz to seek bankruptcy protection.  In addition to the gas can business, the Blitz enterprise included F3 Brands LLC ("F3"), which constituted non-gas-can products.  F3 was spun off from Blitz in October 2011.

On November 9, 2011, Blitz and several of its affiliates (collectively "Debtors") filed for bankruptcy protection under chapter 11 of the Bankruptcy Code, 11 U.S.C. §101 et seq.  Debtors

---

[1] The facts detailed in this section are undisputed by the parties.

continue to operate as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Debtors filed the Motion on May 5, 2012, seeking the Court's approval of an EBITDA[2]-based employee bonus plan for Fiscal Year 2012 (the "Bonus Plan"). Debtors argue that the Bonus Plan is an ordinary course transaction that Debtors are authorized to make without notice and a hearing. In the alternative, Debtors assert that, even if it is not in the ordinary course of business, the Bonus Plan satisfies the stringent requirements of § 503(c)(3)[3] of the Bankruptcy Code. The Official Committee of Unsecured Creditors (the "Committee") filed an objection to the Motion, arguing that the Bonus Plan is not an ordinary course transaction and is not justified by the facts and circumstances of this case. (Doc. # 435.) The U.S. Trustee also filed an objection, taking issue with the amount of payments designated for certain insiders. (Doc. # 436.)

On May 31, 2012, after briefing from the Debtors, Committee, and the U.S. Trustee, the Court held an evidentiary hearing. Debtors presented testimony from Rocky Flick, President and CEO of Blitz, and Fernando Maddock, director at Zolfo Cooper,

---

[2] Earnings before interest, taxes, depreciation, and amortization.

[3] "[T]here shall neither be allowed, nor paid-- other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3) (2005).

4

the Debtors' restructuring firm.  Committee and U.S. Trustee called no witnesses.  The Court asked the parties to submit post-hearing statements.  Committee and Debtors submitted statements and supporting exhibits, and the issue is now ripe for decision.

**Discussion**

*Creation of the Bonus Plan*

The Court makes the following findings of relevant fact regarding the creation of the Bonus Plan:

- Since 1992, Blitz has offered an employee bonus plan as part of its compensation package.  (Hr'g Tr. 16:4-5.)

- At its inception, the program paid a bonus based on Blitz's net income, but was changed to an EBITDA-based model in 2007. (Tr. 16:8-9.)

- Compensation, including bonuses, is set by a four-member Compensation Committee.  (Tr. 6-8.)  All members are Blitz employees who are eligible beneficiaries under the bonus plan. (Tr. 46:25-47:2.)

- The Compensation Committee meets biannually to review compensation, using yearly evaluations with employees and market-based data from Kenexa CompAnalyst ("Kenexa").  Kenexa, a subscription service, compiles data on salary broken down by job description and geographic region. The Compensation Committee reviews Kenexa data in comparing current Blitz

salaries with benchmarks in the relevant market. (Tr. 8-11; Debtors' Ex. 1.)

- The FY[4] 2008 bonus plan - the first plan based on EBITDA - was designed by the Compensation Committee, who "worked with [Flick] and the Board [of Directors]" to implement it. (Tr. 17.)  The Board is comprised of Flick and three outside directors who are not included in the bonus plans.  (Tr. 48:7-9.)

- The FY 2008 plan was modeled on one of a number of plans designed by Springfield Remanufacturing, a group of companies offering books and seminars on compensation. (Tr. 33.)

- Springfield Remanufacturing's philosophy of "employees having a stake in the outcome and how important that is to get employees motivated" influenced the decision to implement the FY 2008 bonus plan. (Tr. 33:10-13.)

- The Compensation Committee sets the annual bonus targets. (Tr. 8, 35.)

- The Compensation Committee's recommendations regarding salary and bonus are approved by Flick and the Board of Directors in connection with the Board's approval of the yearly budget and business plan. (Tr. 15:10-13.)

- The plan designed for FY 2008 is essentially the same in structure as the current Bonus Plan. (Tr. 17:23-18:1, 35.)

---

[4]Fiscal Year

*Parameters of the Bonus Plan*

The Court makes the following findings of fact regarding the details of the Bonus Plan:

- The Bonus Plan's parameters and targets were set prior to the commencement of FY 2012 and prior to the filing of the bankruptcy petition. (Tr. 60.)

- The Compensation Committee sets the EBITDA targets so that employee total compensation levels, on average, will be competitive with the market once three targets are hit. (Tr. 27:6-11.)

- In previous years (2008 through 2011), the first EBITDA target was $6 million. The second target was $9 million, and subsequent targets increased in $3 million increments. (Tr. 19: 1-2.)

- In 2008, one EBITDA target was hit, and approximately $533,620 was paid to employees. Three targets were hit in each 2009 and 2010, for total payments of $1.6 million and $1.75 million, respectively. In 2011, none of the targets were met and so no bonuses were paid. (Debtors' Ex. 4.)

- In the Bonus Plan, the first EBITDA target is $5 million with $2.5 million incremental targets. (Tr. 19:2-4.)

