1            IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3

  In re:                        ) Chapter 11
4                                )
  BLITZ U.S.A., INC., *et al.*,  ) Case No. 11-13603 (PJW)
5                                )
            Debtors.             ) (Jointly Administered)
6

7

                               Wilmington, Delaware
8                              September 11, 2012
                               2:04 p.m.
9

10

11           TRANSCRIPT OF AN ELECTRONIC RECORDING
            BEFORE THE HONORABLE PETER J. WALSH
12              UNITED STATES BANKRUPTCY JUDGE

13

  APPEARANCES:
14

  For the Debtors        DANIEL J. DeFRANCESCHI, ESQ.
15                        PAUL N. HEATH, ESQ.
                          AMANDA R. STEELE, ESQ.
16                        MARK A. KURTZ, ESQ.
                          RICHARDS LAYTON & FINGER
17

  For the Official       MARY E. SEYMOUR, ESQ.
18 Committee of          JEFFREY D. PROL, ESQ.
  Unsecured Creditors    LOWENSTEIN SANDLER, P.C.
19

  For Scepter Holdings,  EVELYN J. MELTZER, ESQ.
20 Inc.                   DAVID M. FOURNIER, ESQ.
                          PEPPER HAMILTON, LLP
21

  For Liberty Surplus    JOHN D. DEMMY, ESQ.
22 Insurance Corporation STEVENS & LEE, P.C.

23 For Chad Funchess,    WILLIAM D. SULLIVAN, ESQ.
  Chris and Holly Boling SULLIVAN HAZELTINE & ALLINSON, LLC
24

25

```
 1    (APPEARANCES CONT'D)

 2    For BOKF              MARGARET M. MANNING, ESQ.
                            KLEHR HARRISON HARVEY BRANZBURG LLP
 3                                    -and-
                            SAMUEL ORY, ESQ.
 4                          FREDERIC DORWART, LAWYERS

 5    For Kinderhook Capital  MATTHEW B. McGUIRE, ESQ.
      Fund, III              LANDIS RATH & COBB, LLP
 6
      For Central Hudson     LISA C. McLAUGHLIN, ESQ.
 7                          PHILLIPS GOLDMAN & SPENCE

 8    For Wal-Mart          ETTA R. MAYERS, ESQ.
                            POTTER ANDERSON & CORROON
 9
      For the Committee     FRANCIS A. MONACO, JR., ESQ.
10                         WOMBLE CARLYLE SANDRIDGE & RICE PLLC

11    For Endurance         JAMES S. YODER, ESQ.
      Specialty Holdings Ltd. WHITE AND WILLIAMS
12
      For the U.S. Trustee  RICHARD L. SCHEPACARTER, ESQ.
13                         OFFICE OF THE UNITED STATES TRUSTEE

14    (Telephonic Appearances - See Attached List)

15                           - - - - -

16    Audio Operator:       MICHAEL MILLER

17    Transcribed by:       JULIE H. PARRACK
                            894 Leeds Road
18                          Elkton, Maryland 21921
                            Ph: (410) 398-5967
19                          E-mail:  Jkparrack@yahoo.com

20          Proceedings recorded by electronic sound recording,

21    transcript produced by transcriptionist.

22                           - - - - -

23

24

25
```

1          THE COURT:  Please be seated.

2          MR. HEATH:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. HEATH:  Paul Heath of Richards, Layton & Finger on

5    behalf of the debtors.

6          Your Honor, we only have one item on today's agenda,

7    and that's the debtors' motion to sell certain assets.  And

8    thank you for accommodating our scheduling requests and moving

9    the hearing from this morning to this afternoon.  I do think

10   that the time helped us to reduce the number of open issues.

11   We still do have a few issues that are open at this time, but

12   hopefully we'll be able to work through those this afternoon

13   as well.

14         THE COURT:  Okay.  I'm not sure my secretary told you,

15   but I have a judges' meeting at 3.  So if we don't finish in

16   an hour, we'll have to come back after that, that meeting.

17         MR. HEATH:  Understood, Your Honor.  She did make us

18   aware of that.  And I do think at some point we probably will

19   need to take a break.

20         What I'd like to do, Your Honor, is make the debtors'

21   case in support of the sale and do that primarily by proffer,

22   two proffers by the debtors, and then I think an additional

23   proffer from the purchaser with respect to adequate assurance

24   of future performance.

25         THE COURT:  Okay.

1          MR. HEATH:  And then at that time, Your Honor, it may

2    make sense to take a break and give the parties an opportunity

3    to review some documents.  We have been putting together a

4    very brief amendment to the asset purchase agreement, and

5    we're using that amendment as, as, as the vehicle to resolve

6    certain of the objections that were raised by the

7    committees -- by the committee and others, and other parties.

8    And we hope that once parties have an opportunity to review

9    the final version of that, that it will further streamline the

10   number of open issues.

11          THE COURT:  Okay.

12          MR. HEATH:  As Your Honor may recall, on June 29th the

13   debtors filed a bidding procedures and sale motion to

14   establish a process for the sale of the debtors' assets.  On

15   July 17th the Court entered the bidding procedures order,

16   which, among other things, established a bid deadline and set

17   an auction date.

18          On August 23rd the debtors executed a stalking horse

19   agreement with Scepter Holdings, Inc.  On August 30th this

20   Court entered a supplemental bidding procedures order

21   approving certain bid protections.