- The 2012 targets were lowered due to the spinoff of F3 Brands. The bonus plans in 2008 through 2011 included F3 Brands, which

made up roughly one-third of the combined company's sales.
After F3 Brands was spun off, the Compensation Committee
reduced the first EBITDA target for Blitz to $5 million, from
the pre-spinoff level of $6 million.  Although no written
analysis was done to arrive at the reduced target, $5 million
was chosen to reflect the loss in sales but account for
Blitz's greater efficiency and better margins. (Tr. 20,
49-50.)

- All Blitz employees are eligible for the Bonus Plan. (Tr.
  33:25-34:1.)

- As in previous years, the Bonus Plan divides employees into
  five levels, depending on their job functions.  The
  Compensation Committee determines the levels, subject to the
  approval of Flick and the Board. (Tr. 30:12-31:1.)

- The levels determine each employee's bonus, as a percentage of
  his or her base salary.  Level 1 employees would receive 4
  percent of their base salary each time a bonus target is hit,
  while the sole Level 5 employee, Flick, would receive 67
  percent of his base salary. (Tr. 31.)

- With the Motion, Debtors are seeking approval for the payments
  associated with meeting only the first two EBITDA targets.
  (Tr. 18:10-12.)  Only the first target has been reached. (Tr.
  27:18-28:5.)

- The achievement of each target would result in a total payout of approximately $427,000. (Debtors' Ex. 4.)

- Debtors' DIP lenders have not objected to the Motion, and indicated to Flick that "they would be in support of paying the first incentive." (Tr. 42:18-22.)  Maddock also testified that the lenders have expressed their approval.  (Tr. 174:11-13.)

*The Bonus Plan is an Ordinary Course Transaction*

Debtors argue that the Bonus Plan is an ordinary course transaction and thus need only be evaluated under the business judgment standard applied in §363.[5]  Committee, on the other hand, argues that the elevated standard prescribed in § 503(c)(3) should apply.  Section 503(c)(3) requires that a payment out of the ordinary course of business be "justified by the facts and circumstances of the case."  Committee asserts that the Bonus Plan is not so justified here.

A number of cases addressing an employee incentive bonus plan first examine whether the plan is a transaction made in the ordinary course of business.  See, e.g., In re Nellson Nutraceutical, Inc., 369 B.R. 787 (Bankr. D. Del. 2007); In re

---

[5] "If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. §363(c)(1) (2010).

Global Home Products, LLC., 369 B.R. 778 (Bankr. D. Del. 2007); In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006). In order to determine whether a transaction is in the ordinary course of business, the Third Circuit and other courts use a two-part inquiry. Nellson, 369 B.R. at 797; Dana, 358 B.R. at 580. First, the transaction must be examined on the "vertical" dimension, which "analyzes the transactions from the vantage point of a hypothetical creditor[,] and the inquiry is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit.'" Nellson, 369 B.R. at 797 (quoting In re Roth Am., Inc., 975 F.2d 949, 953 (3d Cir. 1992)). In other words, the vertical analysis looks at the "debtor's pre-petition business practices and conduct." Id. Next, the court must look at the transaction from the "horizontal" dimension, that is, "'whether from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry.'" Id. (quoting Roth, 975 F.2d at 953).

        Flick testified that Blitz has had some form of bonus plan since 1992 and an EBITDA-based plan since FY 2008. Although the EBITDA-based plan has only been in existence for three years prior to FY 2012, this is sufficient to establish a course of pre-petition conduct. With regard to the downward adjustment of the first $6 million target and the subsequent increments, it is foreseeable that Blitz would lower its EBITDA target as a result of the F3 spinoff.

Given that F3 accounted for nearly one-third of the combined company's sales, it makes sense for the target to be lowered where F3 is no longer part of the Blitz company.  Thus, I conclude that the vertical test has been satisfied.

Turning to the horizontal dimension, I find that the evidence has demonstrated that an incentive-based bonus plan is common to the industry.  Flick testified that there are only a few gas can manufacturers, and that the Compensation Committee relied on a compensation scheme designed by Springfield Remanufacturing, another Midwest manufacturer. (Tr. 33.)  Springfield Remanufacturing publishes books and holds seminars on compensation in the manufacturing industry, and its advice is sought by many companies in the industry.  (Id.)  Flick further testified that it was likely that other companies had bonus and other incentive programs.  (Tr. 13:24-25.)  Committee has produced no evidence to refute Flick's testimony on this point.  I am satisfied that the Bonus Plan is in line with the bonus structures of other similar companies.

In light of the horizontal and vertical analysis, I hold that the Bonus Plan is an ordinary course transaction.  The Bonus Plan is essentially the same as the EBITDA-based plans the company has had since 2008.  Even before the switch to the current model of the plan, Blitz has had an incentive bonus plan for its employees since 1992.  Flick's uncontested testimony demonstrates that the Blitz plan was based on a model from another company recognized for

its guidance in compensation structure, and that other manufacturing companies have similar bonus plans.  Consequently, the Bonus Plan is an ordinary course transaction that is not subject to the requirements of §503(c)(3).  See Nellson, 369 B.R. 803-04 (concluding that the text of § 503(c)(3) clearly restricts its application to transactions outside of the ordinary course of business).