22          The bidding procedures order established September 4th

23   as the deadline for the submission of bids.  No bids were

24   submitted -- no competing bids were submitted by the September

25   4th deadline, and accordingly, the debtors are here today

1   requesting the entry of an order approving the sale to

2   Scepter.

3         We did receive a handful of objections, and again,

4   with the Court's permission, I'd like to proceed with the

5   debtors' case in support of the sale motion, and then turn to

6   the objection.

7         THE COURT:  Okay.

8         MR. HEATH:  I have two brief proffers I would like to

9   make in support of the sale motion.  With me in the courtroom

10   today are Mr. Rocky Flick, president and chief executive

11   officer of Blitz U.S.A., and Mr. Scott Victor, managing

12   director of SSG Capital Advisors, LLC, the debtors' investment

13   banker.  And with the Court's permission, I'd like to proffer

14   their testimony.  They're both present in the courtroom and

15   available for cross-examination.

16         THE COURT:  Okay.

17         MR. HEATH:  I'll start with the proffer of Mr. Flick.

18   If called, Rocky Flick would testify as follows:  He is the

19   president and chief executive officer of Blitz U.S.A., Inc.,

20   and its affiliated debtors.  In such capacity, he is familiar

21   with the debtors' day-to-day operations, financial condition,

22   books and records and business affairs, as well as the events

23   leading up to the filing of these Chapter 11 cases, and the

24   debtors' entry into the asset purchase agreement with the

25   purchaser.

1        Mr. Flick would testify that on August 23, 2012, the

2   debtors and Scepter Holdings, Inc., entered into a stalking

3   horse asset purchase agreement, whereby Scepter agreed to

4   purchase certain of the debtors' assets.  Mr. Flick would

5   further testify that negotiations between the debtors and

6   Scepter were conducted at arm's length and in good faith.

7        Mr. Flick would further testify that the debtors

8   received no other competing qualified bids for the debtors'

9   assets by the bid deadline set forth in the bidding procedures

10  order.

11       Mr. Flick would testify that in the exercise of their

12  business judgment, in consultation with their advisors,

13  including SSG, the investment bankers retained by the debtors

14  to market substantially all of the debtors' assets, the

15  debtors have determined that the consideration offered by the

16  purchaser under the terms of the asset purchase agreement is

17  fair and reasonable, and represents the highest value offered

18  for the debtors' assets and will provide a greater recovery

19  for the debtors' estates than would be provided by any other

20  currently available alternative.

21       Mr. Flick would further testify that no other person

22  or entity or group of persons or entities has offered to

23  purchase the assets for an amount that would give equal or

24  greater economic value to the debtors than the value provided

25  by the purchaser pursuant to the asset purchase agreement.

1          Further, Mr. Flick would testify that there are

2    compelling circumstances to consummate the transactions

3    contemplated by the asset purchase agreement, and that such

4    action is an appropriate exercise of the debtors' business

5    judgment, and in the best interests of the debtors, their

6    estates, and their creditors.

7          Mr. Flick would further testify that such business

8    reasons include expiration of the debtors' ability to use cash

9    collateral on September 30, 2012, the asset purchase agreement

10   constitutes the highest and best offer for the assets, and the

11   asset purchase agreement represents the best opportunity to

12   maximize the value of the assets for the debtors and their

13   creditors.

14         Mr. Flick would testify that the proposed sale

15   transaction with the purchaser is the result of lengthy,

16   comprehensive efforts by the debtors, their management and

17   professionals to locate a potential purchaser for the assets.

18         Mr. Flick would testify that neither the purchaser,

19   nor any of its affiliates, officers, directors, members,

20   partners, principals or shareholders, or any of their

21   respective representatives, successors or assigns is an

22   insider of any of the debtors.  The debtors and the purchasers

23   do not share any officers, directors or controlling share of

24   stockholders.

25         He would further testify that to the best of his

1   knowledge, the debtors conducted an open and fair bidding

2   process in accordance with the Court's bidding procedures

3   order, with the debtors taking reasonable steps to address all

4   issues and questions that were raised during the bidding

5   process, and that no other entity has offered to purchase the

6   debtors' assets for greater economic value to the debtors than

7   that which is contained in the asset purchase agreement.

8          Therefore, the consummation of the proposed sale is in

9   the best interests of the debtors, their creditors, their

10  estates and other parties in interest.

11         Mr. Flick would further testify that the assumption

12  and assignment of the assigned contracts is integral to the

13  asset purchase agreement and is in the best interests of the

14  debtors and their estates.

15         Finally, Mr. Flick would testify that time is of the

16  essence in consummating this sale.

17         That would conclude the testimony of Mr. Flick.

18         THE COURT:  Okay.  Does anyone wish to cross-examine?

19         Okay, next?

20         MR. HEATH:  Next, Your Honor, I'd like to proffer the

21  testimony of Scott Victor.  If called to testify, Mr. Victor

22  would testify as follows:  He is a founding partner and the

23  managing director of SSG Capital Advisors, LLC.  I'll refer to

24  them as SSG.

25         Mr. Victor would testify that in June 2012 the debtors

1   engaged SSG as their investment banker to assist the debtors

2   related to a potential sale of substantially all the debtors'

3   assets.  Mr. Victor would further testify that under his

4   supervision, SSG led a targeted marketing process in

5   contemplation of a proposed sale of the debtors' assets.