*The Bonus Plan Passes the Test under the Business Judgment Standard of Section 363*

Because the Bonus Plan is an ordinary course transaction, we need only see if it was taken in good faith and with sound business judgment.  See Nellson, 369 B.R. at 799.  I find that it was.

The Bonus Plan was designed before the filing of the petition and with the same parameters and under the same process as the previous bonus plans dating back to FY 2008.  The only changes to the Plan were made as a result of the F3 spinoff.  It was reasonable for the Compensation Committee to reduce the first target and increments because F3's sales would no longer be counted toward Blitz's EBITDA; as Flick testified, the total of F3's new bonus target ($1.75 million) and Blitz's new bonus target ($5 million) exceeds the combined company's previous target of $6 million. (Tr. 21, 123:5-12.)

Committee argues that the Board approval process was incomplete because the exact targets were not disclosed and no written analysis was presented, but it has produced no evidence showing that either of these facts demonstrates a lack of good faith or improper process.  Flick's testimony establishes that the Bonus Plan was approved under the same process as the bonus plans in prior years.  (Tr. 123:13-125:2.)

Likewise, the fact that the average payment per employee is higher than in prior years can be explained by the loss of F3 employees.  After the spinoff, the number of employees in Level 1, who would receive only 4 percent of their salary, dropped considerably.  Flick, who as the sole Level 5 employee would receive the largest single share of the bonus payments, remains a Blitz employee.  Comparing the total amount of bonus payments year over year illustrates this fact: the payments contemplated under the Bonus Plan are slightly less than the payments associated with hitting each target in FYs 2008 through 2011.  (Debtors' Exs. 4 & 5.)  This difference is due to the loss of personnel, particularly in Level 1.  (See Tr. 149:21-151:3, 191-92.)  Thus, Committee's argument that the contemplated payments under the Bonus Plan are too high is unfounded and unsupported by the evidence.

Committee also argues that the targets set in the Bonus Plan are not a stretch and are thus designed only to reward certain insiders before the company is liquidated.  To support its argument,

Committee points to a document containing several scenarios prepared in April 2012 by Zolfo Cooper, projecting year-end EBITDA ranging from $8.8 million to $23 million based on two variables, price and market share.  (Comm. Ex. 8.)  Despite these projections, both Flick and Maddock testified that Blitz only passed the $5 million EBITDA mark in April of 2012. (Tr. 27:18, 185:24-35.)  As of the date of the hearing, Blitz had not yet hit the second target and it was not guaranteed to do so.  (Tr. 28:4-7.)  Regardless of what scenarios were projected by Zolfo Cooper - well after the Bonus Plan targets were set by the Compensation Committee - Blitz's actual results show that it has just recently passed the first EBITDA target.  When the Bonus Plan targets were set, Blitz's budget for FY 2012 predicted year-end EBITDA of approximately $4.9 million.  (Tr. 24:6-8, Debtors' Ex. 2.)  Therefore $5 million was a stretch at the time the Bonus Plan was designed, in September 2011.

Committee makes much of the fact that, once the automatic stay went into effect upon filing of the bankruptcy petition, Blitz no longer had to incur the $10 million in product liability defense costs that it had listed in its budget.  This reduction in costs, argues Committee, should have been factored into the Bonus Plan in the form of higher EBITDA targets.  While the Compensation Committee certainly could have raised the EBITDA targets, I do not agree that the failure to do so invalidates the Bonus Plan as it currently stands.  The actual numbers demonstrate that EBITDA has not

skyrocketed due to the lack of defense costs. Further, the
bankruptcy itself may have had a negative impact on EBITDA, as
Blitz's sales figures are down from FY 2011 - some of this decrease
may be due to the bankruptcy filing.  (<u>See</u> Comm. Ex. 9, at 6.)
Blitz also recently raised the price of its gas cans by 85 percent,
which has had a negative impact on market share and thus sales. (Tr.
112, 126, 159.)  Committee argues that the failure to reduce the
target to account for the drop in defense costs rewards employees
for a result that was not due to their increased sales efforts.
This argument has no legs when one notes that Blitz did not move the
target downward once the defense costs spiraled from "below $5
million" in 2008 to more than $10 million in 2011.  (Tr. 177.)

        The Bonus Plan is intended to provide an incentive for
employees, who are informed of the Plan's targets and parameters
during their yearly review, and have no control over the rise and
fall of defense costs or the effects of the bankruptcy.  Further,
where, as here, the employees have known about the Plan since
October 2011 (Tr. 39), rewarding them for hard work already done and
encouraging them to continue working hard to fill existing orders
until operations cease at the end of July does not smack of bad
faith or unsound business judgment.  Therefore, I conclude that the
Bonus Plan satisfies the standard of § 363.

**Conclusion**

   For the reasons described above, I hold that the Bonus Plan is an ordinary course transaction made with sound business judgment and in good faith.  I will grant the Motion and authorize the payments associated with the first two EBITDA targets under the Plan.