6          Mr. Victor would reference and fully incorporated --

7   and fully incorporate his testimony from the bid procedures

8   hearing held on July 17, 2012, and the bid protections hearing

9   on August 30, 2012.

10         Mr. Victor would further testify that following the

11  bid procedures hearing, the Court entered an order approving

12  the bid procedures on July 17th.  He would further testify

13  that the order approving the bid procedures provided that bids

14  for the assets were due on or before September 4, 2012 at 5

15  p.m.  And to the extent necessary, an auction will be held at

16  the offices of Richards, Layton & Finger on September 6, 2012

17  at 10 a.m.

18         Mr. Victor would further -- would testify that on

19  August 23, 2012, the debtors and the purchaser, Scepter

20  Holdings, Inc., entered into the asset purchase agreement,

21  whereby the purchaser has agreed to purchase certain of the

22  debtors' assets.  Notwithstanding the extensive efforts of

23  SSG, the debtors did not receive any competing qualified bids

24  for their assets.

25         Given the absence of any competing qualified bid, the

1  debtors did not hold an auction on September 6th, and the

2  purchaser was designated as the highest and best bidder for

3  the debtors' assets in accordance with the bidding procedures.

4       Accordingly, Mr. Victor would testify that the asset

5  purchase agreement with the purchaser represents the highest

6  and best bid received for the debtors' assets, following an

7  extensive marketing process, and that the asset purchase

8  agreement offers fair and reasonable consideration for the

9  debtors' assets.

10       Mr. Victor would further testify that the asset

11  purchase agreement was proposed in good faith, and is the

12  result of arm's length negotiations between the parties, with

13  each side being separately represented by counsel in

14  connection with the negotiation of the purchase agreement.

15       Finally, Mr. Victor would testify that the debtors'

16  marketing process, the bidding procedures and the timeline

17  established thereunder provided adequate and sufficient notice

18  to prospective purchasers that may have wished to bid on the

19  purchased assets.

20       That would conclude Mr. Victor's proffer.

21       THE COURT:  Does anyone wish to cross-examine?  Okay.

22       MR. HEATH:  Your Honor, we have one, I think it will

23  be a proffer, further proffer, in support of the sale motion,

24  and that would be the proffer of a representative of Scepter,

25  Your Honor, in connection with their adequate assurance of

1   future performance.

2          THE COURT:  Okay.

3          MS. MELTZER:  Good afternoon, Your Honor, Evelyn

4   Meltzer of Pepper Hamilton on behalf of Scepter Holdings, Inc.

5          Your Honor, with your permission, and unless any party

6   in interest objects, I'd like to proffer the direct testimony

7   of Christopher Luck, the chief financial officer of Scepter

8   Holdings, Inc.  Mr. Luck is in the courtroom today and is

9   available for cross-examination.

10         THE COURT:  Okay.

11         MS. MELTZER:  Thank you, Your Honor.

12         Christopher Luck is competent to testify, and if

13  called to testify today as a witness, would testify

14  substantially, under oath, as follows:  Mr. Luck would testify

15  that he is the chief financial officer of Scepter Holdings,

16  Inc., a Canadian company, a position he has held since 1999.

17  In his role as chief financial officer of Scepter, Mr. Luck is

18  responsible for all of the financial aspects of the business.

19  Mr. Luck is generally familiar with the operations and

20  financial performance and condition of Scepter.

21         General information.  Mr. Luck would testify that

22  Scepter is a holding company which conducts operations through

23  its wholly owned subsidiary, Scepter Corporation.  Scepter

24  Corporation specializes in designing and manufacturing unique

25  molded plastic products and has over 95 million in annual

1   revenue.  Scepter Corporation's EBITDA for fiscal year 2012 is

2   estimated to be 20.2 million.  Scepter Corporation has

3   approximately 250 employees and has its main office and only

4   manufacturing facility in Toronto, Canada.

5        Mr. Luck would testify that Scepter Corporation has a

6   proud history as an innovator in the molded plastic products

7   industry.  Scepter Corporation introduced the first plastic

8   jerrycans to North American markets, and designed and

9   manufactured the first dairy plastic cases and the first

10   curbside recycling containers.

11        Moreover, Scepter Corporation played a leading role in

12   converting the marine industry -- excuse me -- to classic

13   remote outboard engine drill tanks, and introduced advanced

14   plastic packaging for heavy-caliber military ammunition.

15        The asset purchase agreement.  Mr. Luck would testify

16   that Scepter is the purchaser under that certain asset

17   purchase agreement dated August 23, 2012, by and between

18   Scepter, Blitz U.S.A., Inc., and Blitz RE Holdings, LLC.  The

19   APA contemplates the acquisition by Scepter, or its assignee,

20   of certain assets of the debtors, Blitz U.S.A., Inc., and

21   Blitz RE Holdings, LLC, which I'll refer to as the assets.

22   Additionally, the APA contemplates the assumption and

23   assignment of the certain contracts and leases to Scepter for

24   its assignee.

25        Mr. Luck would further testify that he has been

1   actively involved in due diligence and negotiations leading up

2   to the proposed sale transaction that is before the Court

3   today.  The sale process, sale and sale price were not tainted

4   by fraud, collusive bidding or other misconduct, and all

5   negotiations with the debtors were vigorous, extensive and

6   conducted at arm's length and in good faith, with the parties

7   being represented by separate legal counsel.  There is no

8   agreement between Scepter and any other party to control the

9   sale price for the assets.

10       Adequate assurance and future performance.  Mr. Luck

11   would testify that pursuant to Section 13.9 of the APA,

12   Scepter has the right to assign its rights under the APA to

13   one or more of its affiliates.  Eco 1 Holdings, Inc., a

14   Delaware corporation, and a wholly owned subsidiary of

15   Scepter, is in the process of forming two wholly owned

16   subsidiaries for this purpose, which assignments will be

17   effectuated at or prior to closing on the sale transaction.

18   Specifically, one entity, which we'll refer to as Leasco, will

19   acquire the real property and the tangible personal property

20   from the debtors.  The other entity, Opco, will acquire the

21   assumed contracts, leases, intellectual property and remaining

22   assets from the debtors.

23       Mr. Luck would further testify that Scepter has

24   received commitments for debt financing from Leasco and Opco

25   from HSBC Bank Canada, in an amount up to $12 million, which

1    amount will be used to fund the 9.5 million purchase price and

2    provide working capital for operations.  Scepter Corporation

3    shall serve as guarantor of the debt financing being provided

4    by the bank, and Leasco and Opco will pledge the assets to

5    secure the loan facility.  Leasco and Opco's financial

6    projections reflect that the bank financing, coupled with cash

7    flow from operations, will afford ample liquidity to meet the

8    cash needs of these companies over the next 12-month period.

9         No successor liability.  Mr. Luck would testify that

10   Scepter Corporation currently manufactures its own distinct

11   line of gas products, and Scepter Corporation and its

12   affiliates intend to continue manufacturing their own distinct

13   line of gas products going forward.  The assets being

14   purchased will be reconfigured to manufacture Scepter

15   Corporation's distinct line of products.  Neither Scepter,

16   Scepter Corporation, Opco, nor Leasco, will manufacture,

17   produce, distribute or sell any products sold by the debtors.

18        Mr. Luck would further testify that there is no, and

19   there will be no, continuity of the debtors' business

20   enterprise through the debtors' management, operations or

21   customer base, and there is no common identity of

22   incorporators, officers, directors or material stockholders

23   between Scepter or its assigns and any of the debtors or their

24   estates.

25        The APA does not require Scepter to hire any of the

1   debtors' employees or provide for Scepter to assume, nor shall

2   Scepter assume, any obligations to the debtors' employees.

3   Any employee who is retained by Scepter or its assigns will be

4   hired under a new employing contract or other employment

5   arrangement.

6       The assets include only those limited assets

7   specifically set forth in the APA, and do not include any of

8   the debtors' logos, trademarks or other goodwill, including

9   any intellectual property used at any time to manufacture,

10   produce, distribute or sell the debtors'  products, other than

11   intellectual property related to the Handi Flow Spout design,

12   and certain third-party licenses.

13       Mr. Luck would further testify that Scepter would not

14   have agreed to the proposed sale transaction that is before

15   the Court today if Scepter or its assigns could be held liable

16   for claims against the debtors under any theory of successor

17   liability, de facto merger, substantial continuity, or similar

18   theories, including, but not limited to, any warranty claims,

19   tort claims, or other obligations to any person or entity

20   relating to the quality, merchantability or safety of, or

21   involving a claim of breach of warranty or defect in, any

22   product or service purchased, manufactured, sold, or performed

23   by the debtors.

24       Your Honor, that is Mr. Luck's proffer.

25       THE COURT:  Okay.  Does anyone wish to cross-examine?

1          Okay.

2          MS. MELTZER:  Thank you.

3          MR. HEATH:  Your Honor, that would, that would

4    conclude the debtors' case in support of the sale motion.  As

5    I referenced earlier, we did have a handful of objections.

6    Three formal objections were listed on the agenda, as well as

7    a prior reservation of rights on behalf of the Committee.

8          We also received two informal objections, one from

9    Hopkins Manufacturing Corporation, and you may recall that

10   Hopkins was the purchaser of the debtors' F3 business.  Your

11   Honor approved that sale earlier this year.  Hopkins requested

12   that we add language to the sale order making it clear that

13   certain agreements we entered into with Hopkins in connection

14   with that Court-approved sale were not affected by this sale

15   order.  And we've added language that's acceptable to Hopkins,

16   and I'll provide Your Honor with a blackline.

17         Additionally, we received an informal objection from

18   the Environmental Protection Agency, making it clear that

19   certain rights of the EPA were not affected by the sale order.

20   Again, we've resolved that issue to the satisfaction of the

21   EPA.

22         Your Honor, that leaves the objections of Liberty

23   Surplus Insurance Corporation, the Official Committee of

24   Unsecured Creditors, and Chad Funchess and Chris and Holly

25   Boling.  I think we've made substantial progress with respect

 1   to those three objections.  And as I'd indicated earlier,

 2   we've prepared a brief -- a short amendment to the APA that I

 3   think addresses some of the provisions of the asset purchase

 4   agreement that may not have been the model of clarity.

 5         So I think now may be a good time to take a break.  I

 6   think Mr. Fournier has prepared that amendment and has a clean

 7   that we could share with parties.  And it may be, Your Honor,

 8   that if we had 20 minutes or maybe until quarter of, we might

 9   be in a position to come back in and, and, and deal with any

10   remaining cleanup issues before Your Honor's meeting.

11         UNIDENTIFIED SPEAKER:  And they're being delivered

12   now.

13         MR. HEATH:  They're being delivered now, so I guess

14   during that time we'll not only have to receive them, but

15   we'll have to work through those with parties.

16         Before Your Honor leaves the bench, I do have a

17   blackline of the form of order, if you'd, if you'd like to

18   sign it.  May I approach?

19         THE COURT:  Okay.  Yes.

20         MR. HEATH:  Your Honor, in that blackline, in

21   paragraphs 26 and 28, we've added the language that I

22   referenced earlier with respect to the Hopkins --

23         THE COURT:  Hold on.  26 and 28?

24         MR. HEATH:  Yes, Your Honor.

25         THE COURT:  Okay.

1      MR. HEATH:  That's the agreed upon language that we've

2   added to address the concerns of Hopkins in the APA.  Again,

3   Your Honor, counsel for Hopkins and representative of the EPA

4   have signed off on that language.

5      So with that, Your Honor, if we could take a short

6   break to see if we can resolve the remaining issues.

7      THE COURT:  How much time do you want to take?

8      MR. HEATH:  I think if we could come back at quarter

9   of, maybe we'd be in a position, maybe I'm being overly

10  optimistic, to, to at least announce that maybe we've resolved

11  all the issues or deal with any statements that we need to

12  make on the record.

13      THE COURT:  Okay, all right.  We'll reconvene at that

14  time.

15      MR. HEATH:  Thank you, Your Honor.

16      (A recess was taken from 2:24 p.m. to 2:46 p.m.)

17      THE COURT:  Please be seated.

18      Yes?

19      MR. HEATH:  Good afternoon, Your Honor.  Paul Heath on

20  behalf of the debtors.

21      I think that our time was used wisely, and I think

22  that with some statements that I need to make on the record

23  and some language that we need to add to the amendment and the

24  order, we are fully resolved with respect to the objections.

25      The Committee -- I'm sorry, Scepter wants to add one

1   addition to the proffer they made earlier, so I'll let

2   Ms. Meltzer address the Court.

3           THE COURT:  Okay.

4           MS. MELTZER:  Thank you.  Evelyn Meltzer again, for

5   the record.

6           The Committee asked us to put the following statement

7   on the record, which we agreed to do so.

8           There is no common identity of stockholders between

9   Scepter Holdings, Inc., Scepter Corporation, Eco 1 Holdings

10  Inc., Leasco, Opco, or any other affiliate of such entities

11  and the debtors, including the non-debtor Kinderhook entities.

12          Thank you, Your Honor.

13          THE COURT:  Okay.

14          MR. HEATH:  Your Honor, if I, if I may, I'd like to

15  address the objection of Chad Funchess and Chris and Holly

16  Boling first.  Mr. Sullivan is here on behalf of them today.

17          Primarily, Your Honor, the objection is concerned with

18  the preservation of documents of the debtors' documents.  And

19  the APA again, Your Honor, may not have been as clear as it

20  should have been with respect to that.

21          The only documents that Scepter is interested in

22  having copies of are documents related to the purchased

23  assets, documents that would relate to the purchased

24  equipment, maybe their user manuals or records regarding

25  maintenance, things like that, documents related to the real

1  property, environmental reports, title reports, things like

2  that.

3       Scepter has no interest in, in obtaining possession of

4  any documents related to personal injury claims, and they've

5  been very clear about that.  And the debtors are going to

6  continue to maintain and preserve all documents.  In

7  connection with the sale, we are going to be providing certain

8  documents to Scepter, documents related to the purchased

9  assets.  The debtors will maintain copies of all documents

10  that are provided to Scepter under the asset purchase

11  agreement, and the debtors will continue to maintain the full

12  universe of all documents in the case.

13       Mr. Sullivan has asked me to put on the record, and

14  because we've agreed to do this, that I think we have three

15  employees left at this point, Your Honor, and he'd like to

16  know that at least one of those employees has been designated

17  as sort of the point person with respect to the documents.

18  And, and we're, we're fine with doing that, Your Honor.

19  Miriam George is one of the employees that remains with the

20  debtors, and we are authorized to name her as the point person

21  with respect to the documents.  And obviously the debtors will

22  be continuing to preserve all documents.

23       To the extent that Miss George were to transition to

24  different employment, we will identify another person who will

25  be the primary point person with respect to the documents.

1         Additionally, Your Honor, between today and closing,

2    the debtors are going to endeavor to put together a list of

3    all of the locations where documents are stored and all of the

4    sometimes third-party service providers that are, that are,

5    that are holding documents.  And we're going to provide that

6    list to the Committee.

7         And Mr. Sullivan has asked me to put on the record

8    that what we'll do, I think we have a hearing scheduled for

9    September 25th, we'll have a status conference at that time as

10   part of the hearing to update the Court with respect to

11   whether or not we've provided that list to the Committee.

12        And I think, Your Honor, with those representations --

13   maybe not.

14        MR. SULLIVAN:  Your Honor, Bill Sullivan on behalf of

15   Chad Funchess and Chris and Holly Boling.

16        Your Honor, Mr. Heath and I had several conversations

17   back and forth today.  There are a couple points I would just

18   like to clarify or elaborate on.  But he got the essentials

19   correct, and I certainly don't mean to stand up to object

20   further.  I think we have basically resolved the document

21   preservation issues for now, which are of essential importance

22   to my clients and to other tort claimants out there whose

23   cases have now been stayed for nine months.

24        My clients, Chad Funchess and Chris and Holly Boling,

25   have stay relief motions pending, but they were not pressed

1    pending the mediation on September 4th.

2         Your Honor, the objection that we filed has raised

3    four or five essential points with respect to the preservation

4    of documents in this case.  The first was we asked for a

5    document custodian to be designated.  They've indicated that

6    Miss George will be designated as the person responsible for

7    maintaining the debtors' documents.

8         Your Honor, we asked for the preservation of all

9    records that currently exist, both hard copies and electronic

10   copies.  Mr. Heath confirmed that the full universe of

11   documents that currently exist will be preserved.

12        An item we discussed but he skipped over was the

13   electronic records.  And with respect to electronic records, I

14   would note that the amendment to the APA at schedule -- at

15   paragraph 7 removes the 10 servers that were listed as

16   purchased equipment from the purchased equipment list.  So it

17   is our understanding now that the purchaser is not acquiring

18   any of the servers or computers that the debtor used in the

19   conduct of its business and which may have records relevant to

20   the litigation that is pending.

21        And with that, Your Honor, and with the understanding

22   that I also discussed with Mr. Heath, that the preservation of

23   electronic records doesn't mean just putting the computer into

24   a storage closet, but also making sure that the computers and

25   the electronic records remain functional and retrievable and,

1   and that's understood with the concept of preserving the

2   electronic records and that was agreed to.

3          Your Honor, with respect to protection and reservation

4   of documents going forward, Mr. Heath confirmed that if Miriam

5   George leaves her employment with the debtors, someone else

6   will be designated as the person responsible for documents.

7          Another point that we discussed was that if Miss

8   George, or whoever is the, is the person responsible for the

9   documents, determines that there is inadequate personnel to

10  maintain the documents and records, that the Committee and/or

11  the tort claimants would be alerted so that if additional

12  personnel need to be retained for that purpose, the parties

13  can address that, either as some sort of document management

14  vendor or individual persons.

15         And lastly, Your Honor, something that was mentioned

16  in our objection, and that we, we did not discuss

17  specifically, but the objection requested that there be no

18  destruction of any documents without notice to the parties who

19  are litigants in state court matters.

20         With respect to -- so that is the, the complete set,

21  according to my notes, of protections that the parties have

22  discussed, and we wanted to put those on the record.

23         In order to make sure that this works, there are a lot

24  of moving parts here, we requested, the debtor agreed, to hold

25  a status conference on September 25th, and I only wanted to

1  add with respect to that that it wouldn't just be reviewing

2  the list, but any of the issues that may arise or that may be

3  raised in sort of monitoring this going forward we would be

4  able to address at that conference.  I'm not trying to predict

5  what would be there, but they have agreed to provide us a

6  listing of where the documents are, and the parties would

7  expect to have further discussions on those issues.

8        Your Honor, our objection also requested the

9  deposition of someone for the authentication of documents now

10  that the debtor is going out of business.  With respect to

11  that matter, we'll leave that for another day and not address

12  the Court further on that today.  For today I think we've

13  gotten the, the preservation of document issues, the urgent

14  issues addressed, and we'd like to go forward.

15        THE COURT:  Okay.

16        MR. HEATH:  Your Honor, we're going to be preserving

17  all the documents.  We're not going to destroy any documents,

18  and I think otherwise we're clear with respect to the

19  resolution.

20        Turning next, Your Honor, to the objection of Liberty

21  Surplus Insurance Corporation, Mr. Demmy is here on behalf of

22  Liberty.  Your Honor, we've added language to the APA

23  amendment that we discussed which makes it clear that we're

24  not assuming and assigning any insurance policies in

25  connection with this asset purchase agreement, that we're only

1   attempting to deal with loss regarding, you know, the

2   purchased assets and the payment of any proceeds for claims

3   made under those policies to purchaser in accordance with the

4   terms of the asset purchase agreement.

5          We've added language to both the order and to the

6   amendment that addressed the concerns raised by Mr. Demmy.

7          MR. DEMMY:  Your Honor, John Demmy, Stevens & Lee for

8   Liberty.

9          That's correct.  Ms. Steele was furiously writing as

10  Your Honor took the bench.  I would just like an opportunity

11  to look at what's been written, but I'm sure it's acceptable.

12  And if it is, we would certainly withdraw our objection,

13  because I think, as Mr. Heath accurately stated when we

14  discussed, they're not actually seeking to assign policies or

15  rights or even proceeds, but they're simply entering into a

16  contractual obligation with the buyer to turn over proceeds to

17  the extent provided, and there would be no change in

18  connection with the seeking or payment of those proceeds under

19  the policies.

20         Thank you, Your Honor.

21         MR. HEATH:  Your Honor, the last objection is the

22  objection of Committee.  Your Honor, I believe that we have

23  addressed all of the concerns of the Committee in either the

24  sale order or the amendment to the asset purchase agreement.

25         I know I'm running out of time, so what I'm going to

1    provide to Your Honor before you leave the bench is a clean of

2    the sale order.  There are two paragraphs that have been added

3    at the end of the sale order:  One to make clear the

4    reservation of rights regarding Mr. Demmy's client, the

5    insurance carrier; and two, Your Honor, to make clear that we

6    have the obligation to pay any received insurance proceeds

7    within three business days to the purchaser.

8         With that, Your Honor, I think that the Committee may

9    want to address Your Honor with respect to the proceed -- the

10   payment of proceeds issues that were raised in their

11   objection.  But if I may approach with the clean, Your Honor?

12        THE COURT:  Okay.

13        MR. HEATH:  Thank you.

14        Your Honor, I'm going to wait a second because I need

15   to attach the amendment to the back of the sale order.  The

16   sale order has the asset purchase agreement as an exhibit, and

17   the amendment will be attached to the back of the asset

18   purchase agreement.

19        THE COURT:  Okay.

20        MS. SEYMOUR:  Good afternoon, Your Honor.  Mary E.

21   Seymour, Lowenstein Sandler, on behalf of the Official

22   Committee of Unsecured Creditors.

23        Your Honor, as, as Mr. Heath has indicated, many of

24   the objections raised by the Committee in the -- with regard

25   to the language of the APA or various provisions in the APA

1  have now been addressed and resolved to the Committee's

2  satisfaction in the amendment.

3       I know that there was one handwritten comment, I'll

4  wait to see it.  But I know in paragraph 3, section 2.1(k) of

5  the amendment that just was circulated by Mr. Fournier, there

6  is an additional entity that needs to be added, "Customers,"

7  and we'll just make sure that that's added.  But what was just

8  provided to us does resolve everything with that additional

9  inclusion of "Customers."

10       One other statement that I think Mr. Heath and I have

11  discussed, and I just want to make sure it's on the record,

12  addresses Section 13.10 of the asset purchase agreement, and

13  that's entitled "Non-recourse."  If I could just have

14  Mr. Heath address that, and then I'll finish up with the last

15  open issue.

16       MR. HEATH:  Your Honor, Section 13.10 is only -- is

17  intended to be only -- it's a provision that only addresses

18  the sellers and the purchasers.  It's not intended to be a

19  release in any way by the debtors of any, any, any directors,

20  officers or other entities, Your Honor.

21       THE COURT:  Okay.

22       MS. SEYMOUR:  Thank you, Paul.

23       Your Honor, that leaves us with one last issue for

24  the, for the Committee that was addressed in the objection,

25  and that is, Your Honor, how we deal with the proceeds of the

1   sale.

2        Scepter is requiring the 14-day -- they're not waiving

3   the 14-day appeal period.  So if the order is entered today,

4   then we would not be closing before 14 days from today, which

5   would bring us pretty close to the September 25th hearing,

6   Your Honor.

7        One issue that has been discussed among the debtors,

8   the Committee and the lenders is how do we address the sale

9   proceeds and the distribution of the sale proceeds upon

10  closing.  And while we've had a lot of discussions today and

11  have made some more progress, we're not at a point today, Your

12  Honor, where we could put something forward or add something

13  in the sale order with respect to the distribution of

14  proceeds.

15       And I think it's -- I don't want to speak for any of

16  the debtors or the lenders, but it's the Committee's

17  understanding, Your Honor, that we would continue to work on

18  the distribution of the proceeds and how they will be

19  allocated upon closing, and we would come back to Your Honor

20  on the 25th with either perhaps a consent order that resolves

21  that issue, or come back to Your Honor to address that with

22  you, if that would be acceptable.

23       And again, I'll just -- if lender's counsel has

24  anything more to add to that, I'll cede the podium.

25       MR. DeFRANCESCHI:  Your Honor, Dan DeFranceschi for

1    the debtors.

2           From the debtors' perspective, that's correct on the

3    application of the proceeds.  We are working with them on that

4    as well.  And I'll let Mr. Ory address for the bank.

5           THE COURT:  And the resolution of that is scheduled

6    for the 25th?

7           MR. DeFRANCESCHI:  Well, that's when we would want

8    to --

9           THE COURT:  Okay.

10          MR. DeFRANCESCHI:  -- do it.  Unless we can come up

11   with something before then that we would submit.  But yes, the

12   25th.

13          THE COURT:  Okay, well, if it's not resolved, I would

14   like to see a response by the lender to the Committee's

15   position.

16          MR. ORY:  Sam Ory, Your Honor, on behalf of BOKF doing

17   business as Bank of Oklahoma.  And we'd be happy to file a

18   response if we can't get it resolved.

19          The only thing I think I would add to the record

20   today, I think the debtor and the Committee, as we discussed,

21   are both agreed, and I just want to put the Court's mind at

22   rest, given the pleadings that were filed, that provided the

23   sale closes as contemplated in the -- in what's been submitted

24   to Your Honor today, the proceeds of that sale, plus the cash

25   on hand of the debtor to date, will pay -- will be sufficient

1    to pay, and I'm not saying that this is what we're going to

2    do, but it would be sufficient to pay the debtor the bank's

3    claims in full, pay all accrued administrative expenses

4    accrued through to date in full, and leave, at the latest

5    estimate, at least 1.2 million in cash, plus the outstanding

6    accounts receivable that could be collected, plus what other

7    assets and claims the estate has.  So there is no risk of

8    administrative insolvency through the date of the 25th when

9    we're coming back or --

10          THE COURT:  Okay.

11          MR. ORY:  And there's, there's money left over.

12          THE COURT:  Okay.

13          MR. HEATH:  Your Honor, I'm sorry.  We went over

14   with -- I was premature in saying I would hand the order to

15   Your Honor.  I think it's probably appropriate for me to let

16   parties at least review the language that we, we handwrote in,

17   and if -- with the Court's permission, I'll give that to your

18   clerk?

19          THE COURT:  Well, look, I don't think my meeting with

20   the other judges is going to be more than a half hour.

21          MR. HEATH:  Okay.

22          THE COURT:  So why don't we just say reconvene at

23   quarter of 4?

24          MR. HEATH:  Okay.  We can do that, Your Honor.

25          THE COURT:  Okay.

1           MR. HEATH:  Thank you.

2           THE COURT:  All right.  We stand in recess.

3           (A recess was taken from 3:03 p.m. until 3:48 p.m.)

4           THE COURT:  Please be seated.

5           Yes?

6           MR. HEATH:  Good afternoon, Your Honor.  Paul Heath of

7      Richards, Layton & Finger on behalf of the debtors.

8           Your Honor, may I approach with a clean of the sale

9      order?

10          THE COURT:  Yes.

11          MR. HEATH:  Attached to the sale order is the asset

12     purchase agreement, and at the back of the asset purchase

13     agreement is the amendment that we've been discussing, and

14     I've tabbed some portions for Your Honor.

15          THE COURT:  Okay.

16          MR. HEATH:  The first tab, Your Honor, are the two

17     paragraphs that we discussed, language that we added to deal

18     with the Liberty Insurance issue, and language that we added

19     regarding the payment of proceeds from any claims made with

20     respect to insurance policies for the purchased assets.  I

21     think those are new paragraphs, 36 and 37.  All parties have

22     reviewed those new paragraphs and signed off on them.

23          THE COURT:  Okay.

24          MR. HEATH:  And the second tab, Your Honor, is the

25     amendment that we've been discussing this afternoon.  And the

1    amendment primarily addresses issues with respect to the asset

2    purchase agreement that weren't necessarily clear to all

3    parties.

4         And, Your Honor, as we -- as you look at the

5    amendment, the first change you'll see is with respect to

6    purchase contracts.  The Committee had asked Your Honor

7    that -- to limit the ability to add contracts to the purchase

8    contracts list.  And the only potentially assignable contracts

9    would be those that were noticed pursuant to the assumption

10   notices that were sent out.

11        THE COURT:  Okay.

12        MR. HEATH:  That's the first issue.  The second issue,

13   Your Honor, is with respect to the definition of purchase

14   documents.  We've added language to make it clear what the

15   universe of purchase documents are.  And we've made a

16   corresponding change, you'll see in No. 3, Your Honor, to take

17   out the description of the purchase documents --

18        THE COURT:  Okay.

19        MR. HEATH:  -- since we now have that defined term.

20        At the bottom of page 2, it's identified as 2.1(k),

21   Your Honor, we've added language to make it clear that with

22   respect to avoidance actions, they can -- they're limited to

23   against trade vendors, and that such avoidance actions for the

24   avoidance of doubt do not include any claims, rights or causes

25   of action, including, but not limited to, breach of fiduciary

1  duty claims, avoidance actions, or any other claims against

2  any present or former officer, director, manager, parent,

3  subsidiary, affiliate, shareholder member, partners, customers

4  or principals of any of the debtor.  We never intended to

5  transfer those actions, but we're just making it clear at the

6  request of the Committee.

7          2.1(l), Your Honor, addresses the insurance proceeds

8  issue and makes it clear, Your Honor, or is making it clear

9  that we're not assuming and assigning any of these policies,

10  we're only dealing with proceeds.

11         THE COURT:  All right.

12         MR. HEATH:  Your Honor, we had a reserve section that

13  was dealing with a Toyota lease.  I think that we've just

14  deleted that provision to make it clear that that's not part

15  of the asset sale.

16         Section 5, Your Honor, the inspection of purchased

17  equipment, that's cleaning up just language that was

18  unnecessary in the header for that section.

19         No. 6, Your Honor, again deals with the insurance

20  proceeds.  And as we discussed earlier with Mr. Demmy, that

21  we're not affecting anything -- we're not assuming and

22  assigning any of those insurance policies or any agreements

23  related thereto, and we're not otherwise affecting what those

24  policies may provide for the rights and respective obligations

25  between the debtors and the insurers.

1      And I believe, Your Honor, that the rest of the

2  changes are just provisions, Your Honor, that would be

3  standard to any asset purchase agreement regarding other

4  provisions remain effective, counterparts binding affecting

5  governing law.

6      One other, one other provision I should note, Your

7  Honor, is No. 7 in the amendment does make it clear, Your

8  Honor, that the agreement is amended to remove the 10 servers

9  that were originally listed on the purchased equipment list.

10     THE COURT:  Okay.

11     MR. HEATH:  Unless Your Honor has any questions.

12     THE COURT:  I have no questions.

13     MR. HEATH:  I think that states our -- the resolution

14  of all the issues.

15     THE COURT:  Okay.  I'll do a final review and

16  hopefully we'll get it docketed today.

17     MR. HEATH:  Thank you very much, Your Honor.  Thank

18  you again for accommodating our scheduling needs.

19     THE COURT:  Okay.  We stand in recess.

20     (The hearing was adjourned at 3:53 p.m.)

21           C E R T I F I C A T I O N

22     I, Julie H. Parrack, transcriber, certify that the
   foregoing is a correct transcript, to the best of my ability,
23  from the official electronic sound recording of the
   proceedings in the above-entitled matter.

24

   /s/Julie H. Parrack          September 12, 2012
25  Julie H. Parrack